## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| **JULIE CANNELL, Individually; and RUSS SHENOUDA, Individually and On Behalf of All Those Similarly Situated,** Plaintiffs, | **Case No.** |
| **v.** | **JURY TRIAL DEMANDED** |
| **STERIGENICS U.S., LLC and GTCR LLC,** Defendants. | |

## NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1331, 1332, 1441 & 1446, Defendant Sterigenics U.S., LLC ("Sterigenics"), hereby removes to this Court the above-styled action, pending as Case No. 2018L010183 in the Circuit Court of Cook County, Illinois ("the Action"). In support of this Notice of Removal, Sterigenics states as follows:

### I.    INTRODUCTION.

1.    The Action is properly removed to this Court pursuant to the federal removal statute, 28 U.S.C. § 1441, because: (i) the Action is pending in the Circuit Court of Cook County, Illinois, which is within the Northern District of Illinois, Eastern Division, 28 U.S.C. § 93(a)(1); (ii) the Court has both diversity jurisdiction and original federal jurisdiction over the Action; and (iii) the procedural requirements for removal set forth in 28 U.S.C. § 1446 and 28 U.S.C. § 1453 are satisfied.

2.    More specifically, this Court has diversity jurisdiction under 28 U.S.C. § 1332(a), because complete diversity of citizenship exists as between Plaintiffs Julie Cannell and Russ Shenouda ("Plaintiffs") and Sterigenics.  Defendant GTCR LLC ("GTCR") is fraudulently

joined to the Action, thus its citizenship should be disregarded for purposes of determining diversity. This Court also has original federal jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because the putative class includes more than 100 members, the parties are minimally diverse, and the amount in controversy exceeds $5 million. Additionally, this Court also has original federal jurisdiction under 28 U.S.C. § 1331, as the Action arises under federal law.

## II.    FACTS.

3.    On September 20, 2018, Plaintiffs filed their Complaint in the Circuit Court of Cook County, Illinois. That same day, Plaintiffs filed their First Amended Class Action Complaint in the Circuit Court of Cook County, Illinois. The First Amended Complaint was served with summons upon Sterigenics on September 21, 2018. On October 12, 2018, Plaintiffs filed a Second Amended Class Action Complaint (Compl.). The Second Amended Class Action Complaint was served upon Sterigenics on October 17, 2018. A copy of the Complaint is attached as Exhibit A. This case arises out of an August 21, 2018, report issued by the federal government's Agency for Toxic Substances and Disease Registry ("ATSDR") concerning emissions of ethylene oxide in Willowbrook, Illinois, where Sterigenics operates a contract sterilization facility (the "Willowbrook facility"). A copy of this report is attached as Exhibit B. The ATSDR's report was published by the U.S. Environmental Protection Agency ("USEPA") on its public-access website on August 22, 2018.[1]

---

[1] *See Evaluation of Potential Health Impacts from Ethylene Oxide Emissions*, U.S. DEP'T OF HEALTH AND HUM. SERVICES 1 (August 21, 2018), https://www.atsdr.cdc.gov/HAC/pha/sterigenic/Sterigenics_International_Inc-508.pdf.

A. **Background on Sterigenics and Ethylene Oxide.**

4. Sterigenics is a leading provider of state-of-the-art sterilization services. Ethylene oxide, a gas, is a heavily regulated chemical. As detailed here, Sterigenics' use of ethylene oxide at the Willowbrook facility is subject to federal regulations promulgated by USEPA and the federal Food and Drug Administration ("FDA"), as well as Illinois regulations promulgated by the Illinois Environmental Protection Agency ("IEPA"). Sterigenics' Willowbrook facility is operating legally and in compliance with applicable regulations. Indeed, Sterigenics' Willowbrook facility not only meets federal and state standards, but exceeds them. (Declaration of Kathleen Hoffman ("Hoffman Decl.") ¶¶ 2, 5 (attached as Exhibit. C).)

5. Sterigenics primarily contracts with healthcare products companies to sterilize medical devices, medical equipment, and surgical kits sold or used by those customers. The FDA regularly inspects[2] Sterigenics' facilities, including the Willowbrook facility, given the importance of sterilization as a final step in the production and preparation of medical and surgical products in the U.S. (*Id.* at ¶¶ 3–4.)

6. Ethylene oxide is critical to the healthcare industry. Over 50% of the medical devices and nearly 90% of the surgical kits[3] used in patient procedures in the U.S. are sterilized by ethylene oxide. According to the Ethylene Oxide Sterilization Association, ethylene oxide sterilizes over 20 billion medical devices each year in the United States alone. (*Id.* at ¶ 5.)

---

[2] *See Compliance Policy Guide Section 100.550 Status and Responsibilities of Contract Sterilizers Engaged in the Sterilization of Drugs and Devices*, U.S. FOOD & DRUG ADMIN., https://www.fda.gov/ICECI/ComplianceManuals/CompliancePolicyGuidanceManual/ucm073824.htm (last visited October 18, 2018).

[3] A "surgical kit" refers to the set of instruments a surgeon uses during an operation. This may include scalpels, clamps, surgical staplers, drills, and other equipment such as the sterilized gowns and drapery used during the procedure. (Hoffman Decl. ¶ 3.)

7.     The Willowbrook facility, like many ethylene oxide sterilization process plants, is the sole sterilization facility for a number of medical device companies in the Midwest. On an average day, the Willowbrook facility sterilizes 1,000 cardiac devices used in heart surgery, 1,000 knee implants, 1,500 surgical procedure kits, 16,000 catheters, 11,000 syringes for injections used in radiology diagnosis, and thousands of diabetes monitoring and care kits, renal care products, neurosurgical devices, and respiratory care products. (*Id.* at *¶* 6.)

8.     For the vast majority of single-use medical devices, complex implantable devices, and surgical kits, ethylene oxide sterilization is widely used because it is the only practical, FDA-approved sterilization method available. While heat and radiation can sometimes be used for sterilization, those processes degrade plastics and other synthetic materials that are widely used in medical devices and surgical kits, including hypodermic needles, catheters and many other common hospital and operating room equipment. (*Id.* at *¶* 8.) Without ethylene oxide sterilization, infection risks would soar dramatically in hospitals and operating rooms. (*Id.* at *¶* 7.) For heat- and irradiation-sensitive devices, no currently available sterilization method exists that has been accepted and approved as a practical replacement for ethylene oxide. (*Id.* at *¶* 9.)

9.     The Willowbrook facility is subject to stringent FDA requirements. As part of its Good Manufacturing Practices regulations, the FDA requires that medical devices and equipment be sterilized pursuant to exacting protocols that must be rigorously tested and validated.[4] Detailed procedures exist for the equipment, methods, and steps used for the ethylene oxide sterilization of each type of medical device or surgical kit at the Willowbrook facility, and that

---

[4] *See Compliance Policy Guide Section 100.550 Status and Responsibilities of Contract Sterilizers Engaged in the Sterilization of Drugs and Devices*, U.S. FOOD & DRUG ADMIN., https://www.fda.gov/ICECI/ComplianceManuals/ CompliancePolicyGuidanceManual/ucm073824.htm (last visited October 18, 2018).

equipment is continually checked and calibrated to ensure adherence to those procedures.  (*Id.* at ¶ 10.)  These FDA-required validation and calibration processes are expensive and can take anywhere from four to six months to complete.  (*Id.* at ¶ 11.)

10.     Moreover, it is important to understand that ethylene oxide is present in an urban atmosphere, such as the Chicago area, from a number of different sources, including natural sources as well as everyday and commercial activities.  Commercial sources of ethylene oxide in the air we breathe include chemical manufacturers, hospitals, and medical sterilization facilities near where people work or live.  (*Id.* at ¶¶ 13–14.)  More than a dozen medical facilities located in DuPage and Cook counties exist that use ethylene oxide to sterilize medical products – Sterigenics' Willowbrook facility is far from alone.  (*Id.* at ¶ 15.)  As a result of all of these natural and other sources, a general background level of ethylene oxide exists in the air.  Not surprisingly, then, USEPA itself explicitly recognizes that a certain level of ethylene oxide will be present in the environment and the air we all breathe.  (*Id.* at ¶ 12.)

**B.     The Release of the ATSDR Report.**

11.     On August 21, 2018, ATSDR released a report purporting to address whether ethylene oxide emissions from the Willowbrook facility pose a public health problem for people living and working in or near Willowbrook.  Broadly speaking, the ATSDR report combined data gathered by USEPA with a new and controversial risk assessment used by USEPA to estimate the potential risk posed by any given concentration of ethylene oxide. (This 2016 assessment was derived pursuant to USEPA's Integrated Risk Information System ("IRIS") program.)  Based on these inputs, the ATSDR report concluded that if the ethylene oxide concentrations actually represented Willowbrook area residents' exposure (*which it did not*), those residents could face potential increased cancer risks. Unfortunately, the report

5

was released with neither context nor explanation.  As noted in a letter signed by Senators

Tammy Duckworth and Richard Durbin, as well as Representative Bill Foster, "[t]he lack of

context has led to confusion, anxiety, and hardship on both the part of the community and

Sterigenics."  A copy of this letter is attached as Exhibit D.[5]

12.     During an August 29, 2018, Willowbrook town hall meeting, an ATSDR

representative acknowledged that its report is "not one that indicated immediate health threat or

that there was an emergency situation."  (Videotape: Highlights from Village of Willowbrook, IL

Town Hall Meeting (August 29, 2018) at 0:42 (to be filed as Exhibit E).) As the ATSDR

representative explained, its "communication strategy fell through [and] did not allow us to

really put this [report] into context."  (*Id.*)  Willowbrook Mayor Frank Trilla attempted to allay

community fears caused by the report by stating that ATSDR "took the [worst] case scenario,

multiplied it by 30 years, 250 days a year, 24 hours exposure . . . and the wind had to be identical

for the entire 30 years — under those circumstances 6.4 people out of 1,000 *might* be affected by

this." (*Id.* at 8:20.)  An ATSDR research officer also attempted to downplay concerns regarding

the report by informing residents that ATSDR "biased [the results] on purpose to try to capture

what might be the worst exposure in the community when they're downwind from the facility."

(*Id.* at 9:55.)  The ATSDR representative also admitted, "I don't know if anyone's home 24

hours a day, 7 days a week for an entire year for 33 years. Which is what we assumed." (*Id.* at

10:22.)

13.     In calculating the exposure risk in its extreme, worst-case hypothetical, ATSDR

also used the highest concentration of ethylene oxide detected in the residential area samples,

---

[5] A copy of this letter was also published on Senator Duckworth's website. *See* https://www.duckworth.senate.gov
/imo/media/doc/18.09.21%20-%20Letter%20re%20Willowbrook%20ambient%20air%20testing%20request%20-
%20EPA%20Wheeler%20and%20Stepp%20(002).pdf.

which were collected under non-representative weather conditions designed to yield the highest possible number. (Ex. B at p. 11.) As the ATSDR representative admitted, this concentration is **not** reflective of actual long-term exposure. In addition, ATSDR intentionally excluded from consideration 21 samples that it acknowledged reflected lower overall measured levels of ethylene oxide. (Ex. B at p. 5–7.) Importantly, the ATSDR report did **not** find Sterigenics to be in violation of any applicable USEPA or IEPA regulation or requirement. Indeed, Alec Messina, IEPA Director, stated during the August 29, 2018, town hall meeting that the Willowbrook facility is "in compliance with all the federal regulations including the emissions standards for ethylene oxide . . . . [The facility is] in compliance with those regulations and state law." (Ex. E at 3:46.)

### C. Further Responses to the ATSDR Report.

14. Following the ATSDR report's release, William L. Wehrum, the Assistant Administrator of USEPA for Air and Radiation, attempted to provide greater clarity on the report to ease citizen concerns. Specifically, Mr. Wehrum sent letters to Governor Bruce Rauner and several other senior elected officials specifically noting that "the air concentrations of ethylene oxide are not high enough to cause immediate harm to health for the people in and around Willowbrook." These letters are attached as Group Exhibit F. Further, Mr. Wehrum noted that "[e]arly indications from the post-control stack testing suggest that emissions have indeed been significantly reduced." Mr. Wehrum also pointed out flaws underlying USEPA's recent National Air Toxics Assessment (the "2014 NATA"), which identified Willowbrook as one of a number of areas potentially having an elevated chronic risk from ethylene oxide.[6] NATA is a screening

---

[6] Although this National Air Toxics Assessment is called the "2014 NATA" because it uses emissions data from 2014, USEPA actually published the 2014 NATA in 2018.

tool used by the federal government to identify areas of the country, pollutants, or types of pollution sources that may need to be further examined to better understand potential risks to public health.  The identification of elevated risks from ethylene oxide in the 2014 NATA are primarily driven by a toxicity value taken from the 2016 IRIS assessment.  Mr. Wehrum noted that the NATA assessment's conclusion about the cancer risk of a given concentration of ethylene oxide is based on "someone who is continuously exposed to [ethylene oxide] for 24 hours per day over 70 years."

15.    Additionally, on September 20 and 21, 2018, a contractor hired by Sterigenics conducted stack tests to measure the actual emissions from the Willowbrook facility.  USEPA and IEPA experts were present to observe these tests.  USEPA will review these results and conduct a risk assessment of the Willowbrook area. This risk assessment "will be more comprehensive than either NATA or the ASTDR analysis.  It will be similar to the types of risk assessments EPA conducts when it is reviewing its regulations for industries that emit air toxics to determine whether those rules need to be updated to improve protection of public health."[7]

## III.    DIVERSITY JURISDICTION EXISTS.

16.    A defendant may remove an action from state court to federal court if the action could have been brought in federal court originally.  28 U.S.C. § 1441.

17.    Federal diversity jurisdiction exists where "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs," and "is between . . . citizens of different States."  28 U.S.C. § 1332(a)(1).  Both prerequisites are satisfied here.

---

[7] *See* Sterigenics Willowbrook Facility – Latest Update, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, https://www.epa.gov/il/sterigenics-willowbrook-facility-latest-update (last visited Oct. 18, 2018).

**A. The Amount in Controversy Exceeds $75,000, Exclusive of Interest and Costs.**

18. A "defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold[;]" only when the defendant's "assertion of the amount in controversy is challenged" do the parties need to submit proof. *Dart Cherokee Basin Operating Co. v. Owens*, 135 S. Ct. 547, 554 (2014); *Midland Mgmt. Co. v. Am. Alternative Ins. Co.*, 132 F. Supp. 3d 1014, 1018 (N.D. Ill. 2015) (same). The removing party is not required "to establish that it was likely that the plaintiff would obtain a judgment exceeding the amount-in-controversy requirement." *Back Doctors Ltd. v. Metro. Prop. & Cas. Ins. Co.*, 637 F.3d 827, 829 (7th Cir. 2011). Rather "jurisdiction will be defeated only if it appears to a legal certainty that the stakes of the lawsuit do not exceed $75,000." *Carroll v. Stryker Corp.*, 658 F.3d 675, 680 (7th Cir. 2011).

19. Plaintiffs allege damages in excess of $50,000 for each of the five counts of the complaint. As such, Plaintiffs' damages allegations themselves demonstrate they seek damages in excess of $75,000, exclusive of interest and costs.

20. Additionally, the nature of Plaintiffs' allegations also demonstrate that they seek damages in excess of $75,000. Plaintiff Cannell alleges she is approximately 34 years old and was diagnosed with breast cancer four years ago. (Compl. ¶ 13.) She alleges that she has "suffered severe and permanent health problems and has endured and will in the future endure pain and suffering; has suffered a loss of the enjoyment of a normal life; has endured and will in the future endure emotional distress; has incurred and will in the future incur expenses for medical and rehabilitative care; has suffered a loss of earnings; and has been damaged in her capacity to earn a living." (*Id.* at ¶ 93.) Plaintiff Shenouda and the class he purports to represent

9

seek damages for the reduction in property value as well as costs required to remediate alleged ethylene oxide contamination on their properties. (*Id.* at ¶¶ 79, 86.)

21.     Given the nature of Plaintiffs' allegations and the lack of any express limitation on the amount of damages sought, the jurisdictional amount requirement is clearly satisfied by her claims alone.

**B.      Complete Diversity of Citizenship Exists.**

      i.      <u>The Parties are Citizens of Different States and No Proper Defendant is a Citizen of Illinois.</u>

22.     Sterigenics is a limited liability company.

23.     Where a party is a limited liability company, "[f]or diversity jurisdiction purposes, the citizenship of an LLC is the citizenship of each of its members. . . . Consequently, an LLC's jurisdictional statement must identify the citizenship of each of its members as of the date the . . . notice of removal was filed, and, if those members have members, the citizenship of those members as well." *Thomas v. Guardsmark, LLC*, 487 F.3d 531, 534 (7th Cir. 2007); *accord Belleville Catering Co. v. Champaign Mkt. Place, L.L.C.*, 350 F.3d 691, 692 (7th Cir. 2003) ("limited liability companies are citizens of every state of which any member is a citizen.").

24.     Where a party is a corporation, "a corporation shall be deemed to be a citizen of every State . . . by which it is has been incorporated and of the State . . . where it has its principal place of business." 28 U.S.C. § 1332(c)(1).

25.     Sterigenics is a Delaware limited liability company whose sole member is Sotera Health LLC. (Declaration of Tiffany Ross Neumann ("Neumann Decl.") ¶ 2 (attached as Exhibit G).)

26.     Sotera Health LLC is a Delaware limited liability company whose sole member is Sotera Health Holdings, LLC.  (Neumann Decl. ¶ 4.)  Sotera Health Holdings, LLC is a Delaware limited liability company whose sole member is Sotera Health Topco, Inc.  (*Id.* at ¶ 5.) Sotera Health Topco, Inc. is a Delaware corporation with its headquarters in Broadview Heights, Ohio.  (*Id.* at ¶ 6.)  Consequently, Sotera Health LLC is a citizen of Delaware and Ohio. Therefore, for the purposes of diversity jurisdiction, Defendant Sterigenics is a citizen of Delaware and Ohio.

27.     Plaintiffs have also named GTCR as a Defendant. As explained *infra*, however, GTCR is fraudulently joined as a Defendant to this Action.  Fraudulently joined defendants "may be disregarded for purposes of determining diversity jurisdiction."  *Midland Mgmt. Co.*, 132 F. Supp. 3d at 1021.

28.     According to the Complaint, at the time the Action was filed and at the time of this removal, Plaintiffs were and are not citizens of Delaware or Ohio.  Rather, according to the Complaint, Plaintiff Shenouda lived in Willowbrook, Illinois from 2007 to present day.  (Compl. ¶ 11.)  Meanwhile, Plaintiff Cannell alleges that she lived in Willowbrook, Illinois from 1987 to 2002, and then moved to Riverside, Illinois where she currently resides.  (*Id.* at ¶ 12).  These factual allegations show that Plaintiffs reside in and intend to remain in Illinois and are domiciled in this state.  *See, e.g.*, *Heinen v. Northrop Grumman Corp.*, 671 F.3d 669, 670 (7th Cir. 2012).  Domicile determines an individual's citizenship for diversity purposes.  *Id.* Accordingly, for diversity purposes, Plaintiffs are citizens of Illinois.

29.     Because Plaintiffs are citizens of neither Ohio nor Delaware, complete diversity of citizenship exists.  *Midland Mgmt. Co.*, 132 F. Supp. 3d. at 1017 (removal based on diversity jurisdiction was proper where properly joined parties were citizens of different states).

11

      ii.      GTCR is Fraudulently Joined.

30.    "Although a plaintiff is generally free to choose its own forum, a plaintiff 'may not join an in-state defendant solely for the purposes of defeating federal diversity jurisdiction.'" *Midland Mgmt. Co.*, 132 F. Supp. at 1021 (quoting *Schwartz v. State Farm Mut. Auto Ins. Co.*, 174 F.3d 875, 878 (7th Cir. 1999)). "In that case, the defendant is considered fraudulently joined, and may be disregarded for purposes of determining diversity jurisdiction." *Id.*

31.    A defendant is fraudulently joined where "there is no reasonable possibility that the plaintiff could prevail against the [in-state] defendant." *Tile Unlimited, Inc. v. Blanke Corp.*, 788 F. Supp. 2d 734, 738 (N.D. Ill. 2011) (quotations and citations omitted). "The court may consider . . . affidavits in determining whether a party has been fraudulently joined." *Hernandez v. Home Depot, U.S.A., Inc.*, No. 05 C 5963, 2006 WL 1647438, at *2 (N.D. Ill. June 5, 2006).

32.    Plaintiffs assert Nuisance (Count I), Trespass (Count II), Fraudulent Concealment (Count III), Negligence (Count IV), and Strict Liability (Count V) against "Defendants" generally. These claims are completely unsupported by *any* specific allegations against GTCR.

33.    Naming GTCR as a Defendant is plainly fraudulent, given that GTCR barely appears within the four corners of the Complaint. Indeed, GTCR is mentioned only twice throughout the entire complaint: once in the caption of the case and a second time at the very beginning of the Complaint, where Plaintiffs name the Defendants. There is no mention of GTCR in any of the numbered paragraphs. Plaintiffs fail to even include GTCR in the Complaint's section describing the various parties to this Action. (Compl. at ¶¶ 11–14.) Significantly, Plaintiffs make no specific allegations regarding GTCR, including that any of its alleged acts or omissions caused Plaintiffs claimed injuries. Instead, GTCR appears to have been

hurriedly inserted into the Complaint as a mere afterthought for no other reason than to defeat diversity.

34.     Further, Plaintiffs could never state a claim against GTCR as it cannot be held liable for the claims asserted.  Within the above-described corporate structure, there are four companies separating GTCR from Sterigenics U.S., LLC. (Neumann Decl. ¶ 9.)  At the top of this company ladder is Sotera Health Topco Parent, L.P., which is owned by dozens of limited partners.  Among those dozens of limited partners are a few funds indirectly affiliated with GTCR. (*Id.* at ¶ 8.)  Thus, there are four companies separating GTCR's partial and indirect ownership interest from Sterigenics U.S., LLC. (*Id.* at ¶ 9.)  As is evidenced by this corporate structure, GTCR is not involved in the operations of Sterigenics U.S., LLC, let alone with the operation and decision-making at the Willowbrook facility.  Plaintiffs cannot allege facts sufficient to demonstrate GTCR's liability, as no such facts exist.

35.     Because Plaintiffs make no specific allegations regarding GTCR's actions or omissions, nor could they ever truthfully make any such allegations, they cannot demonstrate that GTCR owed any legal duty to Plaintiffs or could be otherwise personally liable to them.

36.     Because Plaintiffs have not made ***any*** substantive allegations against GTCR regarding any of their actual claims, there is "no possibility that a plaintiff can state a cause of action against [this] nondiverse defendant[] in state court." *Gottlieb v. Westin Hotel Co.*, 990 F.2d 323, 327 (7th Cir. 1993).  Given all of these facts, GTCR has obviously only been added to the Complaint in a blatant attempt to defeat diversity.

37.     Because no possibility exists, much less any *reasonable* possibility, that Plaintiffs could state ***any*** claim against GTCR, this Defendant was fraudulently joined to this Action.  As such, GTCR's presence as a Defendant should be ignored for purposes of determining diversity

13

jurisdiction. *See Hernandez*, 2006 WL 1647438, at *2 (removal based on diversity of citizenship was proper where there was "no possibility" that plaintiff could state a cause of action for negligence as alleged in the complaint against the in-state defendant).

## IV.     CAFA JURISDICTION.

38.     Under CAFA, district courts have "original jurisdiction in class actions where: (1) the aggregate amount in controversy exceeds $5,000,000; (2) any member of the plaintiff class is a citizen of a state different from any defendant ('minimal diversity'); (3) the primary defendants are not states, state officials, or other government entities against whom the district court may be foreclosed from ordering relief; and (4) the number of members of the plaintiff class is 100 or more." *Hart v. FedEx Ground Package Sys. Inc.*, 457 F.3d 675, 679 (7th Cir. 2006).

39.     In describing how the controversy exceeds $5 million, the party seeking removal need not "confess liability." *Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446, 449 (7th Cir. 2005). Instead, the removing party must show "what the stakes of the litigation *could be*" and also "what they *are* given the plaintiff's actual demands." *Id.* (emphasis in original). This "demonstration concerns what plaintiff is claiming (and thus the amount in controversy between the parties), not whether plaintiff is likely to win or be awarded everything he seeks." *Id.*

### A.     This Court Has Original Jurisdiction of This Case Under CAFA.

40.     Here, Plaintiffs' Complaint seeks recovery for alleged nuisance, trespass, fraudulent concealment, negligence, and strict liability. Plaintiffs assert that they are bringing these claims on behalf of all putative class members. Plaintiffs purport to bring the action on behalf of all individuals who resided within six miles of the Sterigenics facility at 7775 Quincy Street, Willowbrook, Illinois between 1984 to the present. (Compl. ¶ 20.) Plaintiffs claim that over 19,000 individuals live within or have lived within a one to six mile radius of the

14

Willowbrook facility between 1984 to the present. According to the Complaint itself, "this class could contain thousands of members." (*Id.* at ¶ 19.)

41.     For their class action property claims, Plaintiffs seek damages for the alleged reduction of property value and payment of costs associated with remediating all ethylene oxide on their property. (*Id.* at ¶¶ 79, 86.) Plaintiffs also seek damages due to the fact that Plaintiffs have allegedly "suffered harm and damages." (*Id.* at ¶ 89.) These alleged property remediation and other costs could be substantial.

42.     Sterigenics denies that Plaintiffs are entitled to any relief whatsoever and that a class action is proper to adjudicate these claims. However, given the size of the proposed class, the nature of the asserted claims, as well as the magnitude of potential damages, Plaintiffs' allegations clearly demonstrate that they seek damages in excess of $5 million, exclusive of interest and costs.

43.     Plaintiffs are both Illinois citizens. Sterigenics is a citizen of Delaware and Ohio. Because at least one plaintiff is a citizen of a different state from at least one defendant, minimal diversity plainly exists.

44.     Finally, Sterigenics is an entity against which the district court may order relief and, as established by Plaintiffs, the number of plaintiffs in the proposed class is well over 100 individuals.

45.     As outlined above, the district court has original jurisdiction under CAFA. Plaintiffs seek damages in excess of $5 million, minimal diversity exists, and the proposed class contains well over 100 individuals.

15

**B.     The Home-State Controversy Exception to CAFA Does Not Apply.**

46.     Even if all four CAFA requirements are met, as in this case, a court "shall decline to exercise jurisdiction" where two-thirds or more of the members of the proposed plaintiff class and the primary defendants are citizens of the original filing state. 28 U.S.C. § 1332(d)(4)(B). Because Sterigenics has already demonstrated the amount in controversy and the existence of minimal diversity, the burden now shifts to Plaintiffs to show that the "home-state controversy" exception to CAFA jurisdiction applies.  *See Hart*, 457 F.3d at 680.

47.     As explained above, GTCR is a fraudulently joined Defendant.  Therefore, only one primary Defendant exists—Sterigenics.  Sterigenics is not a citizen of Illinois, where this action was originally filed.  Rather, Sterigenics is a citizen of Delaware and Ohio.  Because the primary Defendant is not a citizen of the original filing state, the home-state controversy exception does not apply to this case.

**C.     The Local Controversy Exception to CAFA Does Not Apply.**

48.     A district court also "shall decline to exercise jurisdiction" where all four of the following circumstances are met: (1) more than two-thirds of the members of the proposed plaintiff class are citizens of the original filing state; (2) at least one defendant is a defendant from whom members of the proposed plaintiff class seek significant relief, whose alleged conduct forms a significant basis of the asserted claims, and who is a citizen of the original filing state; (3) the principal injuries were incurred in the original filing state; and (4) no other class action asserting the same or similar factual allegations has been filed against any of the defendants within the three years preceding the filing of the case.  28 U.S.C. § 1332(d)(4)(A). Once again, because Sterigenics has already demonstrated the amount in controversy and the

existence of minimal diversity, the burden now shifts to Plaintiffs to show that the "local controversy" exception to CAFA jurisdiction applies. *See Hart*, 457 F.3d at 680.

49. As explained above, GTCR is a fraudulently joined Defendant. As evidenced by Plaintiffs' failure to make *any* allegations against GTCR regarding any of their asserted claims, GTCR's non-existent and unquestioned conduct could not have formed a "significant basis" of the asserted claims. Therefore, the only properly named Defendant, Sterigenics, is not a citizen of the original filing state, Illinois. Because Plaintiffs have not named a Defendant whose alleged conduct forms a significant basis of the asserted claims *and* who is a citizen of the original filing state, Plaintiffs cannot invoke the local controversy exception to CAFA.

## V.     FEDERAL QUESTION JURISDICTION.

50. Federal-question jurisdiction exists where a plaintiff's cause of action "arises under the Constitution, laws, or treatises of the United States." 28 U.S.C. § 1331. In order to arise under federal law, a claim must either plead a cause of action under federal law or plead a state-law claim that implicates significant federal issues. *See Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005). A state-law claim implicates significant federal issues if it "necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Id.* at 314. In other words, a state-law claim may satisfy the "arising under" jurisdictional test if a federal issue is: "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013) (citing *Grable*, 545 U.S. at 314); *see also Evergreen Square of Cudahy v. Wisconsin Hous. & Econ. Dev. Auth.,* 776 F.3d 463, 466 (7th Cir. 2015). A federal issue is substantial if it requires more

than the routine application of settled federal law to a particular set of facts. *See Behrens v. BMO Harris Bank , N.A.*, No. 16-CV-09949, 2017 WL 3234373, at *6 (N.D. Ill. July 31, 2017).

### A.    Plaintiffs' Complaint Necessarily Raises a Disputed Issue of Federal Law.

51.    The entire substance of Plaintiffs' Complaint is founded on the federal government's ATSDR report entitled "Evaluation of the Inhalation Carcinogenicity of Ethylene Oxide," which, in turn, used *another* federal government agency's report (the 2016 USEPA IRIS) as the basis for its analysis and findings. In that 2016 report, USEPA changed ethylene oxide's cancer weight-of-evidence descriptor from "probably carcinogenic to humans" to "carcinogenic to humans" and "determined that there is sufficient evidence of a causal relationship between EtO exposure and breast cancer in women." (Ex. B, p. 1, 8, 9.)

52.    Nonetheless, at the time the report was released, and at all times before and after the report's release, Sterigenics has been in compliance with all state and federal regulatory emission requirements, most importantly the federal Clean Air Act.

53.    The Clean Air Act, 42 U.S.C. § 7401 *et seq.*, is the primary mechanism through which the federal government manages air emissions from industrial facilities in the United States. Among many regulatory provisions, the Clean Air Act requires USEPA to identify sources of and set national emission standards for a specific list of nearly 200 hazardous air pollutants. 42 U.S.C. § 7412. Ethylene oxide is one of those chemicals, and pursuant to that mandate, USEPA has directly regulated ethylene oxide emissions since 1994. *See* 40 C.F.R. § 63, Subpart 0 (Ethylene Oxide Emissions Standards for Sterilization Facilities); National Emission Standards for Hazardous Air Pollutants for Ethylene Oxide Commercial Sterilization and Fumigation Operations, 59 Fed. Reg. 62585-01 (Dec. 6, 1994). The emission standards (known as "NESHAPs") are directly applicable to facilities such as Sterigenics and enforceable

by USEPA.  40 C.F.R. § 63.368.  If the standards are violated, the United States has the authority

to seek civil penalties of up to $97,229 per day and may obtain temporary or permanent

injunctive relief.  42 U.S.C. § 7613(b); *see also* Civil Monetary Penalty Inflation Adjustment

Rule, 83 Fed. Reg. 1190 (Jan. 10, 2018).

54.     The Clean Air Act also creates a nationally-uniform system of permits, known as

"Title V permits," for major industrial sources to ensure that emission standards are identified

and met.  40 C.F.R. § 70.1.  USEPA sets the substantive requirements for the Title V permitting

program.  It also has the power to authorize individual states to administer the permitting

program on USEPA's behalf.  40 C.F.R. § 70 *et seq.*  USEPA has approved Illinois's Title V

permitting program, 415 ILCS 5/39.5 (known in Illinois as the Clean Air Act Permit Program

("CAAPP"); Illinois, 66 Fed. Reg. 62946 (Dec. 4, 2001) (Clean Air Act Final Full Approval of

the Operating Permits Program).  Pursuant to this grant of authority, IEPA issued Sterigenics a

CAAPP permit.

55.     Together, the dual regulations set by USEPA and IEPA limit Sterigenics' overall

use of ethylene oxide and require most sources of ethylene oxide at the facility to be connected

to pollution control devices, which are required to remove at least 99% of the ethylene oxide

before it can be emitted to the air, pursuant to the federal NESHAP.  40 C.F.R. § 63.362(a).

Sterigenics is in compliance with its CAAPP permit and the federal NESHAP and, in fact, emits

far less than the permitted amount of ethylene oxide.

56.     Nonetheless, Plaintiffs argue that Sterigenics owed a duty to Plaintiff Cannell "to

operate, maintain, control, and use its Willowbrook facility, including the emitting of ethylene

oxide, in a manner that would not cause harm" to Plaintiff Cannell.  (Compl. ¶ 91.)  And,

according to Plaintiffs, Sterigenics "breached that duty by emitting ethylene oxide in a dangerous

and negligent way so as to cause the formation of cancer in [Plaintiff Cannell] and/or place her at a higher risk of acquiring cancer related to ethylene oxide." (*Id.* at ¶ 92.) Plaintiffs also bring a nuisance claim alleging that Sterigenics' use of the sterilizing facility "invaded and caused to be contaminated the areas immediately surrounding and on Plaintiffs' properties." (*Id.* at ¶ 77.)

57. In alleging negligence and nuisance causes of action, Plaintiffs seek to substitute a different standard of care for the carefully-designed emission standard for ethylene oxide that was authorized by Congress, established by USEPA, and implemented in a federally-approved CAAPP permit. Plaintiffs' Complaint is a direct challenge to both the Clean Air Act's ethylene oxide standards as well as IEPA's implementation of those standards. Plaintiffs ask the state court to ignore these uniform federal standards, and impose new and different standards primarily based on USEPA's IRIS report. Thus, not only do Plaintiffs ask the state court to rewrite a federal regulation, they seek to do that based on a report generated by one federal agency—ATSDR—at the behest of another federal agency—USEPA. Given Plaintiffs' direct challenge to federal standards, regulations and enforcement, as well as their reliance on federal agency opinions to state a claim, the Complaint necessarily raises a disputed issue of federal law as to the governing the standards for ethylene oxide emissions.

**B. Plaintiffs' Complaint Raises a Substantial Federal Issue.**

58. Plaintiffs' claims are substantial because their resolution is important to the federal system as a whole. *See Gunn*, 568 U.S. at 260 ("The substantiality inquiry under *Grable* looks instead to the importance of the issue to the federal system as a whole."). The federal government has a strong interest in ensuring uniformity in national air quality standards. This interest is evidenced by the highly comprehensive and detailed regulatory system the federal government has set forth through the Clean Air Act. Sterigenics is in

20

compliance with this comprehensive and detailed federal regulatory system. Plaintiffs, however, are attempting to bypass this federal system and separately regulate Sterigenics' conduct, conduct that is in conformance with federal and state environmental laws. Ironically, Plaintiffs' proposed regulations are taken from assessments issued by federal bodies—ATSDR and USEPA's IRIS program.

59. Notably, the standard of care outlined in both the ATSDR report and the IRIS assessment is at odds with the USEPA's federal regulations. Perhaps most troubling is the fact that USEPA created the IRIS risk assessment. Ethylene oxide emitters are receiving inconsistent messages from *the same federal agency*. Thus, Plaintiffs' case presents an issue that cries out for federal, not state, jurisdiction. Overall, the federal government's direct and substantial interest in this matter demonstrates it is an important issue of federal law that belongs in this Court.

**C.      Resolution of this Substantial Federal Issue in This Court Is Not Disruptive.**

60. Finally, this case does not present issues traditionally regulated by the States. *See Gunn*, 568 U.S. at 264 (denying removal of a legal malpractice case based, in part, on the fact that States "have a special responsibility for maintaining standards among members of the licensed professions") (internal quotation mark omitted). Instead, Plaintiffs' case is premised on inconsistent *federal* messages, which the State of Illinois has no particular interest in resolving. Consequently, Plaintiffs' claims are "capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Id.* at 258.

61. Because this case meets the arising under standards set by the Supreme Court in *Grable*, this Court has federal question jurisdiction under 28 U.S.C. § 1331.

## VI.    THE PROCEDURAL REQUIREMENTS FOR REMOVAL ARE SATISFIED.

62.    This Court is the proper venue for this Action, because it is pending in the Circuit Court for Cook County, Illinois, and the United States District Court for the Northern District of Illinois is the federal court district embracing the geographic place where the Action is pending. 28 U.S.C. §§ 93(a)(1), 1441(a), 1446(a).

63.    The Complaint and Summons were served on Sterigenics on October 17, 2018. Accordingly, this Notice of Removal is timely under 28 U.S.C. § 1446(b).  *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 354 (1999) (30-day time limit for removal runs from date of formal service of the complaint).

64.    In compliance with 28 U.S.C. § 1446(a), this Notice is signed pursuant to Rule 11 of the Federal Rules of Civil Procedure.

65.    No consent is needed from Defendant GTCR, because it is fraudulently joined. *Hernandez*, 2006 WL 1647438, at *2 (fraudulently joined defendants do not need to consent to removal); *see also* 28 U.S.C. § 1446(b)(2)(A) (only "defendants who have been properly joined and served must join in or consent to the removal").  Nonetheless, GTCR consents to removal.

66.    No Defendant properly joined to this case is a citizen of the State of Illinois, the state where the Action was initially filed.  28 U.S.C. § 1441(b)(2); *Midland Mgmt. Co.*, 132 F. Supp. 3d at 1023–24 (presence of fraudulently joined in-state defendant did not "compromise the parties' complete diversity" and did not violate the forum defendant rule).

67.    Pursuant to 28 U.S.C. § 1446(d), Sterigenics will promptly file a removal notice with the Clerk of the Circuit Court of Cook County, Illinois, and will serve written notice of the same upon counsel of record for Plaintiffs.

68.     If any questions arise about this removal, Sterigenics respectfully requests the opportunity to present briefing and oral argument in support of removal, and to conduct jurisdictional discovery, if needed.

69.     By filing this notice of removal, Sterigenics does not waive, either expressly or implicitly, its rights to assert any defense or other objection that it could have asserted in the Circuit Court of Cook County of Illinois, including, without limitation, those related to personal jurisdiction, inconvenience of the forum, venue, or joinder.

## **REQUESTED RELIEF**

WHEREFORE, Defendant Sterigenics U.S., LLC, respectfully requests that this Court assume jurisdiction over this action.

Date:   October 19, 2018

Respectfully submitted,

By:   _/s/ Maja C. Eaton_
    Maja C. Eaton

Maja C. Eaton
meaton@sidley.com
Gerard D. Kelly
gkelly@sidley.com
Elizabeth M. Chiarello
echiarello@sidley.com
Michael L. Lisak
mlisak@sidley.com
Stephanie C. Stern
sstern@sidley.com
SIDLEY AUSTIN LLP
Firm ID No. 42418
One South Dearborn Street
Chicago, Illinois  60603
Telephone: (312) 853-7000
Facsimile:  (312) 853-7036

***ATTORNEYS FOR
STERIGENICS U.S., LLC AND
GTCR, LLC***

23

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

FILED
9/20/2018 10:28 AM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018L010183

JULIE CANNELL, Individually and On Behalf of All Those
Similarly Situated;
PAMELA MCGONIGAL, Individually and On Behalf of All
Those Similarly Situated.

        Plaintiffs,

    v.

STERIGENICS INTERNATIONAL LLC; and
GTCR LLC.

        Defendants.

No:     **2018L010183**

**AFFIDAVIT REGARDING DAMAGES SOUGHT**

Plaintiffs JULIE CANNELL, Individually and On Behalf of All Those Similarly Situated and

Pamela McGonigal, Individually and On Behalf of All Those Similarly Situated, by their attorney,

Todd A. Smith, being first duly sworn under oath, states as follows:

1.    That the affiant is one of the attorneys of record for the Plaintiffs in this matter.

2.    That the total money damages sought in this civil action exceed the amount of

$50,000.00.

Further Affiant Sayeth Not.

_____
TODD A. SMITH

SUBSCRIBED AND SWORN to before me
this 20th day of September, 2018.

_____
NOTARY PUBLIC

> **OFFICIAL SEAL**
> **STACEY DALTON**
> NOTARY PUBLIC - STATE OF ILLINOIS
> MY COMMISSION EXPIRES 09/04/22

POWER ROGERS & SMITH, LLP
70 W. Madison Street, 55th Floor
Chicago, IL 60602-4212
312-236-9381
31444

FILED DATE: 9/20/2018 10:28 AM 2018L010183

OFFICIAL SEAL
STACEY DALTON
NOTARY PUBLIC - STATE OF ILLINOIS

**12-Person Jury**

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT - LAW DIVISION

FILED
9/20/2018 10:28 AM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018L010183

| | |
|---|---|
| JULIE CANNELL, Individually and On behalf of All Those Similarly Situated; PAMELA MCGONIGAL, Individually and On behalf of All Those Similarly Situated, | ) ) ) ) ) |
| Plaintiffs | ) ) |
| v. | ) ) |
| STERIGENICS INTERNATIONAL LLC; and GTCR LLC. | ) ) NO.   2018L010183 |
| Defendants | ) ) |

CIVIL ACTION COVER SHEET

A Civil Action Cover Sheet shall be filed with the complaint in all civil actions in the Law Division. The information contained herein is for administrative purposes only and cannot be introduced into evidence. Please check the box in front of the appropriate general category and then check the sub-category thereunder, if applicable, which best characterizes your action.

[X]   Jury Demand - Fee Paid
[     Jury Demand - No Fee Required

[ ]   PERSONAL INJURY/WRONGFUL DEATH

- [ ]   027   Motor Vehicle
- [ ]   040   Medical Malpractice
- [ ]   047   Asbestos
- [ ]   048   Dram Shop
- [ ]   049   Product Liability
- [ ]   051   Construction Injuries
        (including Structural Work Act, Road
        Construction Injuries Act and negligence)

- [ ]   052   Railroad/FELA
- [ ]   061   Other Personal Injury/Wrongful Death
- [ ]   063   Intentional Tort
- [ ]   064   Miscellaneous Statutory Action
        (Please Specify)

- [X]   065   Premises Liability

[ ]   062   PROPERTY DAMAGE
[ ]   077   LIBEL/SLANDER
[ ]   066   LEGAL MALPRACTICE

[X]   MISCELLANEOUS REMEDIES
- [ ]   007   Confession of Judgment
- [ ]   008   Replevin
- [ ]   009   Tax
- [ ]   015   Condemnation
- [ ]   017   Detinue
- [ ]   018   Distress for Rent
- [ ]   036   Administrative Review Action
- [x]   041   Class Action
- [ ]   084   Petition to Issue Subpoena
- [ ]   085   Petition to Register Foreign Judgment
- [ ]   099   All other Extraordinary Remedies
- [ ]   100   Petition for Discovery

[ ]   COMMERCIAL LITIGATION

- [ ]   002   Breach of Contract
- [ ]   070   Professional Malpractice
        (other than legal or medical)
- [ ]   071   Fraud
- [ ]   072   Consumer Fraud
- [ ]   073   Breach of Warranty
- [ ]   074   Statutory Action
        (Please Specify)

- [ ]   075   Other Commercial Litigation
        (Please Specify)

- [ ]   076   Retaliatory Discharge

POWER ROGERS & SMITH, LLP#31444

By:_____/s/Todd A. Smith_____
       Todd A. Smith,
       Brian LaCien
       70 W. Madison Street, #5500
       Chicago, IL 60602
       312/236-9381
       #31444

FILED
9/20/2018 10:28 AM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018L010183

FILED DATE: 9/20/2018 10:28 AM   2018L010183

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

JULIE CANNELL, Individually and On behalf of All Those      )
Similarly Situated;                                          )
PAMELA MCGONIGAL, Individually and On behalf of All         )
Those Similarly Situated,                                    )
                                                             )
                    Plaintiffs                               )
                                                             )
              v.                                             )
                                                             )
STERIGENICS INTERNATIONAL LLC; and GTCR LLC.                 )    No.    2018L010183
                                                             )
                    Defendants.                              )

JURY DEMAND

The undersigned demands a jury trial.

/s/Todd A. Smith_____
POWER ROGERS & SMITH, LLP

Name          POWER ROGERS & SMITH, LLP
              Todd A. Smith, Brian LaCien
              tsmith@prslaw.com blacien@prslaw.com
Attorneys for Plaintiffs
Address       70 West Madison Street, 55th Floor
City          Chicago, Illinois  60602
Telephone     312-236-9381
Atty. No.     31444

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

FILED
9/20/2018 10:28 AM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018L010183

JULIE CANNELL, Individually and On Behalf of All Those
Similarly Situated;
PAMELA MCGONIGAL, Individually and On Behalf of All
Those Similarly Situated.

Plaintiffs,

v.

STERIGENICS INTERNATIONAL LLC; and
GTCR LLC.

Defendants.

No:   2018L010183

## CLASS ACTION COMPLAINT

NOW COMES Plaintiffs PAMELA MCGONIGAL, Individually and on Behalf of All Those
Similarly Situated, and JULIE CANNELL, Individually and on Behalf of All Those Similarly
Situated, by and through their attorneys, POWER ROGERS & SMITH, LLP and KOREIN
TILLERY LLC, and hereby complaining of Defendants, STERIGENICS INTERNATIONAL
LLC (hereinafter "Sterigenics") and GTCR LLC (hereinafter "GTCR"), pleading hypothetically
and in the alternative, states as follows:

### NATURE OF THE ACTION

1.      This cause of action arises out of Defendant Sterigenics' decades long emissions of
ethylene oxide (EtO) from its plant in Willowbrook, IL. The plant is used to sterilize medical
devices, pharmaceuticals, and food products by placing them into sealed chambers, which are
then sprayed with ethylene oxide, a powerful sterilizing agent. Ethylene oxide is a highly
flammable, colorless gas and has been a known human carcinogen for decades. On July 26,

1

2018, the U.S. Department of Health and Human Services' Agency (H.H.S.) for Toxic Substances and Disease Registry (ATSDR) released a 2016 reassessment of the carcinogenetic nature of ethylene oxide, concluding ethylene oxide now has a "30 fold increase in cancer potency." This prompted the U.S. Environmental Protection Agency's (EPA) to change their description of ethylene oxide from "probably carcinogenic to humans" to "carcinogenic to humans." (See U.S. H.H.S.' "Evaluation of Potential Health Impacts from Ethylene Oxide Emissions," pg. 1, attached as Exhibit A). Based on their assessment of multiple studies, the EPA has determined "that there is sufficient evidence of a causal relationship between EtO exposure and breast cancer in women." (Ex. A, pg. 9).

2.      Willowbrook is a southwestern suburb of the city of Chicago with approximately 8,500 residents. The area where the Sterigenics facility is located is in a densely populated metropolitan area, with 19,271 people living within one mile of the facility boundary and thousands more living within a two mile radius. In addition, there are four schools and one daycare facility within a one-mile radius. (U.S. Census, 2016). (Ex. A, pg. 3).

**PARTIES**

3.      On and before July 26, 2018, and at all times material, Plaintiff PAMELA MCGONIGAL, owned and resided at 544 Ridgemoor Drive, Willowbrook, Illinois consistently from 1987 until 2005, resided at 8448 Kimberly Court, Burr Ridge, Illinois from 2005 until 2012, and now resides at 1014 Oxford Street, Downers Grove, Illinois 60516.

4.      On and before July 26, 2018, and at all times material, Plaintiff JULIE CANNELL resided at 544 Ridgemoor Drive, Willowbrook, Illinois consistently from 1987 until 2002 and now resides at 292 East Burlington Street, Riverside, Illinois 60546.

FILED DATE: 9/20/2018 10:28 AM   2018L010183

FILED DATE: 9/20/2018 10:28 AM    2018L010183

5.       On or about 2014, Plaintiff JULIE CANNELL was diagnosed with breast cancer at the age of 30.

6.       On and before July 26, 2018, and at all times material, Defendant STERIGENICS was a multi-national corporation in the business of sterilizing medical devices, pharmaceuticals, food and high-performance materials and operated a facility at 7775 Quincy St., Willowbrook, Illinois with its principal place of business at 2015 Spring Road, Suite 650, Oak Brook, Illinois.

## JURISDICTION AND VENUE

7.       This Court has jurisdiction over all Defendants because they are domiciled with their principal place of business in Illinois, and do regular and continuous business in Cook County, Illinois.

8.       Plaintiffs currently reside and are domiciled in Illinois.

9.       Venue is proper pursuant to 735 ILCS 5/2-101 because Defendant GTCR LLC's principal place of business is at 300 N. LaSalle Street, Suite 5600, Chicago, IL and Defendant STERIGENIC's principal place of business is at 2015 Spring Road, Suite 650, Oak Brook, Illinois.

10.       This Court retains jurisdiction pursuant to the local controversy exception to the Class Action Fairness Act (CAFA), 28 USC § 1332(d)(4)(A)(i)(I-III). More than two-thirds of the proposed class members in the aggregate are citizens of the State of Illinois; Sterigenics is a Defendant the proposed class members are seeking significant relief from, who's conduct forms a significant basis for the claims asserted by the plaintiffs, and is a citizen of the State of Illinois; principal injuries resulting from Sterigenics' conduct were incurred in the State of Illinois; and no class actions were filed in the past three years asserting the same or similar factual allegations against any of the named Defendants. The purpose of the local controversy

FILED DATE: 9/20/2018 10:28 AM  2018L010183

exception to CAFA is to allow state courts to retain cases when the controversy is so strongly linked to that state, much like the present case.

### CLASS ACTION ALLEGATIONS

11.     Plaintiffs bring this class action complaint pursuant to 735 ILCS 5/2-801:

**a. Numerosity**

This class is so numerous that joinder of all members would be impracticable. Over 19,000 people live within or have lived within a one to two mile radius of the Willowbrook facility from 1984 to the present. Therefore, this class could contain thousands of members. Class certification would be substantially more practical than joinder.

**b. Commonality**

Common questions of law and fact exist as to all members of the class, including but not limited to:

a.   Whether Defendants negligently caused the formation of cancer in plaintiffs;

b.   Whether Defendants fraudulently concealed the highly carcinogenetic nature of ethylene oxide from the plaintiffs;

c.   Whether Defendants caused plaintiffs' property values to diminish;

d.   Whether Defendants interfered with the use and enjoyment of plaintiffs' properties;

e.   Whether Defendants trespassed on plaintiffs' properties by emitting ethylene oxide for decades.

Common questions of law and fact predominate over any questions pertaining to individual members.

FILED DATE: 9/20/2018 10:28 AM    2018L010183

c. **Adequacy**

The representative Plaintiffs will fairly and adequately protect the interests of the entire class. Plaintiffs have no adverse interest to any members of the class. Plaintiffs' intent is to prosecute this case on behalf of all class members, not just themselves. Further, Plaintiffs are relying upon counsel that have knowledge and experience in handling class action lawsuits.

d. **Appropriateness and Efficiency**

This class action is an appropriate method for the fair and efficient adjudication of the controversy because it concerns potentially thousands of plaintiffs all complaining of Defendant's wrongful conduct. A class action is therefore the most efficient and effective method for adjudicating this matter.

12.    Plaintiffs bring this action on behalf of themselves and all current Illinois residents similarly situated who purchased or resided within 2 miles of the Sterigenics facility at 7775 Quincy St., Willowbrook, State of Illinois, from 1984 to filing of this complaint, for losses and damages, stemming from the use and release of Ethylene oxide, including but not limited to loss of value and infringement on personal and real property, statutory penalties, and injunctive relief/equitable relief.

## ALLEGATIONS OF FACT

A. **Sterigenics Has Been Emitting Ethylene Oxide for Decades**

13.    Sterigenics has been operating, maintaining, and using its Willowbrook sterilizing facility at 7775 Quincy Street since 1984. (Ex. A, pg. 2).

14.    Since at least 1984, Sterigenics has used multiple chambers to conduct their sterilizing activities at their Willowbrook facility. (Ex. A, pg. 2).

5

15.     Each chamber stores various medical devices, pharmaceuticals, and food products contained on 40" x 48" pallets, which are then sprayed with ethylene oxide and other chemical compounds, such as gamma, Ebeam, and x-ray sterilization. (Ex. A, pg. 2).

16.     Ethylene oxide is highly reactive, readily absorbed, and easily distributed in the human body. EtO is mutagenic and causes chromosome damage in humans, ultimately leading to the formation of cancer. (Ex. A, pg. 7).

17.     Building 1 chambers were constructed in 1984 and Building 2 chambers were constructed in 1999 and 2012. (Ex. A, pg. 2).

18.     Despite recent attempts of installing pollution controls, historically, the back vents of these chambers have been uncontrolled, allowing for passive releases. (Ex. A, pg. 2).

19.     Emissions data from the United States Environmental Protection Agency's Toxic Release Inventory shows large amounts of ethylene oxide emissions in the late-1990s, while no data exists before 1995 on ambient air releases. (See Figure 1 on Ex. A, pg. 2).

20.     Despite a reduction of emissions in recent years, "the available data suggests that substantially higher ambient releases prior to 1995 were likely." (Ex. A, pg. 2).

21.     Therefore, "EtO has been emitted over the past 34 years from the Willowbrook facility." (Ex. A, pg. 2).

6

FILED DATE: 9/20/2018 10:28 AM    2018L010183

**Figure 1: TRI Total Air Emissions Reported (in pounds), by Sterigenics Corporation for Ethylene Oxide, 1995-2016. [1] [2]**



### B. Willowbrook Air Quality and the Health Implications

22.      The EPA modeled short and long-term ambient EtO concentrations around the facility to evaluate the impact of site emissions. (See Figure 3 on Ex. A, pg. 4).

23.      Figure 3 shows large amounts of ethylene oxide emissions surrounding both Sterigenics buildings and pervading the community up to a one-mile radius. Upon information and belief, those within a two mile or more radius also received significant exposure.

24.      Figure 3 also depicts a 5-year average to represent chronic exposures and maximum 1- and 8-hour averages to represent acute exposures at 882 community receptor points.

---

[1] Source: Toxic Release Inventory (TRI): https://www.epa.gov/enviro/tri-overview.
[2] Exhibit A, page 2.

7

FILED DATE: 9/20/2018 10:28 AM 2018L010183

**Figure 3. AERMOD modeling output: 5-year average exposure estimates**



25.     The U.S. EPA collected 39 air samples from 26 discrete locations in the Willowbrook community on May 16 and 17, 2018 using SUMMA cannisters. (Ex. A, pg. 5).

26.     SUMMA cannisters are "airtight, stainless-steel containers with an inner surface that has been electro-polished and chemically deactivated," ensuring an accurate air sample is collected. (Ex. A, pg. 5).

27.     Based on the samples collected, "chronic upper bound residential (2.1 µg/m3) and occupational (9.1 µg/m3) exposures in the community" existed, with higher concentrations during the nighttime. (Ex. A, pg. 7).

FILED DATE: 9/20/2018 10:28 AM   2018L010183

28.     The implications of these samples are clear: based on numerous studies examined by the U.S. EPA, coupled with the ATSDR's own assessments, "the cancer risk for this residential sample location is 6.4 x 10-3 – an additional lifetime risk of 6.4 cancers in a population of 1,000 residents who could be exposed to EtO emissions from Sterigenics." (Ex. A, pg. 10). Furthermore, this adds to the lifetime background cancer risk of an average American of 1 in 3 people. (American Cancer Society, 2018). (Ex. A, pg. 10). (See Table 4, Ex. A, pg. 10).

29.     Other health effects from elevated ethylene oxide emissions include "primarily neurological effects (headache, dizziness, nausea, lethargy, fatigue, muscle weakness, numbness, memory loss, incoordination, etc.), respiratory irritation (irritation of the nasal cavity, sinuses, coughing, shortness of breath, wheezing, and bronchial constriction and hyperreactivity), excessive thirst and dry mouth, and gastrointestinal effects (vomiting, diarrhea, stomach spasms, etc.)." (Ex. A, pg. 8).

30.     Furthermore, the U.S. EPA has determined that "there is sufficient evidence of a causal relationship between EtO exposure and breast cancer in women." (Ex. A, pg. 9).

**Table 4. Site-specific ADAF calculations for residential exposure**

| Age Range | ADAF | U.S. EPA unadjusted IUR | EPC (µg/m³) | Duration Adjustment | Partial Risk |
|---|---|---|---|---|---|
| 0 to <2 yrs | 10 | $2.99 \times 10^{-3}$ | 2.1 | 2 years/78 years | $1.6 \times 10^{-3}$ |
| 2 to <16 yrs | 3 | $2.99 \times 10^{-3}$ | 2.1 | 14 years/78 years | $3.4 \times 10^{-3}$ |
| 16 to 33 yrs | 3 | $2.99 \times 10^{-3}$ | 2.1 | 17 years/78 years | $1.4 \times 10^{-3}$ |
| | | | | Lifetime Risk | $6.4 \times 10^{-3}$ |

**COUNT I**
(Nuisance – All Members)

31.     Plaintiffs reallege and incorporate herein by reference all allegations into this claim as if fully set forth herein, and further allege as follows:

FILED DATE: 9/20/2018 10:28 AM  2018L010183

32.     At all times relevant hereto, Defendants knew ethylene oxide to be hazardous and harmful to human beings.

33.     As a direct and proximate result of Defendants' operation, maintenance, and use of its sterilizing facility, ethylene oxide continuously invaded and caused to be contaminated the areas immediately surrounding and on Plaintiffs' properties.

34.     As a direct and proximate result of Defendants' operation, maintenance, and use of its sterilizing facility, Plaintiffs sustained and will continue to sustain severe and permanent physical damage to their properties and damage to their property value due to the decades long emission of ethylene oxide.

35.     Plaintiffs bring this action for all monetary damages associated with its ethylene oxide contamination, including damages for reduction of value of their property. Finally, Plaintiffs request that Defendants be required to pay the costs associated with remediating all ethylene oxide contamination that is located on or threatens their property.

Wherefore Plaintiffs demand judgment against Defendants in an amount in excess of $50,000, as shall represent fair and just compensation.

## COUNT II
(Trespass – All Members)

36.     Plaintiffs reallege and incorporate herein by reference all allegations into this claim as if fully set forth herein, and further allege as follows:

37.     Defendants have trespassed through unlawful, unauthorized, and wrongful entry and damage to Plaintiffs' land by depositing airborne and waterborne particles of radiation and other hazardous materials on the Plaintiffs' properties without their permission or invitation.

38.     Defendants were aware that trespass was occurring.

FILED DATE: 9/20/2018 10:28 AM 2018L010183

39.     This trespass has caused actual and substantial damage to the Plaintiffs' properties, and has interfered with the Plaintiffs exclusive possession of their properties. This trespass is continuing and ongoing.

40.     Defendants have indirectly interfered with Plaintiffs possessory rights due to migration of ethylene oxide emitting from its sterilizing facility. This interference was unreasonable and foreseeable.

41.     As a direct and proximate result of Defendants' trespass, Plaintiffs' properties sustained and will continue to sustain severe and permanent physical damages by ethylene oxide contamination.

42.     Plaintiffs bring this action for all monetary damages associated with its ethylene oxide contamination, including damages for reduction of value of their property. Finally, Plaintiffs request that Defendants be required to pay the costs associated with remediating all ethylene oxide contamination that is located on or threatens their property.

Wherefore Plaintiffs demand judgment against Defendants in an amount in excess of $50,000, as shall represent fair and just compensation.

## COUNT III
### (Fraudulent Concealment – All Members)

43.     Plaintiffs reallege and incorporate herein by reference all allegations into this claim as if fully set forth herein, and further allege as follows:

44.     Since 1984, Defendants had actual or constructive knowledge of the highly carcinogenetic nature of ethylene oxide and deliberately hid and/or suppressed information pertaining to the highly carcinogenetic nature of ethylene oxide from Willowbrook residents, workers, and visitors.

FILED DATE: 9/20/2018 10:28 AM   2018L010183

45.     As a direct and proximate result of Defendants' deliberate hiding and/or suppression of information pertaining to the highly carcinogenetic nature of ethylene oxide, Plaintiffs have suffered severe and permanent health problems and have endured and will in the future endure pain and suffering; have suffered a loss of the enjoyment of a normal life; have endured and will in the future endure emotional distress; have incurred and will in the future incur expenses for medical and rehabilitative care; have suffered a loss of earnings; and have been damaged in their capacity to earn a living.

Wherefore Plaintiffs demand judgment against Defendants in an amount in excess of $50,000, as shall represent fair and just compensation.

### COUNT IV
(Negligence – Julie Cannell)

46.     Plaintiffs reallege and incorporate herein by reference all allegations into this claim as if fully set forth herein, and further allege as follows:

47.     Defendants owed a duty to Plaintiffs to operate, maintain, control, and use its Willowbrook facility, including the emitting of ethylene oxide, in a manner that would not cause harm to the Platintiffs.

48.     Defendants breached that duty by emitting ethylene oxide in a dangerous and negligent way so as to cause the formation of cancer in Plaintiffs and/or place them at a higher risk of acquiring cancer related to ethylene oxide. Specifically, Defendants breached their duty in that they:

    a.  Failed to notify residents, workers, and visitors of the highly carcinogenetic nature of ethylene oxide; or

    b.  Failed to notify residents, workers, and visitors of the elevated airborne ethylene oxide concentrations; or

FILED DATE: 9/20/2018 10:28 AM    2018L010183

    c.   Failed to notify residents, workers, and visitors of the elevated cancer risk that ethylene oxide emissions pose; or

    d.   Failed to adopt or construct modern technology to aid in the prevention of ethylene oxide emissions in the surrounding area; or

    e.   Allowed excess levels of ethylene oxide to emit into the community; or

    f.   Failed to use/seek reasonable alternatives to ethylene oxide when they knew of the dangers associated with it; or

    g.   Failed to control emissions of ethylene oxide from their facility; or

    h.   Were otherwise negligent.

49.    As a direct and proximate result of Defendants' negligence, as set forth above, Plaintiffs have suffered severe and permanent health problems and have endured and will in the future endure pain and suffering; have suffered a loss of the enjoyment of a normal life; have endured and will in the future endure emotional distress; have incurred and will in the future incur expenses for medical and rehabilitative care; have suffered a loss of earnings; and have been damaged in their capacity to earn a living.

Wherefore Plaintiffs demand judgment against Defendants in an amount in excess of $50,000, as shall represent fair and just compensation.

## COUNT V
(Ultra-hazardous Activity/Strict Liability – Julie Cannell)

50.    Plaintiffs reallege and incorporate herein by reference all allegations into this claim as if fully set forth herein, and further allege as follows:

51.    Defendants engaged in ultra-hazardous or abnormally dangerous activities by continuously emitting ethylene oxide, a known human carcinogen.

52.     As a direct and proximate result of Defendants' ultra-hazardous or abnormally dangerous activities, Plaintiffs have suffered severe and permanent health problems and have endured and will in the future endure pain and suffering; have suffered a loss of the enjoyment of a normal life; have endured and will in the future endure emotional distress; have incurred and will in the future incur expenses for medical and rehabilitative care; have suffered a loss of earnings; and have been damaged in their capacity to earn a living.

Wherefore Plaintiffs demand judgment against Defendants in an amount in excess of $50,000, as shall represent fair and just compensation.

## JURY DEMAND

All Plaintiffs demand trial by jury.

Respectfully Submitted,


By: /s/Todd A. Smith
One of Their Attorneys

Todd A. Smith, tsmith@prslaw.com
Brian LaCien, blacien@prslaw.com
POWER, ROGERS & SMITH, LLP
70 West Madison Street, 55th Floor
Chicago, IL 60602-4212
Phone: (312) 236-9381
Fax: (312) 236-0920
#31444

John Libra, JLibra@KoreinTillery.com
KOREIN TILLERY, LLC
205 North Michigan Avenue
Suite 1950
Chicago, IL 60601
Office: 312-641-9750

FILED DATE: 9/20/2018 10:28 AM   2018L010183

14

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

FILED
9/20/2018 4:28 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018L010183

JULIE CANNELL, Individually and On Behalf of All Those
Similarly Situated;
PAMELA MCGONIGAL, Individually and On Behalf of All
Those Similarly Situated.

        Plaintiffs,

v.

STERIGENICS U.S. LLC; and
GTCR LLC.

        Defendants.

No: 2018 L 010183

## FIRST AMENDED CLASS ACTION COMPLAINT

NOW COMES Plaintiffs PAMELA MCGONIGAL, Individually and on Behalf of All Those
Similarly Situated, and JULIE CANNELL, Individually and on Behalf of All Those Similarly
Situated, by and through their attorneys, POWER ROGERS & SMITH, LLP and KOREIN
TILLERY LLC, and hereby complaining of Defendants, STERIGENICS U.S. LLC (hereinafter
"Sterigenics") and GTCR LLC (hereinafter "GTCR"), pleading hypothetically and in the
alternative, states as follows:

### NATURE OF THE ACTION

1.      This cause of action arises out of Defendant Sterigenics' decades long emissions of
ethylene oxide (EtO) from its plant in Willowbrook, IL. The plant is used to sterilize medical
devices, pharmaceuticals, and food products by placing them into sealed chambers, which are
then sprayed with ethylene oxide, a powerful sterilizing agent. Ethylene oxide is a highly
flammable, colorless gas and has been a known human carcinogen for decades. On July 26,

1

FILED DATE: 9/20/2018 4:28 PM    2018L010163

2018, the U.S. Department of Health and Human Services' Agency (H.H.S.) for Toxic Substances and Disease Registry (ATSDR) released a 2016 reassessment of the carcinogenetic nature of ethylene oxide, concluding ethylene oxide now has a "30 fold increase in cancer potency." This prompted the U.S. Environmental Protection Agency's (EPA) to change their description of ethylene oxide from "probably carcinogenic to humans" to "carcinogenic to humans." (See U.S. H.H.S.' "Evaluation of Potential Health Impacts from Ethylene Oxide Emissions," pg. 1, attached as Exhibit A). Based on their assessment of multiple studies, the EPA has determined "that there is sufficient evidence of a causal relationship between EtO exposure and breast cancer in women." (Ex. A, pg. 9).

2.      Willowbrook is a southwestern suburb of the city of Chicago with approximately 8,500 residents. The area where the Sterigenics facility is located is in a densely populated metropolitan area, with 19,271 people living within one mile of the facility boundary and tens of thousands more living within a six mile radius. In addition, there are four schools and one daycare facility within a one-mile radius. (U.S. Census, 2016). (Ex. A, pg. 3).

## PARTIES

3.      On and before July 26, 2018, and at all times material, Plaintiff PAMELA MCGONIGAL, owned and resided at 544 Ridgemoor Drive, Willowbrook, Illinois consistently from 1987 until 2005, resided at 8448 Kimberly Court, Burr Ridge, Illinois from 2005 until 2012, and now resides at 1014 Oxford Street, Downers Grove, Illinois 60516.

4.      On and before July 26, 2018, and at all times material, Plaintiff JULIE CANNELL resided at 544 Ridgemoor Drive, Willowbrook, Illinois consistently from 1987 until 2002 and now resides at 292 East Burlington Street, Riverside, Illinois 60546.

2

FILED DATE: 9/20/2018 4:28 PM    2018L010183

5.      On June 20, 2014, Plaintiff JULIE CANNELL was diagnosed with breast cancer at the age of 30.

6.      On and before July 26, 2018, and at all times material, Defendant STERIGENICS was a multi-national corporation in the business of sterilizing medical devices, pharmaceuticals, food and high-performance materials and operated a facility at 7775 Quincy St., Willowbrook, Illinois with its principal place of business at 2015 Spring Road, Suite 650, Oak Brook, Illinois.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over all Defendants because they are domiciled with their principal place of business in Illinois, and do regular and continuous business in Cook County, Illinois.

8.      Plaintiffs currently reside in Illinois.

9.      Venue is proper pursuant to 735 ILCS 5/2-101 because Defendant GTCR LLC's principal place of business is at 300 N. LaSalle Street, Suite 5600, Chicago, IL and Defendant STERIGENIC's principal place of business is at 2015 Spring Road, Suite 650, Oak Brook, Illinois.

10.      This Court retains jurisdiction pursuant to the local controversy exception to the Class Action Fairness Act (CAFA), 28 USC § 1332(d)(4)(A)(i)(I-III). More than two-thirds of the proposed class members in the aggregate are citizens of the State of Illinois; Sterigenics is a Defendant the proposed class members are seeking significant relief from, who's conduct forms a significant basis for the claims asserted by the plaintiffs, and is a citizen of the State of Illinois; principal injuries resulting from Sterigenics' conduct were incurred in the State of Illinois; and no class actions were filed in the past three years asserting the same or similar factual allegations against any of the named Defendants. The purpose of the local controversy

3

exception to CAFA is to allow state courts to retain cases when the controversy is so strongly linked to that state, much like the present case.

## CLASS ACTION ALLEGATIONS

11.      Plaintiffs bring this class action complaint pursuant to 735 ILCS 5/2-801:

**a. Numerosity**

This class is so numerous that joinder of all members would be impracticable. Over 19,000 people live within or have lived within a one to six mile radius of the Willowbrook facility from 1984 to the present. Therefore, this class could contain thousands of members. Class certification would be substantially more practical than joinder.

**b. Commonality**

Common questions of law and fact exist as to all members of the class, including but not limited to:

a.   Whether Defendants negligently caused the formation of cancer in plaintiffs;

b.   Whether Defendants fraudulently concealed the highly carcinogenetic nature of ethylene oxide from the plaintiffs;

c.   Whether Defendants caused plaintiffs' property values to diminish;

d.   Whether Defendants interfered with the use and enjoyment of plaintiffs' properties;

e.   Whether Defendants trespassed on plaintiffs' properties by emitting ethylene oxide for decades.

Common questions of law and fact predominate over any questions pertaining to individual members.

4

FILED DATE: 9/20/2018 4:28 PM   2018L010183

c.  **Adequacy**

The representative Plaintiffs will fairly and adequately protect the interests of the entire class. Plaintiffs have no adverse interest to any members of the class. Plaintiffs' intent is to prosecute this case on behalf of all class members, not just themselves. Further, Plaintiffs are relying upon counsel that have knowledge and experience in handling class action lawsuits.

d.  **Appropriateness and Efficiency**

This class action is an appropriate method for the fair and efficient adjudication of the controversy because it concerns potentially thousands of plaintiffs all complaining of Defendant's wrongful conduct. A class action is therefore the most efficient and effective method for adjudicating this matter.

12.     Plaintiffs bring this action on behalf of themselves and all current Illinois residents similarly situated who purchased or resided within 2 miles of the Sterigenics facility at 7775 Quincy St., Willowbrook, State of Illinois, from 1984 to filing of this complaint for losses and damages, stemming from the use and release of Ethylene oxide, including but not limited to loss of value and infringement on personal and real property, statutory penalties, and injunctive relief/equitable relief.

## ALLEGATIONS OF FACT

**A.  Sterigenics Has Been Emitting Ethylene Oxide for Decades**

13.     Sterigenics has been operating, maintaining, and using its Willowbrook sterilizing facility at 7775 Quincy Street since 1984. (Ex. A, pg. 2).

14.     Since at least 1984, Sterigenics has used multiple chambers to conduct their sterilizing activities at their Willowbrook facility. (Ex. A, pg. 2).

5

15.     Each chamber stores various medical devices, pharmaceuticals, and food products contained on 40" x 48" pallets, which are then sprayed with ethylene oxide and other chemical compounds, such as gamma, Ebeam, and x-ray sterilization. (Ex. A, pg. 2).

16.     Ethylene oxide is highly reactive, readily absorbed, and easily distributed in the human body. EtO is mutagenic and causes chromosome damage in humans, ultimately leading to the formation of cancer. (Ex. A, pg. 7).

17.     Building 1 chambers were constructed in 1984 and Building 2 chambers were constructed in 1999 and 2012. (Ex. A, pg. 2).

18.     Despite recent attempts of installing pollution controls, historically, the back vents of these chambers have been uncontrolled, allowing for passive releases. (Ex. A, pg. 2).

19.     Emissions data from the United States Environmental Protection Agency's Toxic Release Inventory shows large amounts of ethylene oxide emissions in the late-1990s, while no data exists before 1995 on ambient air releases. (See Figure 1 on Ex. A, pg. 2).

20.     Despite a reduction of emissions in recent years, "the available data suggests that substantially higher ambient releases prior to 1995 were likely." (Ex. A, pg. 2).

21.     Therefore, "EtO has been emitted over the past 34 years from the Willowbrook facility." (Ex. A, pg. 2).

FILED DATE: 9/20/2018 4:28 PM    2018L010183

**Figure 1: TRI Total Air Emissions Reported (in pounds), by Sterigenics Corporation for Ethylene Oxide, 1995-2016.** [1] [2]



### B. Willowbrook Air Quality and the Health Implications

22.     The EPA modeled short and long-term ambient EtO concentrations around the facility to evaluate the impact of site emissions. (See Figure 3 on Ex. A, pg. 4).

23.     Figure 3 shows large amounts of ethylene oxide emissions surrounding both Sterigenics buildings and pervading the community up to a one-mile radius.

24.     Figure 3 also depicts a 5-year average to represent chronic exposures and maximum 1- and 8-hour averages to represent acute exposures at 882 community receptor points.

---

[1] Source: Toxic Release Inventory (TRI): https://www.epa.gov/enviro/tri-overview.
[2] Exhibit A, page 2.

FILED DATE: 9/20/2018 4:28 PM   2018L010183

Figure 3. AERMOD modeling output: 5-year average exposure estimates



25.     The U.S. EPA collected 39 air samples from 26 discrete locations in the Willowbrook community on May 16 and 17, 2018 using SUMMA cannisters. (Ex. A, pg. 5).

26.     SUMMA cannisters are "airtight, stainless-steel containers with an inner surface that has been electro-polished and chemically deactivated," ensuring an accurate air sample is collected. (Ex. A, pg. 5).

27.     Based on the samples collected, "chronic upper bound residential (2.1 μg/m3) and occupational (9.1 μg/m3) exposures in the community" existed, with higher concentrations during the nighttime. (Ex. A, pg. 7).

8

FILED DATE: 9/20/2018 4:28 PM    2018L010183

28.     The implications of these samples are clear: based on numerous studies examined by the U.S. EPA, coupled with the ATSDR's own assessments, "the cancer risk for this residential sample location is 6.4 x 10-3 – an additional lifetime risk of 6.4 cancers in a population of 1,000 residents who could be exposed to EtO emissions from Sterigenics." (Ex. A, pg. 10). Furthermore, this adds to the lifetime background cancer risk of an average American of 1 in 3 people. (American Cancer Society, 2018). (Ex. A, pg. 10). (See Table 4, Ex. A, pg. 10).

29.     Other health effects from elevated ethylene oxide emissions include "primarily neurological effects (headache, dizziness, nausea, lethargy, fatigue, muscle weakness, numbness, memory loss, incoordination, etc.), respiratory irritation (irritation of the nasal cavity, sinuses, coughing, shortness of breath, wheezing, and bronchial constriction and hyperreactivity), excessive thirst and dry mouth, and gastrointestinal effects (vomiting, diarrhea, stomach spasms, etc.)." (Ex. A, pg. 8).

30.     Furthermore, the U.S. EPA has determined that "there is sufficient evidence of a causal relationship between EtO exposure and breast cancer in women." (Ex. A, pg. 9).

**Table 4. Site-specific ADAF calculations for residential exposure**

| Age Range | ADAF | U.S. EPA unadjusted IUR | EPC ($\mu g/m^3$) | Duration Adjustment | Partial Risk |
|---|---|---|---|---|---|
| 0 to <2 yrs | 10 | $2.99 \times 10^{-3}$ | 2.1 | 2 years/78 years | $1.6 \times 10^{-3}$ |
| 2 to <16 yrs | 3 | $2.99 \times 10^{-3}$ | 2.1 | 14 years/78 years | $3.4 \times 10^{-3}$ |
| 16 to 33 yrs | 3 | $2.99 \times 10^{-3}$ | 2.1 | 17 years/78 years | $1.4 \times 10^{-3}$ |
| | | | | Lifetime Risk | $6.4 \times 10^{-3}$ |

## COUNT I
### (Nuisance – All Members)

31.     Plaintiffs reallege and incorporate herein by reference all allegations into this claim as if fully set forth herein, and further allege as follows:

FILED DATE: 9/20/2018 4:28 PM    2018L010183

32.     At all times relevant hereto, Defendants knew ethylene oxide to be hazardous and harmful to human beings.

33.     As a direct and proximate result of Defendants' operation, maintenance, and use of its sterilizing facility, ethylene oxide continuously invaded and caused to be contaminated the areas immediately surrounding and on Plaintiffs' properties.

34.     As a direct and proximate result of Defendants' operation, maintenance, and use of its sterilizing facility, Plaintiffs sustained and will continue to sustain severe and permanent physical damage to their properties and damage to their property value due to the decades long emission of ethylene oxide.

35.     Plaintiffs bring this action for all monetary damages associated with its ethylene oxide contamination, including damages for reduction of value of their property. Finally, Plaintiffs request that Defendants be required to pay the costs associated with remediating all ethylene oxide contamination that is located on or threatens their property.

Wherefore Plaintiffs demand judgment against Defendants in an amount in excess of $50,000, as shall represent fair and just compensation.

## COUNT II
(Trespass – All Members)

36.     Plaintiffs reallege and incorporate herein by reference all allegations into this claim as if fully set forth herein, and further allege as follows:

37.     Defendants have trespassed through unlawful, unauthorized, and wrongful entry and damage to Plaintiffs' land by depositing airborne and waterborne particles of radiation and other hazardous materials on the Plaintiffs' properties without their permission or invitation.

38.     Defendants were aware that trespass was occurring.

10

FILED DATE: 9/20/2018 4:28 PM 2018L010183

39.     This trespass has caused actual and substantial damage to the Plaintiffs' properties, and has interfered with the Plaintiffs exclusive possession of their properties. This trespass is continuing and ongoing.

40.     Defendants have indirectly interfered with Plaintiffs possessory rights due to migration of ethylene oxide emitting from its sterilizing facility. This interference was unreasonable and foreseeable.

41.     As a direct and proximate result of Defendants' trespass, Plaintiffs' properties sustained and will continue to sustain severe and permanent physical damages by ethylene oxide contamination.

42.     Plaintiffs bring this action for all monetary damages associated with its ethylene oxide contamination, including damages for reduction of value of their property. Finally, Plaintiffs request that Defendants be required to pay the costs associated with remediating all ethylene oxide contamination that is located on or threatens their property.

Wherefore Plaintiffs demand judgment against Defendants in an amount in excess of $50,000, as shall represent fair and just compensation.

## COUNT III
(Fraudulent Concealment – All Members)

43.     Plaintiffs reallege and incorporate herein by reference all allegations into this claim as if fully set forth herein, and further allege as follows:

44.     Since 1984, Defendants had actual or constructive knowledge of the highly carcinogenetic nature of ethylene oxide and deliberately hid and/or suppressed information pertaining to the highly carcinogenetic nature of ethylene oxide from Willowbrook residents, workers, and visitors.

FILED DATE: 9/20/2018 4:28 PM 2018L010183

45.     As a direct and proximate result of Defendants' deliberate hiding and/or suppression of information pertaining to the highly carcinogenetic nature of ethylene oxide, Plaintiffs have suffered severe and permanent health problems and have endured and will in the future endure pain and suffering; have suffered a loss of the enjoyment of a normal life; have endured and will in the future endure emotional distress; have incurred and will in the future incur expenses for medical and rehabilitative care; have suffered a loss of earnings; and have been damaged in their capacity to earn a living.

Wherefore Plaintiffs demand judgment against Defendants in an amount in excess of $50,000, as shall represent fair and just compensation.

## COUNT IV
(Negligence – Julie Cannell)

46.     Plaintiffs reallege and incorporate herein by reference all allegations into this claim as if fully set forth herein, and further allege as follows:

47.     Defendants owed a duty to Plaintiffs to operate, maintain, control, and use its Willowbrook facility, including the emitting of ethylene oxide, in a manner that would not cause harm to the Platintiffs.

48.     Defendants breached that duty by emitting ethylene oxide in a dangerous and negligent way so as to cause the formation of cancer in Plaintiffs and/or place them at a higher risk of acquiring cancer related to ethylene oxide. Specifically, Defendants breached their duty in that they:

   a.   Failed to notify residents, workers, and visitors of the highly carcinogenetic nature of ethylene oxide; or

   b.   Failed to notify residents, workers, and visitors of the elevated airborne ethylene oxide concentrations; or

12

FILED DATE: 9/20/2018 4:28 PM    2018L010183

    c.  Failed to notify residents, workers, and visitors of the elevated cancer risk that ethylene oxide emissions pose; or

    d.  Failed to adopt or construct modern technology to aid in the prevention of ethylene oxide emissions in the surrounding area; or

    e.  Allowed excess levels of ethylene oxide to emit into the community; or

    f.  Failed to use/seek reasonable alternatives to ethylene oxide when they knew of the dangers associated with it; or

    g.  Failed to control emissions of ethylene oxide from their facility; or

    h.  Were otherwise negligent.

49.    As a direct and proximate result of Defendants' negligence, as set forth above, Plaintiffs have suffered severe and permanent health problems and have endured and will in the future endure pain and suffering; have suffered a loss of the enjoyment of a normal life; have endured and will in the future endure emotional distress; have incurred and will in the future incur expenses for medical and rehabilitative care; have suffered a loss of earnings; and have been damaged in their capacity to earn a living.

Wherefore Plaintiffs demand judgment against Defendants in an amount in excess of $50,000, as shall represent fair and just compensation.

## COUNT V
(Strict Liability – Julie Cannell)

50.    Plaintiffs reallege and incorporate herein by reference all allegations into this claim as if fully set forth herein, and further allege as follows:

51.    Defendants engaged in ultra-hazardous or abnormally dangerous activities by continuously emitting ethylene oxide, a known human carcinogen.

FILED DATE: 9/20/2018 4:28 PM   2018L010183

52.     As a direct and proximate result of Defendants' ultra-hazardous or abnormally dangerous activities, Plaintiffs have suffered severe and permanent health problems and have endured and will in the future endure pain and suffering; have suffered a loss of the enjoyment of a normal life; have endured and will in the future endure emotional distress; have incurred and will in the future incur expenses for medical and rehabilitative care; have suffered a loss of earnings; and have been damaged in their capacity to earn a living.

Wherefore Plaintiffs demand judgment against Defendants in an amount in excess of $50,000, as shall represent fair and just compensation.

## JURY DEMAND

All Plaintiffs demand trial by jury.

Respectfully Submitted,

By:  s/ Brian LaCien
         One of Their Attorneys

Todd A. Smith
Brian LaCien
POWER, ROGERS & SMITH, LLP
70 West Madison Street, 55th Floor
Chicago, IL 60602-4212
Phone: (312) 236-9381
Fax: (312) 236-0920

John Libra
KOREIN TILLERY, LLC
205 North Michigan Avenue
Suite 1950
Chicago, IL 60601
Office: 312-641-9750

14

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

JULIE CANNELL, Individually and On Behalf of All Those
Similarly Situated;
PAMELA MCGONIGAL, Individually and On Behalf of All
Those Similarly Situated.

        Plaintiffs,

    v.

STERIGENICS U.S., LLC; and
GTCR LLC.

        Defendants.

No: 2018 L 010183

## AFFIDAVIT REGARDING DAMAGES SOUGHT

Plaintiffs JULIE CANNELL, Individually and On Behalf of All Those Similarly Situated and Pamela McGonigal, Individually and On Behalf of All Those Similarly Situated, by their attorney, Brian LaCien, being first duly sworn under oath, states as follows:

1.    That the affiant is one of the attorneys of record for the Plaintiffs in this matter.

2.    That the total money damages sought in this civil action exceed the amount of $50,000.00.

Further Affiant Sayeth Not.

_____
BRIAN LACIEN

SUBSCRIBED AND SWORN to before me
this _____ day of _____, 2018.

_____
NOTARY PUBLIC

POWER ROGERS & SMITH, LLP
70 W. Madison Street, 55th Floor
Chicago, IL 60602-4212
312-236-9381
31444

DONNA L SYMANSKI
Official Seal
Notary Public - State of Illinois
My Commission Expires Jun 13, 2020

FILED DATE: 9/20/2018 4:28 PM    2018L010183

FILED DATE: 9/20/2018 4:28 PM    2018L010183

NORMA L SYKHASIN
Official Seal
Notary Public - State of Illinois
My Commission Expires Jun 13, 2020

Return Date: No return date scheduled
Hearing Date: No hearing scheduled
Courtroom Number: No hearing scheduled
Location: No hearing scheduled

FILED
10/11/2018 4:37 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018L010183

FILED DATE: 10/11/2018 4:37 PM    2018L010183

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

JULIE CANNELL, Individually and On Behalf of All Those
Similarly Situated;
PAMELA MCGONIGAL, Individually and On Behalf of All
Those Similarly Situated.

                Plaintiffs,

        v.

STERIGENICS U.S. LLC; and
GTCR LLC.

                Defendants.

No: 2018 L 10183

## ROUTINE MOTION TO FOR LEAVE TO FILE
## SECOND AMENDED COMPLAINT INSTANTER

        Now come the Plaintiffs JULIE CANNELL, Individually and On Behalf of All Those

Similarly Situated and Pamela McGonigal, Individually and On Behalf of All Those Similarly

Situated, by and through their attorneys, POWER ROGERS & SMITH, LLP, and moves this

Honorable Court for an Order allowing Plaintiffs to amend their complaint, voluntarily dismiss

PAMELA MCGONIGAL as a plaintiff without prejudice and without costs and add RUSS

SHENOUDA as a plaintiff. A copy of said Second Amended Complaint is attached hereto and

made a part of this Motion.

                        Respectfully submitted,

                By:    s/Brian LaCien
                        Attorney for Plaintiff

Todd A. Smith
Brian LaCien
POWER ROGERS & SMITH, LLP #31444
70 W. Madison Street, 55th Floor
Chicago, Illinois 60602
Telephone: (312) 236-9381
tsmith@prslaw.com
blacien@prslaw.com

FILED DATE: 10/11/2018 4:37 PM   2018L010183

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

JULIE CANNELL, Individually; and
RUSS SHENOUDA, Individually and On Behalf of All
Those Similarly Situated.

        Plaintiffs,

      v.

STERIGENICS U.S. LLC; and
GTCR LLC.

        Defendants.

No: 2018 L 010183

## SECOND AMENDED COMPLAINT

NOW COMES Plaintiffs RUSS SHENOUDA, Individually and on Behalf of All Those Similarly Situated, and JULIE CANNELL, Individually, by and through their attorneys, POWER ROGERS & SMITH, LLP and KOREIN TILLERY LLC, and hereby complaining of Defendants, STERIGENICS U.S. LLC (hereinafter "Sterigenics") and GTCR LLC (hereinafter "GTCR"), pleading hypothetically and in the alternative, states as follows:

### NATURE OF THE ACTION

1.      This cause of action arises out of Sterigenics' decades long emissions of ethylene oxide ("EtO") from its facility in Willowbrook, Illinois. The Sterigenics plant is used to sterilize medical devices, pharmaceuticals, and food products by placing them into sealed chambers, which are then sprayed with EtO, a powerful sterilizing agent. EtO is a highly flammable, colorless gas and has been a known human carcinogen for decades.

1

FILED DATE: 10/11/2018 4:37 PM    2018L010183

2.      Since 1984, Sterigenics has willfully and negligently released hazardous levels of EtO from its Willowbrook facility into the air, where it has drifted into homes, workplaces, and schools.

3.      Both the Environmental Protection Agency (EPA) and the World Health Organization (WHO) classify EtO as a "'carcinogenic to humans' by the inhalation route of exposure" and find sufficient evidence to establish a causal relationship between EtO exposure and breast, lymphatic, and hematopoietic cancers in humans.[1]

4.      On August 21, 2018, the U.S. Department of Health and Human Services' (HHS) Agency for Toxic Substances and Disease Registry (ATSDR) publicly released an "Evaluation of Potential Impacts for Ethylene Oxide Emissions" analyzing whether the emissions of the Sterigenics Willowbrook facility "pose a public health problem." (See U.S. H.H.S.' "Evaluation of Potential Health Impacts from Ethylene Oxide Emissions," attached as Exhibit A).

5.      The ATSDR's evaluation found that Sterigenics' EtO emissions were not merely a public health problem, **they posed a high enough cancer risk to qualify as a "public health hazard."** (Ex. A, pg. 2). The ATSDR arrived at this conclusion based on air sampling it conducted in areas immediately surrounding the Willowbrook Sterigenics facility to estimate current EtO exposures. As a result of this finding, the ATSDR urged that "Sterigenics take immediate action to reduce EtO emissions at this facility" (Ex. A, pg. 12).

6.      Sterigenics' EtO emissions have exposed Plaintiffs to unacceptable levels of cancer risk. The EPA generally considers the maximum "acceptable risk" for air toxics to be roughly 100 per million (i.e., for every one million people exposed, 100 will develop cancer over their

---

[1] https://cfpub.epa.gov/ncea/iris/iris_documents/documents/subst/1025_summary.pdf &
https://monographs.iarc.fr/wp-content/uploads/2018/06/mono100F-28.pdf *(both accessed 9.25.2018).*

FILED DATE: 10/11/2018 4:37 PM  2018L010183

lifetimes).[2]  However, the 2014 EPA National Air Toxics Assessment (NATA) released on August 22, 2018 found the lifetime cancer risk in the tract of land upon which the Sterigenics facility sits (Tract ID # 17043845902) to be 281.8075 per million, almost three times the maximum acceptable level.

7.        But the August 21, 2018 ATSDR report found that even these concerning estimates of cancer risk were too low. The ATSDR used its 2018 air sampling to calculate that Sterigenics' EtO emissions caused "an additional lifetime risk of 6.4 cancers in a population of 1,000 residents who could be exposed to EtO emissions from Sterigenics." (Ex. A., pg. 10). This is equivalent to 6,400 per million, placing the Willowbrook area's cancer risk at **64 times the EPA's maximum acceptable risk level.**

8.        Moreover, historical EPA emission reports from the Willowbrook Sterigenics facility demonstrate that the amounts of EtO released from the plant over the last decade are significantly    lower    than    the    amounts    released    during    prior    decades. Total air releases in the 1990s were up to **7.7 times higher** than present levels. Sterigenics' EtO releases in the 1980s were even higher than this, with available data suggesting that Sterigenics released **over 20 times more** EtO into the air in 1988 than it did in 2016, the most recent date for which emissions data is publicly available. As a result, the ATSDR report's current estimate of Willowbrook area residents' cancer risk (which is based on sampling conducted this year) must drastically underestimate of the levels of risk faced by those exposed to the Sterigenics facility's emissions in the 1980s and 1990s.

9.        Prior to the ATSDR evaluation's release on August 21, 2018 and the 2014 NATA release on August 22, 2018, the risks and impacts associated Sterigenics' EtO emissions were

---

[2] https://www.epa.gov/national-air-toxics-assessment/nata-frequent-questions *accessed 9.25.2018.*

not generally known to the public. As a result, Willowbrook area residents and workers were not apprised of the unique dangers Sterigenics had exposed them to until this time.

10.     Willowbrook is a southwestern suburb of the city of Chicago with approximately 8,500 residents. The area where the Sterigenics facility is located is in a densely populated metropolitan area, with 19,271 people living within one mile of the facility boundary and tens of thousands more living within a six mile radius. In addition, there are four schools and one daycare facility within a one-mile radius. (U.S. Census, 2016). (Ex. A, pg. 3).

## PARTIES

11.     On and before July 26, 2018, and at all times material, Plaintiff RUSS SHENOUDA, owned and resided at 7822 Virginia Court, Willowbrook, Illinois consistently from 2007 until present day.

12.     On and before July 26, 2018, and at all times material, Plaintiff JULIE CANNELL resided at 544 Ridgemoor Drive, Willowbrook, Illinois consistently from 1987 until 2002 and now resides at 292 East Burlington Street, Riverside, Illinois 60546.

13.     On June 20, 2014, Plaintiff JULIE CANNELL was diagnosed with breast cancer at the age of 30.

14.     On and before July 26, 2018, and at all times material, Defendant STERIGENICS was a multi-national corporation in the business of sterilizing medical devices, pharmaceuticals, food and high-performance materials and operated a facility at 7775 Quincy St., Willowbrook, Illinois with its principal place of business at 2015 Spring Road, Suite 650, Oak Brook, Illinois.

4

FILED DATE: 10/11/2018 4:37 PM    2018L010183

## JURISDICTION AND VENUE

15.      This Court has jurisdiction over all Defendants because they are domiciled with their principal place of business in Illinois, and do regular and continuous business in Cook County, Illinois.

16.      Plaintiffs currently reside in Illinois.

17.      Venue is proper pursuant to 735 ILCS 5/2-101 because Sterigenics' principal place of business is at 2015 Spring Road, Suite 650, Oak Brook, Illinois.

18.      This Court retains jurisdiction pursuant to the local controversy exception to the Class Action Fairness Act (CAFA), 28 U.S.C § 1332(d)(4)(A)(i)(I-III) because: i) more than two-thirds of the proposed class members in the aggregate are citizens of the State of Illinois; ii) Sterigenics is the defendant the proposed class members are seeking significant relief from, whose conduct forms a significant basis for the claims asserted by Plaintiffs, and is a citizen of the State of Illinois; and iii) Plaintiffs' principal injuries resulting from Sterigenics' conduct were incurred in the State of Illinois.  The purpose of the local controversy exception to CAFA is to allow state courts to retain cases when the controversy is so strongly linked to that state, much like the present case.

## CLASS ACTION ALLEGATIONS

19.      Plaintiffs bring this class action complaint pursuant to 735 ILCS 5/2-801:

### a.  Numerosity

This class is so numerous that joinder of all members would be impracticable. Over 19,000 people live within or have lived within a one to six mile radius of the Willowbrook facility from 1984 to the present. Therefore, this class could contain

thousands of members. Class certification would be substantially more practical than joinder.

**b. Commonality**

Common questions of law and fact exist as to all members of the class, including but not limited to:

a. Whether Defendants fraudulently concealed the highly carcinogenetic nature of EtO from the Plaintiffs;

b. Whether Defendants could have upgraded their facility to reduce EtO emissions;

c. Whether Defendants acted unreasonably in refusing to upgrade their facility to reduce EtO emissions;

d. Whether Defendants acted unreasonably in failing to warn class members that its facility emits EtO into the air;

e. Whether EtO emissions from Defendants' facility interfered with class members' right to breathe clean air without dangerous of EtO;

f. Whether Defendants caused Plaintiffs' property values to diminish;

g. Whether Defendants interfered with the use and enjoyment of Plaintiffs' properties;

h. Whether Defendants trespassed on Plaintiffs' properties by emitting EtO for decades.

Common questions of law and fact predominate over any questions pertaining to individual members.

**c. Adequacy**

6

FILED DATE: 10/11/2018 4:37 PM   2018L010183

FILED DATE: 10/11/2018 4:37 PM   2018L010183

The representative Plaintiffs will fairly and adequately protect the interests of the entire class. Plaintiffs have no adverse interest to any members of the class. Plaintiffs' intent is to prosecute this case on behalf of all class members, not just themselves. Further, Plaintiffs are relying upon counsel that have knowledge and experience in handling class action lawsuits.

### d. Appropriateness and Efficiency

This class action is an appropriate method for the fair and efficient adjudication of the controversy because it concerns potentially thousands of plaintiffs all complaining of Defendant's wrongful conduct. A class action is therefore the most efficient and effective method for adjudicating this matter.

20.     Plaintiffs bring this action on behalf of themselves and all current Illinois residents similarly situated who purchased property or resided within 6 miles of the Sterigenics facility at 7775 Quincy St., Willowbrook, State of Illinois, from 1984 to the date of this complaint for losses and damages, stemming from the use and release of ethylene oxide, including but not limited to loss of value and infringement on personal and real property, statutory penalties, and injunctive relief/equitable relief. Excluded from the class are Defendants and their affiliates, predecessors, successors, officers, directors, agents, servants, employees, and the immediate family members of such persons. Plaintiffs reserve the right to modify the class definition or propose subclasses if discovery reveals that such modifications are appropriate.

### FACTUAL ALLEGATIONS

### A. Ethylene Oxide Exposure Carries a High Risk of Cancer in Humans

21.     The causal link between EtO and human cancer has been documented for decades. EtO is well-known mutagen – the EPA reports that the "DNA-damaging properties of EtO have

FILED DATE: 10/11/2018 4:37 PM   2018L010183

been studied since the 1940s."[3] Meanwhile, U.S. sterilizer companies became broadly aware of EtO's potential carcinogenic effects in 1977, with most sterilizing companies taking steps to lower worker exposure though better venting in 1978.[4]

22.     Numerous studies have been published demonstrating that EtO causes lymphatic, hematopoietic, brain, lung, connective tissue, uterus, and mammary gland cancers in mice and rats.[5]

23.     The National Institute of Occupational Safety and Health (NIOSH) first raised awareness of the dangers of EtO in a 1977 bulletin aimed at facilities using EtO as a sterilant.[6] NIOSH recommended "that ETO be considered as mutagenic and potentially carcinogenic to humans and that occupational exposure to it be minimized," with alternate sterilization procedures used wherever feasible.[7]

24.     In 1981, NIOSH released a follow-up bulletin titled "Ethylene Oxide (EtO): Evidence of Carcinogenicity," recommending that workplaces regard EtO as "a potential occupational carcinogen" based on the results of an industry-sponsored study.[8]

25.     In 1985, the U.S. HHS National Toxicology Program classified EtO as "reasonably anticipated to be a human carcinogen."[9]

---

[3] https://cfpub.epa.gov/ncea/iris/iris_documents/documents/subst/1025_summary.pdf *accessed 9.25.2018.*
[4] Kyle Steenland, et al., "Mortality among workers exposed to ethylene oxide," *The New England Journal of Medicine* 324, no. 20 (1991): 1403.
[5] Kyle Steenland, et al., "Mortality among workers exposed to ethylene oxide," *The New England Journal of Medicine* 324, no. 20 (1991): 1403.
[6] https://www.cdc.gov/niosh/docs/77-200/ *accessed 9.25.2018.*
[7] https://www.cdc.gov/niosh/pdfs/77-200a.pdf?id=10.26616/NIOSHPUB77200 *accessed 9.25.2018.*
[8] https://www.cdc.gov/niosh/docs/81-130/ *accessed 9.25.2018.*
[9] https://ntp.niehs.nih.gov/ntp/roc/content/profiles/ethyleneoxide.pdf *accessed 9.25.2018.*

8

FILED DATE: 10/11/2018 4:37 PM    2018L010183

26.    In 1987, the state of California (home to two Sterigenics EtO sterilizing plants)[10] officially designated EtO a carcinogen.[11]

27.    In the early 1990s, the first high quality, long-term research on ethylene oxide's carcinogenic impacts on humans was published. This research was undertaken based on a NIOSH study tracking the mortality of 18,254 U.S. workers who had been exposed to EtO between the 1940s and 1980s at sterilizer plants much like the Sterigenics Willowbrook facility. In fact, according to a Sterigenics employee, the NIOSH study actually included "a couple" of Sterigenics facilities.[12] The NIOSH study ultimately found causal links between exposure to EtO and increased mortality from lymphatic, hematopoietic, and breast cancers. The research on the NIOSH study has since been heavily cited and relied upon by major regulatory organizations, including the WHO and EPA.

28.    The first publication based on this cohort came out in May 1991, finding a "slight but significant increase among men" for hematopoietic cancer with risk of death increasing over time since first exposure to EtO (the study also noted that men were more likely to be exposed to higher amounts of EtO).[13]

29.    In 1994, based in part on this research, the WHO's International Agency for Research on Cancer (IARC) listed EtO as a Group 1 human carcinogen, the agency's highest risk classification[14]

---

[10] https://web.archive.org/web/20180210142202/https://www.sterigenics.com/About_Us/Facilities.php *accessed 9.25.2018.*

[11] http://articles.latimes.com/1991-03-05/local/me-66_1_toxic-gas *accessed 9.25.2018.*

[12] https://yosemite.epa.gov/Sab/Sabproduct.nsf/B839FA45582C200185257D9500496B0E/$File/EPA-+Sterigenics+Speaking+Points+for+IRIS+SAB+Review+Nov+2014.pdf *accessed 9.25.2018.*

[13] Kyle Steenland, et al., "Mortality among workers exposed to ethylene oxide," *The New England Journal of Medicine* 324, no. 20 (1991): 1402.

[14] World Health Organization, "Ethylene Oxide" (2003): 35. *Accessed at* http://www.who.int/ipcs/publications/cicad/en/cicad54.pdf *on 9.25.2018.*

FILED DATE: 10/11/2018 4:37 PM   2018L010183

30.     The U.S. HHS National Toxicology Program in turn reclassified EtO as "known to be a human carcinogen" in 2000, updating its previous designation as "reasonably anticipated to be a human carcinogen" from 1985.[15]

31.     The U.S. Department of Labor's Occupational Safety and Health Administration (OSHA) 2002 fact sheet on EtO indicates that "[b]oth human and animal studies show that EtO is a carcinogen" and requires employers to provide clear signs and labels notifying workers of EtO's "carcinogenic and reproductive hazards."[16]

32.     Follow-up research on the NIOSH cohort was published in 2003 and found that EtO was associated with breast cancer in women, with a positive trend of increased cancer risk with increased EtO exposure.[17]

33.     Additional NIOSH cohort research came out the following year (2004), finding increased incidence of hematopoietic cancer with greater EtO exposure among men, particularly in the case of lymphoid tumors. The study also found "a significant excess of bone cancer compared to the US population," a finding supported by some animal studies, but drew no conclusions from this finding due to this finding being based on a small number of deaths.[18]

34.     Subject to extensive lobbying from sterilization companies, the EPA continued to define EtO as "probably carcinogenic to humans" until 2016. Sterigenics took part in these efforts, submitting comments in 2014 seeking to influence the EPA's draft Integrated Risk Information System (IRIS) reassessment of EtO's risks. In a November 12, 2014 letter, Sterigenics' Senior Vice President of Global Environmental, Health & Safety, Kathleen

---

[15] https://ntp.niehs.nih.gov/ntp/roc/content/profiles/ethyleneoxide.pdf *accessed 9.25.2018.*
[16] https://www.osha.gov/OshDoc/data_General_Facts/ethylene-oxide-factsheet.pdf *accessed 9.25.2018.*
[17] Kyle Steenland, et al., "Ethylene oxide and breast cancer incidence in a cohort study of 7576 women (United States)," *Cancer Causes and Control* 14, no. 6 (2003): 531.
[18] Kyle Steenland, et al., "Mortality analyses in a cohort of 18 235 ethylene oxide exposed workers: follow up extended from 1987 to 1998," *Occupational & Environmental Medicine* 61, no. 1 (2004): 6-7.

FILED DATE: 10/11/2018 4:37 PM   2018L010183

Hoffman, expressed "significant concerns regarding the [EPA's] cancer risk estimates for E[t]O" and argued that "the current assessment [which raised the risks associated with EtO] results in the risk of E[t]O being inappropriately magnified."[19] According to Hoffman, an IRIS assessment closely linking ethylene oxide to cancer risks was problematic because it could "lead to the further regulation of E[t]O exposure." As a result, Hoffman argued that the EPA should not rely too heavily on the NIOSH cohort study that made these causal linkages, even though these conclusions were based in part on the health outcomes of former Sterigenics employees.

35.      Kathleen Hoffman is also the President of the Ethylene Oxide Sterilization Association, another group that has lobbied to EPA to maintain lower ethylene oxide cancer risk estimates.[20]

36.      The EPA ultimately rejected industry arguments against increasing the cancer risk associated with EtO. The final IRIS assessment released in 2016 reclassified EtO as "carcinogenic to humans,"[21] representing a "30-fold increase in cancer potency" (Ex. A, pg. 1). This finding brought the EPA assessment in line with other federal agencies' findings.

37.      Based on the foregoing, Sterigenics knew or should have known about the human cancer risks associated with EtO when it first began operating its Willowbrook facility in 1984. Sterigenics took part in and was familiar with the results of the NIOSH cohort study. Moreover, Sterigenics was exposed to NIOSH and OSHA industry guidance on occupational EtO risks as well as regulatory classifications of EtO as a human carcinogen. The company was well aware

---

[19]

https://yosemite.epa.gov/sab/sabproduct.nsf/BC3AE563588248BC85257D8E00785A32/$File/sterigenics+comments.pdf *accessed 9.25.2018.*
[20] https://www.sterigenics.com/services/steripro_consulting/specialization/CV_-_Environmental_Safety.pdf *accessed 9.25.2018.*
[21] https://cfpub.epa.gov/ncea/iris/iris_documents/documents/subst/1025_summary.pdf *accessed 9.25.2018.*

of existing research and regulation demonstrating that EtO could cause cancer in those who breathed it in.

38.     Yet, as will be detailed below, while Sterigenics took steps to protect its workers by venting EtO from its Willowbrook facility, in so doing it recklessly and negligently released EtO into the air breathed by Plaintiffs. Sterigenics failed to take reasonable steps to limit emissions from its Willowbrook plant, exposing those working, residing, and studying nearby to dramatically increased cancer risks.

## B. Sterigenics Has Been Emitting Ethylene Oxide for Decades

39.     Sterigenics has operated, maintained, and used its Willowbrook sterilizing facility at 7775 Quincy Street since 1984. The Willowbrook facility consists of two buildings, Building 1 and Building 2, with fifteen and four sterilization chambers respectively. Building 1's chambers were built in 1984 and Building 2's chambers were built in 1999 and 2012 (Ex. A, pg. 2).

40.     Each chamber stores various medical devices, pharmaceuticals, and food products contained on 40" x 48" pallets, which are then sprayed with EtO and other chemical compounds, such as gamma, Ebeam, and x-ray sterilization. (Ex. A, pg. 2). Figure 1, below, roughly illustrates an EtO sterilization process:

12

FILED DATE: 10/11/2018 4:37 PM   2018L010183

**Figure 1: Ethylene Oxide Sterilization Process[22]**



41.     From 1984 to present, the back vents on the Willowbrook plant's sterilization chambers were uncontrolled, allowing uninhibited passive release of EtO into the surrounding environment.

42.     This situation persisted in spite of Sterigenics Vice President of Global Environmental, Health & Safety Kathleen Hoffman's 2014 assertion to the EPA that the EtO sterilizing industry "has utilized emission controls to significantly reduce environmental E[t]O emissions during the past several years."[23] Kathleen Hoffman made this statement in order to convince the EPA there was no reason to raise the cancer risk EtO posed to the public, even as her own company had not implemented such emission controls at its Willowbrook facility and was exposing the public to elevated cancer risks.

43.     Only now, after the ATSDR's recent investigation finding hazardous levels of EtO around its plant, has Sterigenics reportedly begun to install pollution controls to limit passive EtO release (Ex. A, pg. 2).

---

[22] https://www.csb.gov/assets/1/20/sterigenics_report.pdf?13828
[23] https://yosemite.epa.gov/sab/sabproduct.nsf/BC3AE563588248BC85257D8E00785A32/$File/sterigenics+comment s.pdf *accessed 9.25.2018.*

13

FILED DATE: 10/11/2018 4:37 PM  2018L010183

44.     Therefore, Sterigenics has been passively emitting EtO from its Willowbrook facility into the surrounding community for the past 34 years (Ex. A, pg. 2).

45.     Emissions data from the United States Environmental Protection Agency's Toxic Release Inventory (TRI) show large amounts of EtO emissions in the late-1990s (see Figure 3 and Figure 4, below).

46.     No continuous data exist before 1995 on ambient air releases. However, the ATSDR notes that the available data suggest that "substantially higher ambient releases prior to 1995 were likely." (Ex. A, pg. 2). Indeed, a lone 1988 report on Sterigenics' Willowbrook facility's EtO emissions accessed through the EPA's TRI Explorer Database supports this contention.[24] The 1988 report indicates that the Willowbrook facility emitted 97,518 pounds of EtO into the air.[25] This is over three times greater than the highest amount recorded in the contiguous 1995-2016 data set (32,200 pounds in 1998) and over 20 times greater than emissions levels in 2016 (4,205 pounds).

47.     Figure 2 and Figure 3 illustrate available data on the total EtO air emissions released from the Willowbrook Sterigenics Facility:

---

[24]

https://iaspub.epa.gov/triexplorer/release_trends?tri=60521GRFFT7775Q&p_view=TRYR&trilib=TRIQ1&sort=_VIEW_&sort_fmt=1&state=All+states&county=All+counties&chemical=000075218&industry=ALL&core_year=&tab_rpt=1&FLD=AIRLBY&FLD=E1&FLD=E2&FLD=E3&FLD=E4&FLD=E41&FLD=E42&FLD=E5&FLD=E52&FLD=E53&FLD=E53A&FLD=E53B&FLD=E54&FLD=E51&FLD=E51A&FLD=E51B&FLD=TSFDSP&FLD=m10&FLD=m41&FLD=m62&FLD=potwmetl&FLD=m71&FLD=m81&FLD=m82&FLD=m72&FLD=m63&FLD=m64&FLD=m65&FLD=m66&FLD=m67&FLD=m73&FLD=m79&FLD=m90&FLD=m94&FLD=m99&FLD=RELLBY

[25]

https://ofmpub.epa.gov/enviro/tri_formr_partone_v2.get_thisone?rpt_year=1988&dcn_num=1388025024213&ban_flag=Y

14

FILED DATE: 10/11/2018 4:37 PM   2018L010183

**Figure 2: TRI total air emissions (in pounds), by Sterigenics Willowbrook – Ethylene Oxide. 1988, 1995-2016**[26]

| Year | Pounds EtO |
|------|-----------|
| 1988 | 97,518 |
| 1989 | - |
| 1990 | - |
| 1991 | - |
| 1992 | - |
| 1993 | - |
| 1994 | - |
| 1995 | 18,373 |
| 1996 | 22,420 |
| 1997 | 27,020 |
| 1998 | 32,200 |
| Year | Pounds EtO |
| 1999 | 2,640 |
| 2000 | 7,628 |
| 2001 | 8,113 |
| 2002 | 6,957 |
| 2003 | 6,909 |
| 2004 | 5,312 |
| 2005 | 2,910 |
| 2006 | 4,274 |
| 2007 | 3,966 |
| Year | Pounds EtO |
| 2008 | 3,858 |
| 2009 | 3,690 |
| 2010 | 7,151 |
| 2011 | 7,160 |
| 2012 | 7,091 |
| 2013 | 6,133 |
| 2014 | 5,241 |
| 2015 | 4,899 |
| 2016 | 4,205 |

---

[26] https://iaspub.epa.gov/triexplorer/release_trends?tri=60521GRFFT7775Q&p_view=TRYR&trilib=TRIQ1&sort=_V IEW_&sort_fmt=1&state=All+states&county=All+counties&chemical=000075218&industry=ALL&core_year=&t ab_rpt=1&FLD=AIRLBY&FLD=E1&FLD=E2&FLD=E3&FLD=E4&FLD=E41&FLD=E42&FLD=E5&FLD=E5 2&FLD=E53&FLD=E53A&FLD=E53B&FLD=E54&FLD=E51&FLD=E51A&FLD=E51B&FLD=TSFDSP&FLD =m10&FLD=m41&FLD=m62&FLD=potwmetl&FLD=m71&FLD=m81&FLD=m82&FLD=m72&FLD=m63&FL D=m64&FLD=m65&FLD=m66&FLD=m67&FLD=m73&FLD=m79&FLD=m90&FLD=m94&FLD=m99&FLD= RELLBY

FILED DATE: 10/11/2018 4:37 PM 2018L010183

**Figure 3: TRI total air emissions reported (in pounds), by Sterigenics Willowbrook – Ethylene Oxide, 1995-2016. [27] [28]**



48.     Nor was passive venting the only manner in which Sterigenics exposed area residents, workers, and students to EtO. Sterigenics has also made at least one mass "uncontrolled release" of EtO. In 2015, Sterigenics signed a consent order with the State of Illinois in response to an October 7, 2013 release of ethylene glycol (an EtO byproduct) into the soil and groundwater surrounding the Willowbrook plant and another uncontrolled release of EtO into the atmosphere (See "Consent Order," attached as Exhibit B). Sterigenics initially reported that it had released 30 pounds of EtO into the atmosphere in this incident, but subsequently revised its estimate to 12 pounds. Sterigenics ultimately paid a $50,000 civil penalty for these uncontrolled releases.

---

[27] Source: Toxic Release Inventory (TRI): https://www.epa.gov/enviro/tri-overview.
[28] Exhibit A, page 2.

49. Notably, even after this incident, Sterigenics did not install control measures on the vents that freely allowed EtO to disperse into the atmosphere.

50. Nor did Sterigenics' EtO emissions, once released, disperse far. The half-life of EtO in the atmosphere is roughly 211 days. According the IARC, "[n]either rain nor absorption of aqueous aerosols is capable of removing ethylene oxide from the atmosphere."[29] In addition, EtO is heavier than air, meaning that it can linger and travel along the ground.[30] Consequently, Sterigenics' releases of EtO are likely to have lingered at breathing level in the area around its facility for a considerable time, causing ongoing harm the Plaintiffs.

**C. Sterigenics' Activity in Willowbrook Is Part of a Broader Pattern of Behavior**

51. Sterigenics' behavior in Willowbrook fits into a broader pattern of recklessness related to its EtO facilities.

52. Between 2004 and 2009, Sterigenics released excessive amounts of EtO into the atmosphere from its sterilizing facility in the Dutch town of Zoetermeer. The excess EtO was reportedly due to Sterigenics failure to replace broken filters.[31] Like the Willowbrook plant, the Zoetermeer facility was set amidst a residential neighborhood, meaning that approximately 2,000 residents were potentially exposed.[32] Sterigenics ultimately shut down and demolished the Zoetermeer plant.[33]

53. In the U.S., Sterigenics' California facilities have a history of regulatory problems. Sterigenics was investigated and fined $450,000 by the U.S. Department of Justice (DOJ) in

---

[29] https://monographs.iarc.fr/wp-content/uploads/2018/06/mono100F-28.pdf *accessed 9.25.2018.*
[30] http://www.inchem.org/documents/icsc/icsc/eics0155.htm *accessed 9.25.2018.*
[31] https://www.omroepwest.nl/nieuws/3574491/Rechtszaak-tegen-gifuitstoter-Sterigenics-na-jaren-van-start-Hoe-zat-het-ook-alweer *accessed 9.25.2018.*
[32] https://www.omroepwest.nl/nieuws/2648769/Niet-vaker-kanker-rondom-Sterigenics-in-Zoetermeer *accessed 9.25.2018.*
[33] https://www.dutchnews.nl/news/2010/07/zoetermeer_shuts_firm_for_brea/ & https://www.zoetermeer.nl/inwoners/uitstoot-schadelijke-stoffen-bij-sterigenics_46553?pk_campaign=Redirects&pk_kwd=sterigenics *accessed 9.25.2018.*

17

FILED DATE: 10/11/2018 4:37 PM   2018L010183

2015 for failing "to keep and maintain adequate records pertaining to controlled substances." Specifically, the DOJ found that between April 4, 2011 and April 4, 2013, Sterigenics failed compliance with the Controlled Substance Act at least 156 times.[34]

54.     More seriously, Sterigenics failed to properly train employees in the safe use of EtO at its sterilizing plant in Ontario, California, causing a major EtO explosion on August 19, 2004 that injured four employees and forcing the evacuation of the plant and neighboring facilities. The U.S. Chemical Safety and Hazard Investigation Board (CSB) investigation into the incident found that Sterigenics had failed to ensure its maintenance employees understood the hazards associated with EtO-based processes, which led them to manually override safety devices, causing the explosion. The CSB faulted Sterigenics management for not implementing "company-wide engineering control recommendations that could have prevented this explosion" and failing to follow recommendations on EtO concentrations disseminated by NIOSH.[35]

55.     At Sterigenics' Willowbrook, Illinois facility, OSHA records several safety violations for which the company has paid thousands of dollars in fines.[36] Specifically, Sterigenics paid $5,062 in fines in 2006 for several "Serious" violations that left workers exposed to unspecified "highly hazardous chemicals." [37] Given the work undertaken at the Willowbrook facility, these "highly hazardous chemicals" likely included EtO.

56.     Current and former Sterigenics employees have also raised concerns about company safety practices around EtO. For instance, on the company's Glassdoor page, one

---

[34] https://www.justice.gov/usao-ndca/pr/bay-area-company-agrees-pay-450000-settle-claims-failing-maintain-adequate-records *accessed 9.25.2018.*
[35] https://www.csb.gov/assets/1/20/sterigenics_report.pdf?13828 *accessed 9.25.2018.*
[36] E.g. https://www.osha.gov/pls/imis/establishment.inspection_detail?id=308153717 *accessed 9.25.2018.*
[37] https://www.osha.gov/pls/imis/establishment.inspection_detail?id=308153717 &
https://www.osha.gov/pls/imis/establishment.violation_detail?id=308153717&citation_id=01001 *accessed 9.25.2018.*

FILED DATE: 10/11/2018 4:37 PM   2018L010183

former employee noted on June 25, 2013 that "[t]here is a minimum attention to quality & safety which will backfire eventually."[38] Another stated on October 9, 2015 that "you're working with Ethylene Oxide which is extremely dangerous and the company seems to cut corners around safety at times."[39] Perhaps most concerning, an "EtO A Operator" in the Charlotte, North Carolina facility reported on February 24, 2015 that "Safety is an issue sometimes regarding procedures. The maintenance team cuts a lot of corners." This employee advised management to "Lock out the overrides for equipment. Fire any maintenance manager that shows operators how to manually operate equipment without it showing on the computer system."[40] Notably, this comment comes after the 2004 Ontario, California explosion. As discussed above, the CSB identified maintenance cutting corners and manually overriding equipment as factors leading to that incident. This employee review suggests that the safety and management failures that caused the California explosion were not addressed system-wide and continued to be in evidence at other Sterigenics facilities over a decade later.

57.     Taken together, these elements demonstrate a pattern of Sterigenics consistently failing to implement company-wide safety measures across all its facilities, despite research, NIOSH bulletins, regulatory interventions, and problematic incidents demonstrating their need. This willingness to "cut corners" and lack of oversight may explain why Sterigenics failed for decades to install emission mitigation technology to limit passive venting of EtO from its Willowbrook facility.

**D. Willowbrook Air Quality and the Health Implications**

---

[38] https://www.glassdoor.com/Reviews/Employee-Review-Sterigenics-RVW2768416.htm *accessed 9.25.2018.*
[39] https://www.glassdoor.com/Reviews/Employee-Review-Sterigenics-RVW8236300.htm *accessed 9.25.2018.*
[40] https://www.glassdoor.com/Reviews/Employee-Review-Sterigenics-RVW5987616.htm *accessed 9.25.2018.*

FILED DATE: 10/11/2018 4:37 PM    2018L010183

58.     Scientific analysis demonstrates that Sterigenics failure to install appropriate emissions mitigation technology has exposed residents, workers, and students to hazardous levels of EtO for the last 34 years.

59.     The 2014 EPA NATA database already demonstrated unacceptably high levels of cancer risk in the area surrounding the Willowbrook plant. The database places the cancer risks of the land tracts measured in Willowbrook as the highest in Illinois and among the highest in the country (the tract upon which the Sterigenics facility sits is in the 99.98[th] percentile for cancer risk level in the U.S.).[41] These risk levels are comparable to those of "Cancer Alley," an area along the Mississippi River famous for high incidences of cancer.[42]

60.     The NATA database also makes clear that the elevated cancer risks around Willowbrook are primarily due to EtO emissions, attributing 88.98% of the risk to this source. Sterigenics is the only major emitter of EtO in this area. Notably, this data was collected **before** the EPA revised the way it calculated the carcinogenicity of EtO to accommodate "a 30-fold increase in cancer potency" (Ex. A, pg. 2).

61.     As discussed earlier, the EPA generally considers the maximum "acceptable risk" for air toxics to be roughly a 100 per million (i.e., for every one million people exposed, 100 develop cancer over their lifetimes).[43] However, a 2014 EPA National Air Toxics Assessment (NATA) found the lifetime cancer risk in the tract of land upon which the Sterigenics plant sits (Tract ID # 17043845902) to be 281.8075 per million, almost three times the maximum acceptable level.

---

[41] https://www.epa.gov/national-air-toxics-assessment *accessed 9.25.2018.*
[42] http://www.chicagotribune.com/news/local/breaking/ct-met-dupage-cancer-pollution-rauner-20180827-story.html *accessed 9.25.2018.*
[43] https://www.epa.gov/national-air-toxics-assessment/nata-frequent-questions *accessed 9.25.2018.*

FILED DATE: 10/11/2018 4:37 PM    2018L010183

62.     Figure 4 below depicts a 2014 NATA map demonstrating above-acceptable levels (>100 per million) of cancer risk in the tracts surrounding the Willowbrook facility:

**Figure 4: 2014 NATA map depicting levels of lifetime cancer risk surrounding the Willowbrook Sterigenics facility**



63.     More recently, for the August 21, 2018 evaluation of the Willowbrook plant's EtO emissions, the EPA modeled short and long-term ambient EtO concentrations around the facility to determine the impact of site emissions. (See Figure 3 on Ex. A, pg. 4).

64.     Figure 5 shows large amounts of EtO emissions surrounding both Sterigenics buildings and pervading the community up to a one-mile radius.

65.     Figure 5 also depicts a 5-year average to represent chronic exposures and maximum 1- and 8-hour averages to represent acute exposures at 882 community receptor points.

**Figure 5. AERMOD modeling output: 5-year average exposure estimates**



66.    The U.S. EPA collected 39 air samples from 26 discrete locations in the Willowbrook community on May 16 and 17, 2018 using SUMMA canisters. (Ex. A, pg. 5).

67.    SUMMA canisters are "airtight, stainless-steel containers with an inner surface that has been electro-polished and chemically deactivated," ensuring an accurate air sample is collected. (Ex. A, pg. 5).

22

FILED DATE: 10/11/2018 4:37 PM    2018L010183

68.     Based on the samples collected, "chronic upper bound residential (2.1 μg/m3) and occupational (9.1 μg/m3) exposures in the community" existed, with higher concentrations during the nighttime. (Ex. A, pg. 7).

**Figure 6. Site-specific ADAF calculations for residential exposure**

| Age Range | ADAF | U.S. EPA unadjusted | EPC (μg/m³) | Duration Adjustment | Partial Risk |
|---|---|---|---|---|---|
| 0 to <2 yrs | 10 | $2.99 \times 10^{-3}$ | 2.1 | 2 years/78 years | $1.6 \times 10^{-3}$ |
| 2 to <16 yrs | 3 | $2.99 \times 10^{-3}$ | 2.1 | 14 years/78 years | $3.4 \times 10^{-3}$ |
| 16 to 33 yrs | 3 | $2.99 \times 10^{-3}$ | 2.1 | 17 years/78 years | $1.4 \times 10^{-3}$ |
| | | | | Lifetime Risk | $6.4 \times 10^{-3}$ |

69.     Ultimately, the August 21, 2018 report calculated that Sterigenics' EtO emissions caused "an additional lifetime risk of 6.4 cancers in a population of 1,000 residents who could be exposed to EtO emissions from Sterigenics," equivalent to 6,400 per million (Ex. A., pg. 10).  These updated calculations place the area's cancer risk at 64 times the EPA's maximum acceptable risk level.

70.     It should also be noted that, if anything, the EPA samples and models are a massive underestimate for the ambient levels of EtO the area has been exposed to in the last 34 years. As noted earlier, total EtO air releases from the Willowbrook facility were over 20 times higher in 1988 than in 2016 (2016 levels are presumably comparable to present release levels). In addition, release levels in the late 1990s were still up to 7.7 times higher than 2016 levels.

71.     Throughout the period of exposure, the area immediately around the Willowbrook plant has contained numerous homes and businesses, as well as four schools and a daycare facility (See Figure 2 on Ex. A, pg. 3). As a result, thousands of residents, workers, and students have been exposed to elevated levels of EtO. Figure 7 demonstrates the proximity of these facilities to the Willowbrook plant:

FILED DATE: 10/11/2018 4:37 PM 2018L010183

**Figure 7. Aerial map of the community surrounding Sterigenics Corporation[44]**



72.     One of the schools near the Sterigenics facility is Gower West Elementary School, with recent enrollment of almost 500 students.[45] Another is Hinsdale South High School, with enrollment of over 1,500 students.[46] Hinsdale South High School has been open and active at its present locations since prior to the Sterigenics facility's opening in 1984. Consequently, thousands of minors have been exposed to unsafe levels of EtO over the years both in classrooms and outdoor athletic facilities.

73.     The EPA notes that EtO exposure could have especially deleterious effects on children, as "the immaturity of *detoxifying* enzymes in very young children may increase children's susceptibility because children may clear EtO at a slower rate than adults... In the

---

[44] http://www.chicagotribune.com/news/local/breaking/ct-met-sterigenics-cancer-risks-politics-20180919-story,amp.html *accessed 9.25.2018.*
[45] http://webprod.isbe.net/ereportcard/publicsite/getReport.aspx?year=2017&code=1902206202002_e.pdf *accessed 9.25.2018.*
[46] http://webprod.isbe.net/ereportcard/publicsite/getReport.aspx?year=2017&code=1902208600002_e.pdf *accessed 9.25.2018.*

absence of data on the relative susceptibility associated with EtO exposure in early life, increased early-life susceptibility is assumed."[47] Thus it is likely that students at schools within a one-mile radius of the Willowbrook facility in the 1980s and 1990s were particularly vulnerable to the mutagenic effects of EtO.

74.     Although apprised of the severe dangers associated with EtO, Sterigenics nonetheless willfully and negligently emitted large amounts of this toxic gas from its Willowbrook facility for 34 years. Moreover, Sterigenics failed to warn those near its plant of their exposure to EtO and the risks to their health this exposure entailed.  Consequently, Sterigenics exposed Plaintiffs and thousands like them to devastating health consequences.

## COUNT I
(Nuisance – Russ Shenouda, Individually and On Behalf of All Those Similarly Situated)

75.     Plaintiffs reallege and incorporate herein by reference all allegations into this claim as if fully set forth herein, and further allege as follows:

76.     At all times relevant hereto, Defendants knew ethylene oxide to be hazardous and harmful to human beings.

77.     As a direct and proximate result of Defendants' operation, maintenance, and use of its sterilizing facility, ethylene oxide continuously invaded and caused to be contaminated the areas immediately surrounding and on Plaintiffs' properties.

78.     As a direct and proximate result of Defendants' operation, maintenance, and use of its sterilizing facility, Plaintiffs sustained and will continue to sustain severe and permanent physical damage to their properties and damage to their property value due to the decades long emission of ethylene oxide.

---

[47] https://cfpub.epa.gov/ncea/iris/iris_documents/documents/toxreviews/1025tr.pdf at pg. 3-71. *Accessed 9.25.2018.*

25

FILED DATE: 10/11/2018 4:37 PM    2018L010183

79.     Plaintiffs bring this action for all monetary damages associated with its ethylene oxide contamination, including damages for reduction of value of their property. Finally, Plaintiffs request that Defendants be required to pay the costs associated with remediating all ethylene oxide contamination that is located on or threatens their property.

Wherefore, Russ Shenouda, Individually and On Behalf of All Those Similarly Situated, demand judgment against Defendants in an amount in excess of $50,000, as shall represent fair and just compensation.

## COUNT II
(Trespass – Russ Shenouda, Individually and On Behalf of All Those Similarly Situated)

80.     Plaintiffs reallege and incorporate herein by reference all allegations into this claim as if fully set forth herein, and further allege as follows:

81.     Defendants have trespassed through unlawful, unauthorized, and wrongful entry and damage to Plaintiffs' land by depositing airborne and waterborne particles of radiation and other hazardous materials on the Plaintiffs' properties without their permission or invitation.

82.     Defendants were aware that trespass was occurring.

83.     This trespass has caused actual and substantial damage to the Plaintiffs' properties, and has interfered with the Plaintiffs exclusive possession of their properties. This trespass is continuing and ongoing.

84.     Defendants have indirectly interfered with Plaintiffs possessory rights due to migration of ethylene oxide emitting from its sterilizing facility. This interference was unreasonable and foreseeable.

85.     As a direct and proximate result of Defendants' trespass, Plaintiffs' properties sustained and will continue to sustain severe and permanent physical damages by ethylene oxide contamination.

26

FILED DATE: 10/11/2018 4:37 PM    2018L010183

86.     Plaintiffs bring this action for all monetary damages associated with its ethylene oxide contamination, including damages for reduction of value of their property. Finally, Plaintiffs request that Defendants be required to pay the costs associated with remediating all ethylene oxide contamination that is located on or threatens their property.

Wherefore, Russ Shenouda, Individually and On Behalf of All Those Similarly Situated, demand judgment against Defendants in an amount in excess of $50,000, as shall represent fair and just compensation.

### COUNT III
(Fraudulent Concealment – All Plaintiffs)

87.     Plaintiffs reallege and incorporate herein by reference all allegations into this claim as if fully set forth herein, and further allege as follows:

88.     Since 1984, Defendants had actual or constructive knowledge of the highly carcinogenetic nature of ethylene oxide and deliberately hid and/or suppressed information pertaining to the highly carcinogenetic nature of ethylene oxide from Willowbrook residents, workers, and visitors.

89.     As a direct and proximate result of Defendants' deliberate hiding and/or suppression of information pertaining to the highly carcinogenetic nature of ethylene oxide, Plaintiffs have suffered harm and damages.

Wherefore Plaintiffs demand judgment against Defendants in an amount in excess of $50,000, as shall represent fair and just compensation.

### COUNT IV
(Negligence – Julie Cannell)

90.     JULIE CANNELL realleges and incorporates herein by reference all allegations into this claim as if fully set forth herein, and further allege as follows:

27

FILED DATE: 10/11/2018 4:37 PM   2018L010183

91.     Defendants owed a duty to JULIE CANNELL to operate, maintain, control, and use its Willowbrook facility, including the emitting of ethylene oxide, in a manner that would not cause harm to JULIE CANNELL.

92.     Defendants breached that duty by emitting ethylene oxide in a dangerous and negligent way so as to cause the formation of cancer in JULIE CANNELL and/or place her at a higher risk of acquiring cancer related to ethylene oxide. Specifically, Defendants breached their duty in that they:

    a.  Failed to notify residents, workers, and visitors of the highly carcinogenetic nature of ethylene oxide; or

    b.  Failed to notify residents, workers, and visitors of the elevated airborne ethylene oxide concentrations; or

    c.  Failed to notify residents, workers, and visitors of the elevated cancer risk that ethylene oxide emissions pose; or

    d.  Failed to adopt or construct modern technology to aid in the prevention of ethylene oxide emissions in the surrounding area; or

    e.  Allowed excess levels of ethylene oxide to emit into the community; or

    f.  Failed to use/seek reasonable alternatives to ethylene oxide when they knew of the dangers associated with it; or

    g.  Failed to control emissions of ethylene oxide from their facility; or

    h.  Were otherwise negligent.

93.     As a direct and proximate result of Defendants' negligence, as set forth above, JULIE CANNELL has suffered severe and permanent health problems and has endured and will in the future endure pain and suffering; has suffered a loss of the enjoyment of a normal

FILED DATE: 10/11/2018 4:37 PM   2018L010183

life; has endured and will in the future endure emotional distress; has incurred and will in the future incur expenses for medical and rehabilitative care; has suffered a loss of earnings; and has been damaged in her capacity to earn a living.

Wherefore Plaintiff JULIE CANNELL demands judgment against Defendants in an amount in excess of $50,000, as shall represent fair and just compensation.

### COUNT V
(Strict Liability – Julie Cannell)

94.    JULIE CANNELL realleges and incorporates herein by reference all allegations into this claim as if fully set forth herein, and further allege as follows:

95.    Defendants engaged in ultra-hazardous or abnormally dangerous activities by continuously emitting ethylene oxide, a known human carcinogen.

96.    As a direct and proximate result of Defendants' ultra-hazardous or abnormally dangerous activities, JULIE CANNELL has suffered severe and permanent health problems and has endured and will in the future endure pain and suffering; has suffered a loss of the enjoyment of a normal life; has endured and will in the future endure emotional distress; has incurred and will in the future incur expenses for medical and rehabilitative care; has suffered a loss of earnings; and has been damaged in her capacity to earn a living.

Wherefore Plaintiff JULIE CANNELL demands judgment against Defendants in an amount in excess of $50,000, as shall represent fair and just compensation.

FILED DATE: 10/11/2018 4:37 PM    2018L010183

## JURY DEMAND

All Plaintiffs demand trial by jury.

Respectfully Submitted,

By: s/ Brian LaCien
       One of Their Attorneys

Todd A. Smith
Brian LaCien
POWER, ROGERS & SMITH, LLP
70 West Madison Street, 55th Floor
Chicago, IL 60602-4212
Phone: (312) 236-9381
Fax: (312) 236-0920

John Libra
KOREIN TILLERY, LLC
205 North Michigan Avenue
Suite 1950
Chicago, IL 60601
Office: 312-641-9750

FILED DATE: 10/11/2018 4:37 PM   2018L010183

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

JULIE CANNELL, Individually and On Behalf of All Those
Similarly Situated;
RUSS SHENOUDA, Individually and On Behalf of All
Those Similarly Situated.

        Plaintiffs,

      v.

STERIGENICS U.S., LLC; and
GTCR LLC.

        Defendants.

No: 2018 L 010183

## AFFIDAVIT REGARDING DAMAGES SOUGHT

Plaintiffs JULIE CANNELL, Individually and On Behalf of All Those Similarly Situated and

RUSS SHENOUDA, Individually and On Behalf of All Those Similarly Situated, by their attorney,

Brian LaCien, being first duly sworn under oath, states as follows:

1.    That the affiant is one of the attorneys of record for the Plaintiffs in this matter.

2.    That the total money damages sought in this civil action exceed the amount of

$50,000.00.

Further Affiant Sayeth Not.

                                        BRIAN LACIEN

SUBSCRIBED AND SWORN to before me
this ____ day of _____, 2018.

_____
NOTARY PUBLIC

POWER ROGERS & SMITH, LLP
70 W. Madison Street, 55th Floor
Chicago, IL 60602-4212
312-236-9381
31444

DONNA L SYMANSKI
Official Seal
Notary Public - State of Illinois
My Commission Expires Jun 13, 2020

FILED DATE: 10/11/2018 4:37 PM   2018L010183

DONNA L. SYMANSKI
Official Seal
Notary Public - State of Illinois
My Commission Expires Jun 13, 2020

FILED DATE: 10/11/2018 4:37 PM   2018L010183

# Letter Health Consultation

"Evaluation of Potential Health Impacts from Ethylene Oxide Emissions"

STERIGENICS INTERNATIONAL, INC.

WILLOWBROOK, ILLINOIS

AUGUST 21, 2018

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
Agency for Toxic Substances and Disease Registry
Division of Community Health Investigations
Atlanta, Georgia  30333



FILED DATE: 10/11/2018 4:37 PM    2018L010183

**Health Consultation:  A Note of Explanation**

An ATSDR health consultation is a verbal or written response from ATSDR to a specific request for information about health risks related to a specific site, a chemical release, or the presence of hazardous material. In order to prevent or mitigate exposures, a consultation may lead to specific actions, such as restricting use of or replacing water supplies; intensifying environmental sampling; restricting site access; or removing the contaminated material.

In addition, consultations may recommend additional public health actions, such as conducting health surveillance activities to evaluate exposure or trends in adverse health outcomes; conducting biological indicators of exposure studies to assess exposure; and providing health education for health care providers and community members. This concludes the health consultation process for this site, unless additional information is obtained by ATSDR which, in the Agency's opinion, indicates a need to revise or append the conclusions previously issued.

You May Contact ATSDR TOLL FREE at
1-800-CDC-INFO
or
Visit our Home Page at: http://www.atsdr.cdc.gov

FILED DATE: 10/11/2018 4:37 PM   2018L010183

LETTER HEALTH CONSULTATION

"Evaluation of Potential Health Impacts from Ethylene Oxide Emissions"

STERIGENICS INTERNATIONAL, INC.

WILLOWBROOK, ILLINOIS

Prepared By:

U.S. Department of Health and Human Services
Agency for Toxic Substances and Disease Registry
Division of Community Health Investigations



**DEPARTMENT OF HEALTH & HUMAN SERVICES**
*Agency for Toxic Substances and Disease Registry,*
*Region 5*

*Public Health Service*
*77 W. Jackson Blvd., Room 413*
*Chicago, IL 60604*

FILED DATE: 10/11/2018 4:37 PM    2018L010183

July 26, 2018 *

Ed Nam
Director, Air and Radiation Division
United States Environmental Protection Agency, Region 5
77 W. Jackson Blvd., MS A-18J
Chicago, IL 60604

Dear Mr. Nam:

Since February 2018, ATSDR has met with U.S. EPA Region 5 Air and Radiation Division (ARD) staff regarding a change in the cancer risk basis for ethylene oxide (EtO) in the EPA Integrated Risk Information System (IRIS) and how that change affects general population risks estimated from EtO-emitting facilities in the draft 2014 National Air Toxics Assessment (NATA) update[1]. In December 2016, IRIS changed EtO's adult-based inhalation unit risk from 0.0001 per microgram per cubic meter ($\mu g/m^3$) to 0.003 per $\mu g/m^3$, a 30-fold increase in cancer potency. It also changed EtO's cancer weight-of-evidence descriptor from "probably carcinogenic to humans" to "carcinogenic to humans". These changes could result in many census tracts having estimated cancer risks that are greater than 1 in 10,000 from EtO exposure identified through the draft NATA modeling of air emissions across the United States.

Specifically, ARD decided to evaluate the implications of this change at two sites, Sterigenics International, Inc. (referred to in the letter as "*Sterigenics*") in Willowbrook, IL and the Elé Corporation in McCook, IL. This letter addresses EtO emissions from the Sterigenics facility. In June 2018, after the monitoring results were received and reviewed, ARD requested that ATSDR review air measurements of EtO and modeling results of EtO emissions from Sterigenics and specifically answer the question: *If modeled and measured ethylene oxide concentrations represent long term conditions, would they pose a public health problem for people living and working in Willowbrook?*

The air modeling data that U.S. EPA provided to ATSDR estimated potential short-term and long-term concentrations of EtO in ambient air surrounding the Sterigenics Corporation. Follow-up air monitoring data confirm the presence of elevated EtO at concentrations within a similar range to those estimated by the air modeling of Sterigenics emissions. Based on these measured and modeled concentrations and the proximity to residences and other commercial structures, cancer risks higher than 1 in 10,000 people may exist for some community members and workers exposed to airborne EtO in this community. If these measured and estimated concentrations represent chronic exposures

---

\* Minor edits to the reference list have been incorporated into the final posted ATSDR Letter Health Consultation.

[1] The 2014 NATA is expected to be publicly available in the fall of 2018.

FILED DATE: 10/11/2018 4:37 PM   2018L010183

in the surrounding community (with higher exposures likely for workers of the facility), EtO emissions from the Sterigenics Corporation poses a public health hazard.

## BACKGROUND

Sterigenics provides sterilization processes using gamma, ethylene oxide, Ebeam, and X-ray sterilization and operates 46 facilities in 13 countries (Sterigenics, 2018). The facility stores ethylene oxide that is sprayed into sealed chambers to sterilize medical equipment, pharmaceuticals, and food/spice products contained on 40" x 48" pallets. The sterilization chambers are contained in two buildings. Building 1 has fifteen chambers that can hold 1 to 13 pallets, while Building 2 has four sterilization chambers that can hold 13 to 26 pallets (Illinois EPA, 2017). Building 1 chambers were constructed in 1984, while Building 2 chambers were built in 1999 and 2012. Pollution control technology includes acid water scrubbers and dry bed reactors that convert the ethylene oxide to ethylene glycol after the sterilization process (Illinois EPA, 2015). Although back vents on the units have historically been uncontrolled, Sterigenics is currently in the process of installing pollution controls to control passive releases (ATSDR, 2018).

Figure 1 illustrates the total reported emissions in pounds per year (lbs/yr) of EtO from Sterigenics.

**Figure 1. TRI Total Air Emissions Reported (in pounds), by Sterigenics Corporation for Ethylene Oxide, 1995-2016**



[a]*Source: Toxic Release Inventory (TRI): https://www.epa.gov/enviro/tri-overview*
[b]*Dates for facility constructed and upgrades were identified according to Illinois EPA (2017) DRAFT/PROPOSED Clean Air Act Permit Program (CAAPP) Permit*

FILED DATE: 10/11/2018 4:37 PM    2018L010183

The emissions data show a substantial reduction in total air releases after 1998. No data are available before 1995 on ambient air releases, but the available data suggests that substantially higher ambient releases prior to 1995 were likely. The Building 1 sterilization chambers were constructed in 1984, therefore EtO has been emitted over the past 34 years from the Willowbrook facility.

Willowbrook, Illinois is a small suburb of Chicago with approximately 8,500 residents (U.S. Census, 2016). The Willowbrook industrial complex where Sterigenics is located is in a densely populated metropolitan area, with 19,271 people living within 1 mile of the facility boundary. There are four schools and one daycare facility within 1 mile of the facility. According to 2016 Census estimates, Willowbrook residents are predominately white (73.3%), non-Hispanic (66.6%), educated (97.7% graduate high school, and 48.9% graduated with a bachelor's degree or higher), and middle class (median household income was over $67,000 per year). Approximately 18.5% of the population is identified as Asian, and 6.3% as black.

Figure 2. Aerial map of the community surrounding Sterigenics Corporation



Source: Google Earth

FILED DATE: 10/11/2018 4:37 PM    2018L010183

## ENVIRONMENTAL DATA

*Air Modeling*

U.S. EPA modeled short and long-term ambient EtO concentrations (AERMOD version 18081) to evaluate the potential impact of site emissions. These scenarios estimated a 5-year average to represent chronic exposures and maximum 1- and 8-hour averages to represent acute exposures at 882 community receptor points. An overlay of the modeling output is displayed in Figure 3, below. The statistical distributions of the modeled air concentrations are presented in Table 1.

**Figure 3. AERMOD modeling output: 5-year average exposure estimates**



*Source: U.S. EPA Air and Radiation Division, Region 5*
*Note: Source 1 is Sterigenics Willowbrook Building 1, and Source 2 is Sterigenics Willowbrook Building 2*

FILED DATE: 10/11/2018 4:37 PM    2018L010183

**Table 1. Statistical distribution of EtO modeling\***

| Statistics | Modeled 1-hour ($\mu g/m^3$) | Modeled 8-hour ($\mu g/m^3$) | Modeled 5-year ($\mu g/m^3$) |
|---|---|---|---|
| Minimum | 2.17 | 1.02 | 0.03 |
| 25th Percentile | 4.62 | 2.26 | 0.09 |
| 50th Percentile | 9.72 | 4.07 | 0.17 |
| 75th Percentile | 18.88 | 7.29 | 0.31 |
| 90th Percentile | 33.90 | 12.62 | 0.57 |
| 95th Percentile | 45.22 | 18.83 | 0.91 |
| 99th Percentile | 134.73 | 61.39 | 2.97 |
| Maximum | 249.77 | 123.89 | 13.32 |
| Mean | 15.75 | 6.72 | 0.32 |
| Geometric Mean | 10.13 | 4.41 | 0.18 |

*\*N= 882 modeled receptors*

*Air Measurements*

U.S. EPA collected 39 validated samples May 16th and May 17th, 2018. These samples were collected using SUMMA® canisters, and analyzed using U.S. EPA Compendium Method TO-15, Compendium of Methods for the Determination of Toxic Organic Compounds in Ambient Air. A SUMMA® canister is an airtight, stainless-steel container with an inner surface that has been electro-polished and chemically deactivated. The laboratory is required to clean each canister and evacuate it to a high vacuum prior to shipping it to the sampling location. A canister can hold the vacuum for up to 30 days. The air being sampled is "drawn" into the canister by the high vacuum, thus eliminating the need for a pump. While opening the inlet orifice fills the canister in less than a minute, yielding an instantaneous "grab" sample, regulators can be added to the inlet orifice to draw the air into the canister over a designated period, ranging from 1 to 24-hours.

Of the 39 samples collected at 26 discrete locations (Figure 4), 18 were 12-hour samples, and 21 were grab samples (Table 2). Three of the 12-hour samples were collocated duplicates, and three of the grab samples were collocated duplicates. Grab samples generally had lower EtO concentrations than 12-hour averaged samples (U.S. EPA, 2018). However, all grab samples were collected between 10:20 am and 3:05 pm. ARD staff noted that higher EtO concentrations were measured overnight than during the day, and 12-hour samples were collected overnight in some locations. Since Sterigenics is a 24-hour operation, this may be due to calm meteorological conditions overnight with a higher potential for inversions. Given the elevated detections over a limited duration, additional long-term sampling is warranted to better characterize residential exposure to EtO.

FILED DATE: 10/11/2018 4:37 PM    2018L010183

**Table 2. Statistical distribution of residential and commercial EtO air sampling***

| Statistics | Grab samples ($\mu g/m^3$) | 12-hour samples ($\mu g/m^3$) |
|---|---|---|
| Min | 0.16 | 0.34 |
| 25th Percentile | 0.24 | 0.69 |
| 50th Percentile | 0.45 | 1.56 |
| 75th Percentile | 1.34 | 4.39 |
| 90th Percentile | 2.28 | 8.26 |
| 95th Percentile | 4.27 | 8.44 |
| 99th Percentile | 4.33 | 8.96 |
| Max | 4.34 | 9.09 |
| Mean | 1.07 | 3.02 |
| Geo Mean | 0.62 | 1.74 |

*N=21 grab samples, 18 12-hour samples*

**Figure 4. Ambient air samples near the Sterigenics facility, Willowbrook, IL**



*Source: U.S. EPA, Region 5*

6

Figure 4, shows the location of discrete samples collected in the community. Given limited measured data presented in Table 2, ATSDR used the maximum 12-hour residential sample concentration and the maximum 12-hour commercial sample concentration to represent chronic upper bound residential (2.1 μg/m³) and occupational (9.1 μg/m³) exposures in the community. These concentrations represent maximums identified during a very temporally and spatially limited sampling campaign and actual average long-term exposures may be higher or lower.

## HEALTH IMPLICATIONS

### Overview for identifying contaminants of concern and evaluating risk

To evaluate EtO exposures near Sterigenics, ATSDR considered its own health-based comparison values as well as those published by other agencies. ATSDR uses comparison values for screening purposes to determine whether a pollutant should be evaluated further. A CV was identified for both an intermediate exposure duration (for non-cancer evaluation) as well as for a long-term (chronic) exposure duration (for which we considered both cancer and non-cancer health effects). In this evaluation, the air sampling results were compared to the ATSDR Cancer Risk Evaluation Guide (CREG) and environmental media evaluation guide (EMEG) and California EPA Reference Exposure Level (REL) for EtO.

- **ATSDR CREGs** are estimates of the concentrations of a carcinogen at which there is an elevated risk for one additional case of cancer in one million people exposed over a lifetime. ATSDR's CREG for EtO is calculated from the current U.S. EPA's adult-based inhalation unit risk value (0.003 (μg/m³)⁻¹) and is based on U.S. EPA evaluations and assumptions about hypothetical cancer risks at low levels of exposure. ATSDR's CREG for EtO is 0.00021 μg/m³.
- **ATSDR inhalation minimal risk levels (MRL)/EMEGs** are estimates of the concentrations of pollutants calculated that anyone could be exposed to where health effects are unlikely, based on chronic, intermediate, and acute exposures (those occurring longer than 365 days, between 14-365 days, and 14 days of exposure or less, respectively). For EtO, ATSDR only has an intermediate EMEG of 160 μg/m³ (ATSDR, 1990).
- **California RELs** are concentrations that are unlikely to result in adverse non-cancer health effects. The chronic California REL for EtO is 30 μg/m³ (California EPA, 2008).

All 5-year modeled and 12-hour measured averages exceeded the ATSDR CREG. Only maximum modeled concentrations exceeded intermediate or chronic non-cancer screening values. The following sections evaluate chronic non-cancer and cancer risks further.

### Ethylene oxide properties

Ethylene oxide is a highly flammable gas that is highly reactive with nucleophilic substances such as water, alcohols, halides, amines, and sulfhydryl compounds. It is used as an intermediate in the production of ethylene glycol and surfactants as well as a fumigant for sterilizing foods and heat-sensitive medical equipment.

EtO is highly reactive, readily absorbed, and easily distributed in the human body. The absolute odor threshold has been reported in several studies to be about 470 milligrams per cubic meter (mg/m³)

7

FILED DATE: 10/11/2018 4:37 PM    2018L010183

(or 470,000 $\mu g/m^3$), with acute health effects possible in the range of the odor threshold (NRC, 2010). Chronic exposures can result somatic cell damage at much lower concentrations (California EPA, 2008). EtO is mutagenic and causes chromosome damage in many species, including humans. EtO exposure has widely been studied in scientific literature and its adverse health impacts are well understood. The carcinogenic effects of EtO have been documented in human and animal studies (U.S. EPA 2016).

### Acute and intermediate exposure and health effects
Acute and intermediate effects have mostly been documented in hospital workers or in other occupational settings that include sterilizing chambers. Short-term exposure (minutes to weeks or months) above the odor threshold of 470 $mg/m^3$ (into the thousands of $mg/m^3$) include primarily neurological effects (headache, dizziness, nausea, lethargy, fatigue, muscle weakness, numbness, memory loss, incoordination, etc.), respiratory irritation (irritation of the nasal cavity, sinuses, coughing, shortness of breath, wheezing, and bronchial constriction and hyperreactivity), excessive thirst and dry mouth, and gastrointestinal effects (vomiting, diarrhea, stomach spasms, etc.). Some studies reported skin rashes with short-term exposures (NRC, 2010).

All studies with documented health effects summarized above had substantially higher EtO concentrations than what was observed in measured and modeled data in this assessment. ATSDR does not have an acute health-based comparison value but does have an intermediate-duration health-based comparison value of 160 $\mu g/m^3$. No measured data and only the maximum 1-hour modeled concentration of EtO exceeded this value and modeled and measured concentrations of EtO in this investigation were well below the odor threshold. Thus, it is unlikely that the non-cancer health effects noted above would occur in the general or off-site worker populations.

### Chronic exposure and health effects
#### Cancer effects
The U.S. EPA IRIS released an "Evaluation of the Inhalation Carcinogenicity of Ethylene Oxide" in December 2016. This evaluation summarizes the evidence that EtO is "carcinogenic to humans" through a mutagenic mode of action (MOA) and derives an inhalation unit risk value for EtO (U.S. EPA, 2016). Many studies have identified the genotoxic potential and mutagenic mode of action of EtO exposure via inhalation. There is clear evidence from multiple studies that EtO causes chromosomal aberrations, sister chromatic exchanges, and micronuclei in peripheral blood lymphocytes and bone marrow cells. Chromosomal aberrations and micronucleus frequency have been linked to increased risk of cancer in a number of large human studies (Jinot et al., 2017). Mice and rats exposed to EtO demonstrate cancers of the lymphohematopoietic system (cells involved in the production of lymphocytes and cells of blood, bone marrow, spleen, lymph nodes, and thymus), brain, lung, connective tissue, uterus, and mammary gland.

In humans, an increased incidence and mortality of breast and lymphohematopoietic system cancers have been observed in workers in the EtO manufacturing and in sterilizing facilities (U.S. EPA, 2016). U.S. EPA identified six studies evaluating breast cancer in women, with the largest being a study from the National Institute of Occupational Safety and Health (NIOSH) of over 18,000 workers (45% male, 55% female) in 14 commercial sterilization plants. The NIOSH study reported statistically significant

FILED DATE: 10/11/2018 4:37 PM    2018L010183

exposure-response relationships for breast cancer incidence and mortality (Steenland et al., 2003 and Steenland et al., 2004). From assessing these studies, U.S. EPA (2016) determined that there is sufficient evidence of a causal relationship between EtO exposure and breast cancer in women.

U.S. EPA used the cancer incidence data from the NIOSH study, using individual exposure estimates for 17,530 workers from 13 plants, to calculate an inhalation unit risk value. A linear low-dose extrapolation of the lowest effective concentration (LEC; defined here as the lower 95% confidence limit on the $EC_{01}$, the estimated effective concentration associated with 1% extra risk) for lymphoid cancer was calculated as $2.9 \times 10^{-3}$ per $\mu g/m^3$. Using the same approach, the lifetime unit risk for breast cancer was calculated as $8.1 \times 10^{-4}$ per $\mu g/m^3$. Combining the risk for lymphoid and breast cancers in females U.S. EPA adopted an inhalation unit risk of $2.99 \times 10^{-3}$ per $\mu g/m^3$ (rounded to $3.0 \times 10^{-3}$ per $\mu g/m^3$). These adult-exposure only unit risk estimates were then rescaled to a lifetime, using age-dependent adjustment factors (ADAF). ADAFs are used to incorporate the greater risk of early life exposure to chemicals that have a mutagenic MOA. When applying the ADAFs, EPA calculated an inhalation unit risk value over a 70-year lifetime of $5.0 \times 10^{-3}$ per $\mu g/m^3$ (U.S. EPA, 2016). Cancer risk from measured and modeled EtO concentrations are estimated by multiplying the IUR by the EtO concentrations.

### U.S. EPA Cancer Risk Estimates Reviewed by ATSDR

U.S. EPA Region 5 air modelers estimated cancer risk assuming a 70-year lifetime from measured and modeled data. Based on modeled EtO concentrations at over 882 specific locations around the Sterigenics facility, U.S. EPA used the 5-year average EtO concentrations to calculate lifetime cancer risks between $1.3 \times 10^{-4}$ to $6.7 \times 10^{-2}$, with a geometric mean risk of $9.1 \times 10^{-4}$. Even though cancer risks are not generally calculated for short term exposures, the estimated cancer risks associated with the *measured* EtO air concentration (19 samples collected for 12 hours each) were similar (range: $7.9 \times 10^{-4}$ to $4.5 \times 10^{-2}$, geometric mean: $7.7 \times 10^{-3}$; Table 3). Note that these cancer risks were calculated using the lifetime ADAF-adjusted IUR of $5.0 \times 10^{-3}$ per $\mu g/m^3$.

**Table 3. Range of measured and modeled EtO concentrations: U.S. EPA Cancer Risk Estimates**

| Statistics | Modeled 5-year ($\mu g/m^3$) | Modeled cancer risk range | 12-hour samples ($\mu g/m^3$) | Measured cancer risk range* |
|---|---|---|---|---|
| Minimum | 0.03 | 1.3E-04 | 0.16 | 7.9E-04 |
| Maximum | 13.32 | 6.7E-02 | 4.34 | 4.5E-02 |
| Mean | 0.32 | 1.6E-03 | 1.04 | 1.4E-02 |
| Geometric Mean | 0.18 | 9.1E-04 | 0.61 | 7.7E-03 |

*Cancer risk was calculated to estimate what long term exposures to the 12-hour concentration could look like if sustained long term and does not represent actual exposures.*

### Cancer Risk Estimates Calculated by ATSDR

For ATSDR assessments, the reasonable maximum exposure (RME) scenario for residential exposure duration is 33 years over a lifetime of 78 years, so ATSDR calculated an IUR based on 33-year residential exposure using ADAFs. As mentioned previously, ATSDR's RME exposure point concentration (EPC) of 2.1 $\mu g/m^3$ was used as a reasonable estimate of exposure for the most exposed individual in the community. This EPC is the maximum residential sample concentration of EtO in the May 2018 data collection period. Given these assumptions, the cancer risk for this residential sample

FILED DATE: 10/11/2018 4:37 PM    2018L010183

location is **6.4 x 10$^{-3}$**—an additional lifetime risk of 6.4 cancers in a population of 1,000 residents who could be exposed to EtO emissions from Sterigenics. This cancer risk exceeds U.S. EPA's decision-making cancer risk range of 1.0 x 10$^{-6}$ to 1.0 x 10$^{-4}$, and adds to the lifetime background cancer risk of an average American of 1 in 3 people (American Cancer Society, 2018).

**Table 4. Site-specific ADAF calculations for residential exposure***

| Age Range | ADAF | U.S. EPA unadjusted IUR | EPC (µg/m³) | Duration Adjustment | Partial Risk |
|---|---|---|---|---|---|
| 0 to <2 yrs | 10 | 2.99 x 10$^{-3}$ | 2.1 | 2 years/78 years | 1.6 x 10$^{-3}$ |
| 2 to <16 yrs | 3 | 2.99 x 10$^{-3}$ | 2.1 | 14 years/78 years | 3.4 x 10$^{-3}$ |
| 16 to 33 yrs | 3 | 2.99 x 10$^{-3}$ | 2.1 | 17 years/78 years | 1.4 x 10$^{-3}$ |
|  |  |  |  | Lifetime Risk | 6.4 x 10$^{-3}$ |

*Cancer risk was calculated to estimate what long term exposures to the 12-hour concentration could look like if sustained long term and does not represent actual exposures.*

Likewise, ATSDR assumed the maximum commercial 12-hour sample concentration in commercial sample locations of 9.1 µg/m³ to represent RME occupational exposures to workers in nearby facilities. Note that workers at the Sterigenics facility would be covered under the Occupational Safety and Health Administration (OSHA) EtO standard (29 CFR 1910.1047). For the off-site worker scenario, ATSDR assumed an 8.5-hour workday, 250 days a year, for 25 years (ATSDR, 2016), yielding an exposure factor (EF) of 0.08.

$$EF_{cancer,\ chronic} = \frac{8.5\ \frac{hr}{d} \times 5\ \frac{d}{wk} \times 50\ \frac{wk}{yr} \times 25\ yr}{24\ \frac{hr}{d} \times 7\ \frac{d}{wk} \times 52.14\ \frac{wk}{yr} \times 78\ yr} = 0.08$$

Cancer risk for workers can be calculated by multiplying the long-term air concentration by the IUR, adjusting the duration of exposure as appropriate using the exposure factor calculation, above:

*Cancer risk= IUR x EPC (µg/m³) x EF*

For the maximum commercial concentration of 9.1 µg/m³, this risk equation yields a lifetime occupational cancer risk of 2.1 x 10$^{-3}$, or an increased risk of cancer for 2.1 people in a population of 1,000 workers from chronic exposures to Sterigenics emissions:

*Cancer risk$_{occupational}$ = 0.00299 x 9.1 µg/m³ x 0.08 = **2.1 x 10$^{-3}$***

While a more complete database from which to characterize exposure is preferable, we used U.S. EPA's limited data for the Sterigenics investigation and applied the standard ATSDR evaluation process. Note that in both ATSDR calculations, we made a very conservative assumption that a 12-hour sample represents long term exposure. We felt this assumption was warranted because the measured and modeled concentrations demonstrated consistency and provided support that this range of exposure is possible in the area surrounding Sterigenics.

FILED DATE: 10/11/2018 4:37 PM   2018L010183

*Non-cancer effects*

Workers exposed to ethylene oxide over a long-term duration experienced similar health effects to those exposed over shorter durations (California EPA, 2008). Workers exposed to levels of EtO at 8,500 µg/m³ and higher over an average of 5-6.5 years demonstrated cognitive and motor impairment compared to unexposed controls. At lower levels of EtO exposure (145-300 µg/m³), studies have shown evidence of hemoglobin adducts, DNA damage effects (i.e. sister chromatid exchanges), and hematological effects (i.e. increases in leukocytes and decreases in neutrophil counts; decreases in hematocrit and hemoglobin) (California EPA, 2008). No measured EtO concentrations from the residential or occupational sampling approached or exceeded effect levels in the long-term modeling estimates or the 12-hour samples being used as chronic exposure surrogates, therefore, non-cancer health effects are not expected. However, air sampling in this effort was extremely limited.

## LIMITATIONS

ATSDR made several assumptions as part of this assessment that could lead to the over or underestimation of risk. Some limitations of this assessment include:

1. To calculate risks, ATSDR assumed that the concentrations measured during this assessment will continue, unchanged if no actions are taken, over 33 years for residents, and 25 years for workers.
2. ATSDR assumed that the very limited sampling investigation of 26 discrete locations over 2 days throughout the community represents typical exposure conditions from Sterigenics EtO emissions. Only one 12-hour residential sample was collected, and that sample was used to represent the RME residential chronic exposure estimate. EtO concentrations from grab samples at one other residential location were slightly higher than the 12-hour averaged sample collected at this property.
3. ATSDR assumed that the highest EtO concentration in the commercial area surrounding Sterigenics represents worst case off-site worker exposures. This is likely underestimating worker exposures for some employees in this area.
4. Due to a lack of long term sampling, the temporal trends of EtO emissions could not be evaluated. Fluctuations of seasons that affect temperatures, barometric pressure, wind speed and direction, and other potential factors that could influence the transport of EtO into the surrounding community were not assessed.

Despite these limitations, ATSDR acknowledges that the U.S. EPA modeling demonstrates similar concentration ranges to community air measurements. Thus, ATSDR believes the exposure estimates assumed in this assessment are reasonable. Historical emissions were higher before a substantial drop in 1999 with the construction of aeration rooms in Building 1. EtO cancer risks may have been substantially greater for the 14 years the facility operated before these emission controls were implemented, but historical risk cannot be evaluated with available emissions data.

FILED DATE: 10/11/2018 4:37 PM    2018L010183

**Conclusions:**

U.S. EPA asked ATSDR to answer the following question: *"If modeled and measured ethylene oxide concentrations represent long term conditions, would they pose a public health problem for people living and working in Willowbrook?"* U.S. EPA provided modeled and measured data for ATSDR to evaluate and render a health opinion.

It is ATSDR's conclusion that the data U.S. EPA provided suggests that residents and workers are exposed to elevated airborne EtO concentrations from facility emissions. It is difficult to assess long-term public health implications from facility emissions because there has been no historical air monitoring in the community. ATSDR assumed that these data represent long term exposures for area residents and workers. Specifically, ATSDR concludes the following:

1) If measured and modeled data represent typical EtO ambient concentrations in ambient air, *an elevated cancer risk exists* for residents and off-site workers in the Willowbrook community surrounding the Sterigenics facility. These elevated risks *present a public health hazard to these populations*.
2) Measured and modeled ethylene oxide concentrations in ambient air indicate that non-cancer health effects are unlikely for residents and off-site workers in the Willowbrook community surrounding the Sterigenics facility.

**Recommendations:**

1) ATSDR recommends that Sterigenics take immediate action to reduce EtO emissions at this facility.
2) ATSDR recommends that U.S. EPA work with the Sterigenics facility to initiate long-term air monitoring as soon as possible to measure ambient air levels of EtO. Ongoing air monitoring can demonstrate the effectiveness of actions taken by the company to reduce emissions and subsequent exposures in the community.
3) ATSDR recommends that IDPH investigate whether there are elevated cancers in the population surrounding the Sterigenics facility that are consistent with those associated with chronic EtO exposures.

Please do not hesitate to contact ATSDR Region 5 to discuss this assessment further or to request further public health assistance.

Sincerely,

Michelle A. Colledge

Michelle Colledge, MPH, PhD
Environmental Health Scientist
Agency for Toxic Substances and Disease Registry
Division of Community Health Investigations
Central Branch, Region 5

FILED DATE: 10/11/2018 4:37 PM   2018L010183

CC:
Ken Runkle, IDPH
Aaron Martin, IDPH
Kathryn Siegel, U.S. EPA
Margaret Sieffert, U.S. EPA
Alexis Cain, U.S. EPA
Mark Johnson, ATSDR/ DCHI/CB
Rick Gillig, ATSDR/ DCHI/CB
Tina Forrester, ATSDR/ DCHI/OD

FILED DATE: 10/11/2018 4:37 PM    2018L010183

**References:**

Agency for Toxic Substances and Disease Registry (ATSDR). 2018. Discussion between ATSDR and U.S. EPA Region 5 Air and Radiation Division on 7/23/2018.

Agency for Toxic Substances and Disease Registry (ATSDR). 2016. Exposure Dose Guidance for Determining Life Expectancy and Exposure Factor. Atlanta, GA: U.S. Department of Health and Human Services, Public Health Service.

Agency for Toxic Substances and Disease Registry (ATSDR). 1990. Toxicological Profile for Ethylene Oxide. Health and Human Services: Atlanta, GA. Accessed from: https://www.atsdr.cdc.gov/toxprofiles/tp.asp?id=734&tid=133

American Cancer Society (ACS). 2018. Lifetime probability of developing or dying of cancer. Accessed from: https://www.cancer.org/cancer/cancer-basics/lifetime-probability-of-developing-or-dying-from-cancer.html

California Environmental Protection Agency (California EPA). 2008. Determination of Noncancer Chronic Reference Exposure Levels, Appendix D3, Ethylene Oxide. Accessed from: https://oehha.ca.gov/chemicals/ethylene-oxide.

Illinois Environmental Protection Agency (Illinois EPA). 2017. DRAFT/PROPOSED Clean Air Act Permit Program (CAAPP) PERMIT. Permit No. 95120085. Bureau of Air, Permit Section. April 17, 2017.

Illinois Environmental Protection Agency (Illinois EPA). 2015. *Statement of Basis* for the DRAFT CAAPP Permit for: Sterigenics. Statement of Basis No.: 95120085. February 25, 2015.

Jinot, J., Fritz, J., Vulimiri, S., and Keshava, N. 2017. Carcinogenicity of ethylene oxide: key findings and scientific issues. *Toxicol Mech Methods*, Jun;28(5):386-396.

National Research Council (NRC). 2010. Committee on Acute Exposure Guideline Levels. Washington (DC): National Academies Press (US). ISBN: 978-0-309-15944-9.

Steenland, K; Stayner, L; Deddens, J. 2004. Mortality analyses in a cohort of 18 235 ethylene oxide exposed workers: Follow up extended from 1987 to 1998. Occup Environ Med 61: 2-7.

Steenland, K., Whelan, E., Deddens, J., Stayner, L., Ward, E. 2003. Ethylene oxide and breast cancer incidence in a cohort study of 7576 women (United States). *Cancer Causes Control*. 14:531–539.

Sterigenics International, LLC. 2018. Willowbrook, IL: Ethylene Oxide Sterilization. Accessed from: https://www.sterigenics.com/facilities_pdfs/2018/eo/n_amer/Willowbrook.pdf.

United States Census (Census). 2016. American Fact Finder: 2016 Population Estimates. Accessed from http://www.census.gov.

United States Environmental Protection Agency (U.S. EPA). 2018. Validated Raw Data Package. Provided to ATSDR by U.S. EPA Air and Radiation Division (ARD) for review on 6/6/2018.

United States Environmental Protection Agency (U.S. EPA). 2016. Evaluation of the Inhalation Carcinogenicity of Ethylene Oxide. National Center for Environmental Assessment, Washington DC. Accessed from http://www.epa.gov/iris.

740
1990

FILED DATE: 10/11/2018 4:37 PM    2018L010183

IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT
DUPAGE COUNTY, ILLINOIS
CHANCERY DIVISION

2015 SEP 18 AM 9: 21
FILED

PEOPLE OF THE STATE OF ILLINOIS,       )
*ex rel.* LISA MADIGAN, Attorney       )
General of the State of Illinois,      )
                                       )
    Plaintiff,      )
                                       )
    v.              )    No.  2015 CH 651
                                       )
STERIGENICS U.S., LLC,                 )
a Delaware limited liability company,  )
                                       )
    Defendant.      )

CASE CLOSED
JUDGE'S INIT. _____

**CONSENT ORDER**

    Plaintiff, PEOPLE OF THE STATE OF ILLINOIS, *ex rel.* LISA MADIGAN, Attorney

General of the State of Illinois, the Illinois Environmental Protection Agency ("Illinois EPA"),

and Defendant, STERIGENICS U.S., LLC, (collectively, "Parties to the Consent Order") have

agreed to the making of this Consent Order and submit it to this Court for approval.

I.    INTRODUCTION

    This stipulation of facts is made and agreed upon for purposes of settlement only and as a

factual basis for the Court's entry of the Consent Order and issuance of any injunctive relief.

None of the facts stipulated herein shall be introduced into evidence in any other proceeding

regarding the violations of the Illinois Environmental Protection Act ("Act"), 415 ILCS 5/1 *et*

*seq.* (2014), and the Illinois Pollution Control Board ("Board") Regulations, alleged in the

Complaint except as otherwise provided herein.  It is the intent of the parties to this Consent

Order that it be a final judgment on the merits of this matter.

1



EXHIBIT
B

FILED DATE: 10/11/2018 4:37 PM    2018L010183

**A.    Parties**

1.    On April 3, 2015, a Complaint was filed on behalf of the People of the State of Illinois by Lisa Madigan, Attorney General of the State of Illinois, on her own motion and upon the request of the Illinois EPA, pursuant to Section 42(d) and (e) of the Act, 415 ILCS 5/42(d) and (e) (2014), against the Defendant.

2.    The Illinois EPA is an administrative agency of the State of Illinois, created pursuant to Section 4 of the Act, 415 ILCS 5/4 (2014).

3.    At all times relevant to the Complaint, Defendant Sterigenics U.S., LLC was, and is, a Delaware limited liability company, and operated a gaseous sterilization business located at 7775 Quincy Street, Willowbrook, DuPage County, Illinois ("Facility" or "Site").

4.    The Defendant's sterilization process uses ethylene oxide, a hazardous air pollutant, and generates ethylene glycol and other chemicals.

5.    Plaintiff has alleged that, on or about October 7, 2013, the Defendant released ethylene glycol into soil and groundwater at, and in the vicinity of, the Site.

6.    On October 21, 2013, the Defendant reported the uncontrolled release of 30 pounds of ethylene oxide gas to the atmosphere. The Defendant subsequently revised its estimate of the quantity of ethylene oxide released to approximately 12 pounds.

**B.    Allegations of Non-Compliance**

Plaintiff contends that the Defendant has violated the following provisions of the Act and Board Regulations:

Count I:    WATER POLLUTION, violation of 415 ILCS 5/12(a) (2014);

Count II:    CREATING A WATER POLLUTION HAZARD, violation of 415

2

FILED DATE: 10/11/2018 4:37 PM    2018L010183

ILCS 5/12(d) (2014);

Count III:    VIOLATION OF GENERAL USE WATER QUALITY STANDARDS, 415 ILCS 5/9(a) (2014), and 35 Ill. Adm. Code 302.203;

Count IV:    NPDES PERMIT VIOLATION, 415 ILCS 5/12(f) (2014), and 35 Ill. Adm. Code 309.102;

Count V:    AIR POLLUTION, violation of 415 ILCS 5/9(a) (2014) and 35 Ill. Adm. Code 201.141;

Count VI:    VIOLATION OF CAAPP PERMIT CONDITIONS: FAILURE TO COMPLY WITH NESHAP EMISSION STANDARDS, 415 ILCS 5/9.1(d) (2014), 415 ILCS 5/39.5(6) (2014), 40 CFR 63.362(a), and Conditions 7.1.6(c)(1) and 7.1.3(b)(ii) of CAAPP Permit No. 95120085;

Count VII:    VIOLATION OF CAAPP PERMIT CONDITIONS: FAILURE TO COMPLY WITH EMISSION LIMITATIONS FOR THE CHICAGO AREA, 415 ILCS 5/9(a) (2014), 415 ILCS 5/39.5(6) (2014), 35 Ill. Adm. Code 218.986(a), and Condition 7.1.3(d)(i) of CAAPP Permit No. 95120085.

**C.    Non-Admission of Violations**

The Defendant represents that it has entered into this Consent Order for the purpose of settling and compromising disputed claims without having to incur the expense of contested litigation. By entering into this Consent Order and complying with its terms, the Defendant does not affirmatively admit the allegations of violation within the Complaint and referenced above, and this Consent Order shall not be interpreted as including such admission.

**D.    Compliance Activities to Date**

1.    On January 13, 2014, the Defendant applied to enter its Facility into Illinois EPA's voluntary Site Remediation Program ("SRP") to address remediation of the release of ethylene glycol, propylene glycol and sulfate from the Facility. The Facility remediation project

was designated under the SRP as the "Sterigenics US LLC site, LPC No. 0431105032" ("On Site SRP").

2.     On November 18, 2014, Illinois EPA issued a No Further Remediation letter ("NFR letter") to the Defendant for the work performed under the On-Site SRP.  The Defendant recorded the NFR letter for the On-Site SRP with the office of the DuPage County Recorder on December 5, 2014.

3.     On July 13, 2014, the Defendant applied to enter off-site areas which were affected, or potentially affected, by the release of ethylene glycol, propylene glycol, and sulfate into the SRP.  The off-site remediation project has been designated by Illinois EPA as the "Willowbrook Centre Joint Venture, LPC No. 0431105077" ("Off-Site SRP").

4.     On May 29, 2015, Illinois EPA issued an NFR letter to the Defendant for work performed under the Off-Site SRP.  The Defendant recorded the NFR letter for the Off-Site SRP with the office of the DuPage County Recorder on July 6, 2015.

## II.    APPLICABILITY

This Consent Order shall apply to and be binding upon the Parties to the Consent Order. The Defendant waives as a defense to any enforcement action taken pursuant to this Consent Order the failure of any of its officers, directors, agents, employees or successors or assigns to take such action as shall be required to comply with the provisions of this Consent Order.  This Consent Order may be used against the Defendant in any subsequent enforcement action or permit proceeding as proof of a past adjudication of violation of the Act and the Board Regulations for all violations alleged in the Complaint in this matter, for purposes of Sections 39 and 42 of the Act, 415 ILCS 5/39 and 42 (2014).

4

### III.    JUDGMENT ORDER

This Court has jurisdiction of the subject matter herein and of the Parties to the Consent Order and, having considered the stipulated facts and being advised in the premises, finds the following relief appropriate:

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED:**

**A.    Civil Penalty**

1.    The Defendant shall pay a civil penalty of Fifty Thousand Dollars ($50,000.00). Payment shall be tendered at time of entry of the Consent Order.

2.    The civil penalty payment shall be made by certified check or money order payable to the Illinois EPA for deposit into the Environmental Protection Trust Fund ("EPTF").

3.    The case name and case number shall appear on the face of the certified check or money order.

**B.    Future Compliance**

1.    The Defendant shall comply with the terms and conditions of its Clean Air Act Permit Program ("CAAPP ) Permit.

2.    This Consent Order in no way affects the responsibilities of the Defendant to comply with any other federal, state or local laws or regulations, including but not limited to the Act and the Board Regulations.

3.    The Defendant shall cease and desist from future violations of the Act and Board Regulations that were the subject matter of the Complaint.

**C.    Enforcement and Modification of Consent Order**

1.    This Consent Order is a binding and enforceable order of this Court.  This Court shall retain jurisdiction of this matter and shall consider any motion by any party for the purposes

5

FILED DATE: 10/11/2018 4:37 PM    2018L010183

of interpreting and enforcing the terms and conditions of this Consent Order. The Defendant agrees that notice of any subsequent proceeding to enforce this Consent Order may be made by mail and waives any requirement of service of process.

       2.      The Parties to the Consent Order may, by mutual written consent, extend any compliance dates or modify the terms of this Consent Order without leave of this Court. A request for any modification shall be made in writing and submitted to the designated representatives. Any such request shall be made by separate document, and shall not be submitted within any other report or submittal required by this Consent Order. Any such agreed modification shall be in writing and signed by authorized representatives of each party, for filing and incorporation by reference into this Consent Order.

**D.**     **Release from Liability**

     In consideration of the Defendant's payment of a $50,000.00 civil penalty and its commitment to cease and desist as contained in Section III.B.2 above, the Plaintiff releases, waives and discharges the Defendant from any further liability or penalties for the violations of the Act and Board Regulations that were the subject matter of the Complaint herein. The release set forth above does not extend to any matters other than those expressly specified in Plaintiff's Complaint filed on April 3, 2015. The Plaintiff reserves, and this Consent Order is without prejudice to, all rights of the State of Illinois against the Defendant with respect to all other matters, including but not limited to the following:

     a.     criminal liability;

     b.     liability for future violations;

     c.     liability for natural resources damage arising out of the alleged violations; and

     d.     the Defendant's failure to satisfy the requirements of this Consent Order.

Nothing in this Consent Order is intended as a waiver, discharge, release, or covenant not to sue for any claim or cause of action, administrative or judicial, civil or criminal, past or future, in law or in equity, which the State of Illinois may have against any person, as defined by Section 3.315 of the Act, 415 ILCS 5/3.315 (2014), other than the Defendant.

**E.  Execution and Entry of Consent Order**

This Order shall become effective only when executed by all Parties to the Consent Order and the Court.  This Order may be executed by the parties in one or more counterparts, all of which taken together shall constitute one and the same instrument. The undersigned representatives for each party certify that they are fully authorized by the party whom they represent to enter into the terms and conditions of this Consent Order and to legally bind them to it.

WHEREFORE, the parties, by their representatives, enter into this Consent Order and submit it to this Court that it may be approved and entered.

AGREED:

FOR THE PLAINTIFF:

PEOPLE OF THE STATE OF ILLINOIS
*ex rel.* LISA MADIGAN
Attorney General of the
State of Illinois

ILLINOIS ENVIRONMENTAL
PROTECTION AGENCY

MATTHEW J. DUNN, Chief
Environmental Enforcement/
Asbestos Litigation Division

LISA BONNETT, Director
Illinois Environmental Protection Agency

BY: _Elizabeth Wallace_
ELIZABETH WALLACE, Chief
Assistant Attorney General
Environmental Bureau

BY: _____
JOHN J. KIM
Chief Legal Counsel

DATE: 9/14/15

DATE: 9/10/15

8

FOR THE DEFENDANT:

STERIGENICS U.S., LLC

BY: _KAltooman_

Its: _SVP - Global EH&S_

DATE: _08-Sent-2015_


ENTERED:

_Donne M Neston_

JUDGE

DATE: _9-18-15_


*People v. Sterigenics U.S. LLC, 15 CH 651*

9

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

FILED
9/20/2018 12:19 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018L010183

JULIE CANNELL, Individually and On Behalf of All    )
Those Similarly Situated;    )
PAMELA MCGONIGAL, Individually and On Behalf of  )
All Those Similarly Situated;    )
    )
                 Plaintiffs,    )
        v.    )    No. 2018 L 10183
    )
STERIGENICS INTRNATIONAL LLC; and    )
GTCR LLC,    )
    )
                 Defendants.    )

## NOTICE OF FILING

TO:  No Parties Have Appeared

      I hereby certify that on September 20, 2018, at or before the hour of 5:00 PM, I electronically filed this Notice of Filing and Motion for Appointment of Special Process Server with the Clerk of the Circuit Court of Cook County by using the Odyssey eFile IL system.

                 s/ Brian LaCien

| | |
|---|---|
| Name: | POWER ROGERS & SMITH, LLP (Brian LaCien) |
| Atty for: | Plaintiff |
| Address: | 70 W. Madison Street, 55th Floor |
| City: | Chicago, Illinois 60601 |
| Telephone: | 236-9381 |
| Atty. No.: | 31444 |

FILED
9/20/2018 3:03 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018L010183

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

JULIE CANNELL, Individually and On Behalf of All )
Those Similarly Situated; )
PAMELA MCGONIGAL, Individually and On Behalf of )
All Those Similarly Situated; )
)
)
Plaintiffs, )
v. )　　　No. 2018 L 10183
)
STERIGENICS INTRNATIONAL LLC; and )
GTCR LLC, )
)
Defendants. )

**NOTICE OF FILING**

TO:  No Parties Have Appeared

　　　I hereby certify that on September 20, 2018, at or before the hour of 5:00 PM, I electronically filed this Notice of Filing and Routine Motion for Leave to File First Amended Complaint and Appointment of Special Process Server with the Clerk of the Circuit Court of Cook County by using the Odyssey eFile IL system.

　　　　　　　　　　　　　　　　s/ Brian LaCien
　　　　　　　　　　　　　　　　_____

Name:　　　POWER ROGERS & SMITH, LLP (Brian LaCien)
Atty for:　　Plaintiff
Address:　　70 W. Madison Street, 55th Floor
City:　　　　Chicago, Illinois 60601
Telephone:　236-9381
Atty. No.:　　31444

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

JULIE CANNELL, Individually and On Behalf of All Those
Similarly Situated;
PAMELA MCGONIGAL, Individually and On Behalf of All
Those Similarly Situated.



        Plaintiffs,

v.                                    No: 2018 L 10183

STERIGENICS INTERNATIONAL LLC; and
GTCR LLC.

        Defendants. *Oral Emergency Motion*

~~ROUTINE~~ ORDER

    This matter Coming to be heard on Plaintiffs' Motion for Leave to File First Amended
Complaint and Appoint Special Process Server, no parties having appeared and the Court being
fully advised in the premises;

    IT IS HEREBY ORDRED:                                *4292*

1. Plaintiffs are hereby granted leave to file their First Amended Complaint Instanter
   correcting the misnomer STERIGENICS INTERNATIONAL, LLC to the properly
   named defendant STERIGENICS U.S., LLC; and

                                                          *4209*

2. LaSalle Process Servers and any other employee of LaSalle Process Servers, License
   No. 117001432, be appointed special process server for the purpose of serving
   Summons and First Amended Complaint upon Defendants, STERIGENICS U.S.,
   LLC and GTCR, LLC.

                             Associate Judge Moira S. Johnson

ENTER:      SEP 20 2018

            Circuit Court 1836

                          Judge

Todd A. Smith
Brian LaCien
POWER ROGERS & SMITH, LLP
70 W. Madison Street, 55th Floor
Chicago, IL 60602-4212
312-236-9381
31444

FILED
9/20/2018 12:19 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018L010183

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

JULIE CANNELL, Individually and On Behalf of All Those
Similarly Situated;
PAMELA MCGONIGAL, Individually and On Behalf of All
Those Similarly Situated.

        Plaintiffs,

    v.

STERIGENICS INTERNATIONAL LLC; and
GTCR LLC.

        Defendants.

No: 2018 L 10183

## ROUTINE MOTION TO APPOINT SPECIAL PROCESS SERVER

Now come the Plaintiffs JULIE CANNELL, Individually and On Behalf of All Those

Similarly Situated and Pamela McGonigal, Individually and On Behalf of All Those Similarly

Situated, by and through their attorneys, POWER ROGERS & SMITH, LLP, and moves this

Honorable Court for an Order pursuant to Local Rule 2.2 and the Illinois Code of Civil Procedure,

Section 5/2-202, appointing LASALLE PROCESS SERVERS, and any other employee of

LASALLE PROCESS SERVERS, who is over the age of 18,  License No. I.D. 117001432, as

Special Process Server for the purpose of effecting service upon Defendants, STERIGENICS

INTERNATIONAL LLC and GTCR LLC.

        Respectfully submitted,

        By:    s/Brian LaCien_____
                Attorney for Plaintiff

Todd A. Smith
Brian LaCien
POWER ROGERS & SMITH, LLP #31444
Attorneys for Plaintiff
Three First National Plaza
70 W. Madison Street, 55th Floor
Chicago, Illinois 60602
Telephone: (312) 236-9381
tsmith@prslaw.com
blacien@prslaw.com

FILED DATE: 9/20/2018 12:19 PM   2018L010183

ORDER

CCG-2

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT - LAW DIVISION

JULIE CANNELL, Individually and On Behalf of )
All Those Similarly Situated, )
PAMELA MCGONIGAL, Individually and On Behalf of )
All Those Similarly Situated )
 )
            Plaintiffs, )
 )
 )
        vs. )  No.  2018 L 10183
 )
STERIGENICS INTERNATIONAL LLC; and )
GTCR LLC, )
 )
         Defendants. )

# ROUTINE ORDER

      THIS MATTER coming to heard on Plaintiffs' Motion to Appoint Special Process Server, no parties having appeared, and the Court being advised;

      IT IS HEREBY ORDERED that LASALLE PROCESS SERVERS, and any other employee of LASALLE PROCESS SERVERS, License No. 117001432, be appointed special process server for the purpose of serving Summons and Plaintiffs' Complaint upon Defendants, STERIGENICS INTERNATIONAL LLC and GTCR LLC.

Atty No.    **31444**
Name      **POWER ROGERS & SMITH, LLP**
            **Todd A. Smith**
            **Brian LaCien**
**Attorney for**  **Plaintiff(s)**
**Address**    **70 W. Madison St., 55th Floor**
**City**      **Chicago, Illinois  60602-14212**
**Telephone**  **312/236-9381**

.............................................., 20........

**ENTER:**

............................................................
          **Judge**       **Judge's No.**

**DOROTHY BROWN CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

FILED DATE: 9/20/2018 12:19 PM   2018L010183

| 2120 - Served | 2121 - Served |
|---|---|
| 2220 - Not Served | 2221 - Not Served |
| 2320 - Served By Mail | 2321 - Served By Mail |
| 2420 - Served By Publication | 2421 - Served By Publication |
| Summons - Alias Summons | (06/28/18) CCG 0001 |

FILED
9/20/2018 12:22 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018L010183

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

JULIE CANNELL, Individually, et al.,

_____ (Name all parties)

v.

STERIGENICS INTERNATIONAL, LLC, et al.,

Case No. ___ 2018 L 10183 ___

Please serve: See Attached

### ☑ SUMMONS  ☐ ALIAS SUMMONS

To each Defendant:

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance and pay the required fee **within thirty (30) days after service of this Summons**, not counting the day of service. To file your answer or appearance you need access to the internet. Please visit www.cookcountyclerkofcourt.org to initiate this process. Kiosks with internet access are available at all Clerk's Office locations. Please refer to the last page of this document for location information.

**If you fail to do so, a judgment by default may be entered against you for the relief requested in the complaint.**

To the Officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than thirty (30) days after its date.

**E-filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit https://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/FAQ/gethelp.asp.**

Witness: _____

9/20/2018 12:22 PM DOROTHY BROWN

_____
DOROTHY BROWN, Clerk of Court

Atty. No.: ___ 31444 ___

Atty Name: ___ Todd A. Smith and Brian LaCien ___

Atty. for: ___ Plaintiff ___

Address: ___ 70 W. Madison Street, 55th Floor ___

City: ___ Chicago ___   State: ___ IL ___

Zip: ___ 60602 ___

Telephone: ___ 312-236-9381 ___

Primary Email: ___ blacien@prslaw.com ___

Secondary Email: ___ tmoran@prslaw.com ___

Tertiary Email: _____

Date of Service: _____
(To be inserted by officer on copy left with Defendant or other person):

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois   cookcountyclerkofcourt.org**

FILED DATE: 9/20/2018 12:22 PM    2018L010183

Cannell v. Sterigenics International, et al.
Court No. 2018 L 10183

Please serve:

Sterigenics International LLC
2015 Spring Road, Suite 650
Oak Brook, Illinois

GTCR LLC
300 N. LaSalle Street, Suite 5600
Chicago, Illinois

FILED DATE: 9/20/2018 12:22 PM   2018L010183

## CLERK OF THE CIRCUIT COURT OF COOK COUNTY OFFICE LOCATIONS

○ Richard J Daley Center
50 W Washington
Chicago, IL 60602

○ District 2 - Skokie
5600 Old Orchard Rd
Skokie, IL 60077

○ District 3 - Rolling Meadows
2121 Euclid
Rolling Meadows, IL 60008

○ District 4 - Maywood
1500 Maybrook Ave
Maywood, IL 60153

○ District 5 - Bridgeview
10220 S 76th Ave
Bridgeview, IL 60455

○ District 6 - Markham
16501 S Kedzie Pkwy
Markham, IL 60428

○ Domestic Violence Court
555 W Harrison
Chicago, IL 60607

○ Juvenile Center Building
2245 W Ogden Ave, Rm 13
Chicago, IL 60612

○ Criminal Court Building
2650 S California Ave, Rm 526
Chicago, IL 60608

### Daley Center Divisions/Departments

○ Civil Division
Richard J Daley Center
50 W Washington, Rm 601
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

○ Chancery Division
Richard J Daley Center
50 W Washington, Rm 802
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

○ Domestic Relations Division
Richard J Daley Center
50 W Washington, Rm 802
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

○ Civil Appeals
Richard J Daley Center
50 W Washington, Rm 801
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

○ Criminal Department
Richard J Daley Center
50 W Washington, Rm 1006
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

○ County Division
Richard J Daley Center
50 W Washington, Rm 1202
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

○ Probate Division
Richard J Daley Center
50 W Washington, Rm 1202
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

○ Law Division
Richard J Daley Center
50 W Washington, Rm 801
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

○ Traffic Division
Richard J Daley Center
50 W Washington, Lower Level
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

FILED DATE: 10/11/2018 4:37 PM   2018L010183

Return Date: No return date scheduled
Hearing Date: No hearing scheduled
Courtroom Number: No hearing scheduled
Location: No hearing scheduled

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT, LAW DIVISION

FILED
10/11/2018 4:37 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018L010183

JULIE CANNELL, Individually and on Behalf of )
All those Similarly Situated; )
PAMELA MCGONIGAL, Individually and On Behalf )
of All Those Similarly Situated, )
)
             Plaintiffs, )
)
v. )       2018 L 010183
)
STERIGENICS U.S. LLC; and )
GTCR LLC, )
)
           Defendants. )

## NOTICE OF ROUTINE MOTION

TO:   No Parties Have Appeared

      On **Friday, October 12, 2018, at 8:45 AM,** or as soon thereafter as counsel may be heard, I shall appear before the **Honorable Moira Johnson,** in **Room 2201,** or any judge sitting in her stead, in the courtroom usually occupied by her in Chicago, Illinois and then and there present **Plaintiffs' Routine Motion for leave to file Second Amended Complaint.** A copy of said motion is attached hereto.


                       s/ Brian LaCien


Name:     POWER ROGERS & SMITH, LLP (Brian LaCien)
Atty for:   Plaintiff
Address:  70 W. Madison Street, 55th Floor
City:      Chicago, Illinois 60602
Telephone: 236-9381
Atty. No.:  31444

Return Date: No return date scheduled
Hearing Date: No hearing scheduled
Courtroom Number: No hearing scheduled
Location: No hearing scheduled

FILED
10/11/2018 4:37 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018L010183

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

FILED DATE: 10/11/2018 4:37 PM   2018L010183

JULIE CANNELL, Individually and On Behalf of All Those
Similarly Situated;
PAMELA MCGONIGAL, Individually and On Behalf of All
Those Similarly Situated.

        Plaintiffs,

v.

STERIGENICS U.S. LLC; and
GTCR LLC.

        Defendants.

No: 2018 L 10183

### ROUTINE MOTION TO  FOR LEAVE TO FILE
### SECOND AMENDED COMPLAINT INSTANTER

Now come the Plaintiffs JULIE CANNELL, Individually and On Behalf of All Those

Similarly Situated and Pamela McGonigal, Individually and On Behalf of All Those Similarly

Situated, by and through their attorneys, POWER ROGERS & SMITH, LLP, and moves this

Honorable Court for an Order allowing Plaintiffs to amend their complaint, voluntarily dismiss

PAMELA MCGONIGAL as a plaintiff without prejudice and without costs and add RUSS

SHENOUDA as a plaintiff.  A copy of said Second Amended Complaint is attached hereto and

made a part of this Motion.

        Respectfully submitted,

        By:    s/Brian LaCien
                Attorney for Plaintiff

Todd A. Smith
Brian LaCien
POWER ROGERS & SMITH, LLP #31444
70 W. Madison Street, 55th Floor
Chicago, Illinois 60602
Telephone: (312) 236-9381
tsmith@prslaw.com
blacien@prslaw.com

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

FILED
10/12/2018 10:42 AM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018L010183

JULIE CANNELL, Individually; and
RUSS SHENOUDA, Individually and On Behalf of All
Those Similarly Situated.

        Plaintiffs,

    v.

STERIGENICS U.S. LLC; and
GTCR LLC.

        Defendants.

No: 2018 L 010183

FILED DATE: 10/12/2018 10:42 AM   2018L010183

## SECOND AMENDED COMPLAINT

NOW COMES Plaintiffs RUSS SHENOUDA, Individually and on Behalf of All Those Similarly Situated, and JULIE CANNELL, Individually, by and through their attorneys, POWER ROGERS & SMITH, LLP and KOREIN TILLERY LLC, and hereby complaining of Defendants, STERIGENICS U.S. LLC (hereinafter "Sterigenics") and GTCR LLC (hereinafter "GTCR"), pleading hypothetically and in the alternative, states as follows:

## NATURE OF THE ACTION

1.      This cause of action arises out of Sterigenics' decades long emissions of ethylene oxide ("EtO") from its facility in Willowbrook, Illinois. The Sterigenics plant is used to sterilize medical devices, pharmaceuticals, and food products by placing them into sealed chambers, which are then sprayed with EtO, a powerful sterilizing agent. EtO is a highly flammable, colorless gas and has been a known human carcinogen for decades.

1

FILED DATE: 10/12/2018 10:42 AM 2018L010183

2.      Since 1984, Sterigenics has willfully and negligently released hazardous levels of EtO from its Willowbrook facility into the air, where it has drifted into homes, workplaces, and schools.

3.      Both the Environmental Protection Agency (EPA) and the World Health Organization (WHO) classify EtO as a "'carcinogenic to humans' by the inhalation route of exposure" and find sufficient evidence to establish a causal relationship between EtO exposure and breast, lymphatic, and hematopoietic cancers in humans.[1]

4.      On August 21, 2018, the U.S. Department of Health and Human Services' (HHS) Agency for Toxic Substances and Disease Registry (ATSDR) publicly released an "Evaluation of Potential Impacts for Ethylene Oxide Emissions" analyzing whether the emissions of the Sterigenics Willowbrook facility "pose a public health problem." (See U.S. H.H.S.' "Evaluation of Potential Health Impacts from Ethylene Oxide Emissions," attached as Exhibit A).

5.      The ATSDR's evaluation found that Sterigenics' EtO emissions were not merely a public health problem, **they posed a high enough cancer risk to qualify as a "public health hazard."** (Ex. A, pg. 2). The ATSDR arrived at this conclusion based on air sampling it conducted in areas immediately surrounding the Willowbrook Sterigenics facility to estimate current EtO exposures. As a result of this finding, the ATSDR urged that "Sterigenics take immediate action to reduce EtO emissions at this facility" (Ex. A, pg. 12).

6.      Sterigenics' EtO emissions have exposed Plaintiffs to unacceptable levels of cancer risk. The EPA generally considers the maximum "acceptable risk" for air toxics to be roughly 100 per million (i.e., for every one million people exposed, 100 will develop cancer over their

---

[1] https://cfpub.epa.gov/ncea/iris/iris_documents/documents/subst/1025_summary.pdf & https://monographs.iarc.fr/wp-content/uploads/2018/06/mono100F-28.pdf *(both accessed 9.25.2018).*

lifetimes).[2]  However, the 2014 EPA National Air Toxics Assessment (NATA) released on August 22, 2018 found the lifetime cancer risk in the tract of land upon which the Sterigenics facility sits (Tract ID # 17043845902) to be 281.8075 per million, almost three times the maximum acceptable level.

7.        But the August 21, 2018 ATSDR report found that even these concerning estimates of cancer risk were too low. The ATSDR used its 2018 air sampling to calculate that Sterigenics' EtO emissions caused "an additional lifetime risk of 6.4 cancers in a population of 1,000 residents who could be exposed to EtO emissions from Sterigenics." (Ex. A., pg. 10). This is equivalent to 6,400 per million, placing the Willowbrook area's cancer risk at **64 times the EPA's maximum acceptable risk level.**

8.        Moreover, historical EPA emission reports from the Willowbrook Sterigenics facility demonstrate that the amounts of EtO released from the plant over the last decade are significantly lower than the amounts released during prior decades. Total air releases in the 1990s were up to **7.7 times higher** than present levels. Sterigenics' EtO releases in the 1980s were even higher than this, with available data suggesting that Sterigenics released **over 20 times more** EtO into the air in 1988 than it did in 2016, the most recent date for which emissions data is publicly available. As a result, the ATSDR report's current estimate of Willowbrook area residents' cancer risk (which is based on sampling conducted this year) must drastically underestimate of the levels of risk faced by those exposed to the Sterigenics facility's emissions in the 1980s and 1990s.

9.        Prior to the ATSDR evaluation's release on August 21, 2018 and the 2014 NATA release on August 22, 2018, the risks and impacts associated Sterigenics' EtO emissions were

---

[2] https://www.epa.gov/national-air-toxics-assessment/nata-frequent-questions *accessed 9.25.2018.*

FILED DATE: 10/12/2018 10:42 AM   2018L010183

FILED DATE: 10/12/2018 10:42 AM    2018L010183

not generally known to the public. As a result, Willowbrook area residents and workers were not apprised of the unique dangers Sterigenics had exposed them to until this time.

10.    Willowbrook is a southwestern suburb of the city of Chicago with approximately 8,500 residents. The area where the Sterigenics facility is located is in a densely populated metropolitan area, with 19,271 people living within one mile of the facility boundary and tens of thousands more living within a six mile radius. In addition, there are four schools and one daycare facility within a one-mile radius. (U.S. Census, 2016). (Ex. A, pg. 3).

### PARTIES

11.    On and before July 26, 2018, and at all times material, Plaintiff RUSS SHENOUDA, owned and resided at 7822 Virginia Court, Willowbrook, Illinois consistently from 2007 until present day.

12.    On and before July 26, 2018, and at all times material, Plaintiff JULIE CANNELL resided at 544 Ridgemoor Drive, Willowbrook, Illinois consistently from 1987 until 2002 and now resides at 292 East Burlington Street, Riverside, Illinois 60546.

13.    On June 20, 2014, Plaintiff JULIE CANNELL was diagnosed with breast cancer at the age of 30.

14.    On and before July 26, 2018, and at all times material, Defendant STERIGENICS was a multi-national corporation in the business of sterilizing medical devices, pharmaceuticals, food and high-performance materials and operated a facility at 7775 Quincy St., Willowbrook, Illinois with its principal place of business at 2015 Spring Road, Suite 650, Oak Brook, Illinois.

4

FILED DATE: 10/12/2018 10:42 AM   2018L010183

## JURISDICTION AND VENUE

15.      This Court has jurisdiction over all Defendants because they are domiciled with their principal place of business in Illinois, and do regular and continuous business in Cook County, Illinois.

16.      Plaintiffs currently reside in Illinois.

17.      Venue is proper pursuant to 735 ILCS 5/2-101 because Sterigenics' principal place of business is at 2015 Spring Road, Suite 650, Oak Brook, Illinois.

18.      This Court retains jurisdiction pursuant to the local controversy exception to the Class Action Fairness Act (CAFA), 28 U.S.C § 1332(d)(4)(A)(i)(I-III) because: i) more than two-thirds of the proposed class members in the aggregate are citizens of the State of Illinois; ii) Sterigenics is the defendant the proposed class members are seeking significant relief from, whose conduct forms a significant basis for the claims asserted by Plaintiffs, and is a citizen of the State of Illinois; and iii) Plaintiffs' principal injuries resulting from Sterigenics' conduct were incurred in the State of Illinois. The purpose of the local controversy exception to CAFA is to allow state courts to retain cases when the controversy is so strongly linked to that state, much like the present case.

## CLASS ACTION ALLEGATIONS

19.      Plaintiffs bring this class action complaint pursuant to 735 ILCS 5/2-801:

### a. Numerosity

This class is so numerous that joinder of all members would be impracticable. Over 19,000 people live within or have lived within a one to six mile radius of the Willowbrook facility from 1984 to the present. Therefore, this class could contain

5

FILED DATE: 10/12/2018 10:42 AM   2018L010183

thousands of members. Class certification would be substantially more practical than joinder.

**b. Commonality**

Common questions of law and fact exist as to all members of the class, including but not limited to:

a. Whether Defendants fraudulently concealed the highly carcinogenetic nature of EtO from the Plaintiffs;

b. Whether Defendants could have upgraded their facility to reduce EtO emissions;

c. Whether Defendants acted unreasonably in refusing to upgrade their facility to reduce EtO emissions;

d. Whether Defendants acted unreasonably in failing to warn class members that its facility emits EtO into the air;

e. Whether EtO emissions from Defendants' facility interfered with class members' right to breathe clean air without dangerous of EtO;

f. Whether Defendants caused Plaintiffs' property values to diminish;

g. Whether Defendants interfered with the use and enjoyment of Plaintiffs' properties;

h. Whether Defendants trespassed on Plaintiffs' properties by emitting EtO for decades.

Common questions of law and fact predominate over any questions pertaining to individual members.

**c. Adequacy**

6

The representative Plaintiffs will fairly and adequately protect the interests of the entire class. Plaintiffs have no adverse interest to any members of the class. Plaintiffs' intent is to prosecute this case on behalf of all class members, not just themselves. Further, Plaintiffs are relying upon counsel that have knowledge and experience in handling class action lawsuits.

**d. Appropriateness and Efficiency**

This class action is an appropriate method for the fair and efficient adjudication of the controversy because it concerns potentially thousands of plaintiffs all complaining of Defendant's wrongful conduct. A class action is therefore the most efficient and effective method for adjudicating this matter.

20. Plaintiffs bring this action on behalf of themselves and all current Illinois residents similarly situated who purchased property or resided within 6 miles of the Sterigenics facility at 7775 Quincy St., Willowbrook, State of Illinois, from 1984 to the date of this complaint for losses and damages, stemming from the use and release of ethylene oxide, including but not limited to loss of value and infringement on personal and real property, statutory penalties, and injunctive relief/equitable relief. Excluded from the class are Defendants and their affiliates, predecessors, successors, officers, directors, agents, servants, employees, and the immediate family members of such persons. Plaintiffs reserve the right to modify the class definition or propose subclasses if discovery reveals that such modifications are appropriate.

## FACTUAL ALLEGATIONS

### A. Ethylene Oxide Exposure Carries a High Risk of Cancer in Humans

21. The causal link between EtO and human cancer has been documented for decades. EtO is well-known mutagen – the EPA reports that the "DNA-damaging properties of EtO have

been studied since the 1940s."[3] Meanwhile, U.S. sterilizer companies became broadly aware of EtO's potential carcinogenic effects in 1977, with most sterilizing companies taking steps to lower worker exposure though better venting in 1978.[4]

22.     Numerous studies have been published demonstrating that EtO causes lymphatic, hematopoietic, brain, lung, connective tissue, uterus, and mammary gland cancers in mice and rats.[5]

23.     The National Institute of Occupational Safety and Health (NIOSH) first raised awareness of the dangers of EtO in a 1977 bulletin aimed at facilities using EtO as a sterilant.[6] NIOSH recommended "that ETO be considered as mutagenic and potentially carcinogenic to humans and that occupational exposure to it be minimized," with alternate sterilization procedures used wherever feasible.[7]

24.     In 1981, NIOSH released a follow-up bulletin titled "Ethylene Oxide (EtO): Evidence of Carcinogenicity," recommending that workplaces regard EtO as "a potential occupational carcinogen" based on the results of an industry-sponsored study.[8]

25.     In 1985, the U.S. HHS National Toxicology Program classified EtO as "reasonably anticipated to be a human carcinogen."[9]

---

[3] https://cfpub.epa.gov/ncea/iris/iris_documents/documents/subst/1025_summary.pdf *accessed 9.25.2018.*
[4] Kyle Steenland, et al., "Mortality among workers exposed to ethylene oxide," *The New England Journal of Medicine* 324, no. 20 (1991): 1403.
[5] Kyle Steenland, et al., "Mortality among workers exposed to ethylene oxide," *The New England Journal of Medicine* 324, no. 20 (1991): 1403.
[6] https://www.cdc.gov/niosh/docs/77-200/ *accessed 9.25.2018.*
[7] https://www.cdc.gov/niosh/pdfs/77-200a.pdf?id=10.26616/NIOSHPUB77200 *accessed 9.25.2018.*
[8] https://www.cdc.gov/niosh/docs/81-130/ *accessed 9.25.2018.*
[9] https://ntp.niehs.nih.gov/ntp/roc/content/profiles/ethyleneoxide.pdf *accessed 9.25.2018.*

FILED DATE: 10/12/2018 10:42 AM    2018L010183

FILED DATE: 10/12/2018 10:42 AM   2018L010183

26.     In 1987, the state of California (home to two Sterigenics EtO sterilizing plants)[10] officially designated EtO a carcinogen.[11]

27.     In the early 1990s, the first high quality, long-term research on ethylene oxide's carcinogenic impacts on humans was published. This research was undertaken based on a NIOSH study tracking the mortality of 18,254 U.S. workers who had been exposed to EtO between the 1940s and 1980s at sterilizer plants much like the Sterigenics Willowbrook facility. In fact, according to a Sterigenics employee, the NIOSH study actually included "a couple" of Sterigenics facilities.[12] The NIOSH study ultimately found causal links between exposure to EtO and increased mortality from lymphatic, hematopoietic, and breast cancers. The research on the NIOSH study has since been heavily cited and relied upon by major regulatory organizations, including the WHO and EPA.

28.     The first publication based on this cohort came out in May 1991, finding a "slight but significant increase among men" for hematopoietic cancer with risk of death increasing over time since first exposure to EtO (the study also noted that men were more likely to be exposed to higher amounts of EtO).[13]

29.     In 1994, based in part on this research, the WHO's International Agency for Research on Cancer (IARC) listed EtO as a Group 1 human carcinogen, the agency's highest risk classification[14]

---

[10] https://web.archive.org/web/20180210142202/https://www.sterigenics.com/About_Us/Facilities.php *accessed 9.25.2018.*
[11] http://articles.latimes.com/1991-03-05/local/me-66_1_toxic-gas *accessed 9.25.2018.*
[12] https://yosemite.epa.gov/Sab/Sabproduct.nsf/B839FA45582C200185257D9500496B0E/$File/EPA-+Sterigenics+Speaking+Points+for+IRIS+SAB+Review-Nov+2014.pdf *accessed 9.25.2018.*
[13] Kyle Steenland, et al., "Mortality among workers exposed to ethylene oxide," *The New England Journal of Medicine* 324, no. 20 (1991): 1402.
[14] World Health Organization, "Ethylene Oxide" (2003): 35. *Accessed at* http://www.who.int/ipcs/publications/cicad/en/cicad54.pdf *on 9.25.2018.*

FILED DATE: 10/12/2018 10:42 AM   2018L010183

30.     The U.S. HHS National Toxicology Program in turn reclassified EtO as "known to be a human carcinogen" in 2000, updating its previous designation as "reasonably anticipated to be a human carcinogen" from 1985.[15]

31.     The U.S. Department of Labor's Occupational Safety and Health Administration (OSHA) 2002 fact sheet on EtO indicates that "[b]oth human and animal studies show that EtO is a carcinogen" and requires employers to provide clear signs and labels notifying workers of EtO's "carcinogenic and reproductive hazards."[16]

32.     Follow-up research on the NIOSH cohort was published in 2003 and found that EtO was associated with breast cancer in women, with a positive trend of increased cancer risk with increased EtO exposure.[17]

33.     Additional NIOSH cohort research came out the following year (2004), finding increased incidence of hematopoietic cancer with greater EtO exposure among men, particularly in the case of lymphoid tumors. The study also found "a significant excess of bone cancer compared to the US population," a finding supported by some animal studies, but drew no conclusions from this finding due to this finding being based on a small number of deaths.[18]

34.     Subject to extensive lobbying from sterilization companies, the EPA continued to define EtO as "probably carcinogenic to humans" until 2016. Sterigenics took part in these efforts, submitting comments in 2014 seeking to influence the EPA's draft Integrated Risk Information System (IRIS) reassessment of EtO's risks. In a November 12, 2014 letter, Sterigenics' Senior Vice President of Global Environmental, Health & Safety, Kathleen

[15] https://ntp.niehs.nih.gov/ntp/roc/content/profiles/ethyleneoxide.pdf *accessed 9.25.2018.*
[16] https://www.osha.gov/OshDoc/data_General_Facts/ethylene-oxide-factsheet.pdf *accessed 9.25.2018.*
[17] Kyle Steenland, et al., "Ethylene oxide and breast cancer incidence in a cohort study of 7576 women (United States)," *Cancer Causes and Control* 14, no. 6 (2003): 531.
[18] Kyle Steenland, et al., "Mortality analyses in a cohort of 18 235 ethylene oxide exposed workers: follow up extended from 1987 to 1998," *Occupational & Environmental Medicine* 61, no. 1 (2004): 6-7.

Hoffman, expressed "significant concerns regarding the [EPA's] cancer risk estimates for E[t]O" and argued that "the current assessment [which raised the risks associated with EtO] results in the risk of E[t]O being inappropriately magnified."[19] According to Hoffman, an IRIS assessment closely linking ethylene oxide to cancer risks was problematic because it could "lead to the further regulation of E[t]O exposure." As a result, Hoffman argued that the EPA should not rely too heavily on the NIOSH cohort study that made these causal linkages, even though these conclusions were based in part on the health outcomes of former Sterigenics employees.

35.      Kathleen Hoffman is also the President of the Ethylene Oxide Sterilization Association, another group that has lobbied to EPA to maintain lower ethylene oxide cancer risk estimates.[20]

36.      The EPA ultimately rejected industry arguments against increasing the cancer risk associated with EtO. The final IRIS assessment released in 2016 reclassified EtO as "carcinogenic to humans,"[21] representing a "30-fold increase in cancer potency" (Ex. A, pg. 1). This finding brought the EPA assessment in line with other federal agencies' findings.

37.      Based on the foregoing, Sterigenics knew or should have known about the human cancer risks associated with EtO when it first began operating its Willowbrook facility in 1984. Sterigenics took part in and was familiar with the results of the NIOSH cohort study. Moreover, Sterigenics was exposed to NIOSH and OSHA industry guidance on occupational EtO risks as well as regulatory classifications of EtO as a human carcinogen. The company was well aware

---

[19]
https://yosemite.epa.gov/sab/sabproduct.nsf/BC3AE563588248BC85257D8E00785A32/$File/sterigenics+comments.pdf *accessed 9.25.2018.*
[20] https://www.sterigenics.com/services/steripro_consulting/specialization/CV_-_Environmental_Safety.pdf *accessed 9.25.2018.*
[21] https://cfpub.epa.gov/ncea/iris/iris_documents/documents/subst/1025_summary.pdf *accessed 9.25.2018.*

11

FILED DATE: 10/12/2018 10:42 AM  2018L010183

of existing research and regulation demonstrating that EtO could cause cancer in those who breathed it in.

38.     Yet, as will be detailed below, while Sterigenics took steps to protect its workers by venting EtO from its Willowbrook facility, in so doing it recklessly and negligently released EtO into the air breathed by Plaintiffs. Sterigenics failed to take reasonable steps to limit emissions from its Willowbrook plant, exposing those working, residing, and studying nearby to dramatically increased cancer risks.

## B. Sterigenics Has Been Emitting Ethylene Oxide for Decades

39.     Sterigenics has operated, maintained, and used its Willowbrook sterilizing facility at 7775 Quincy Street since 1984. The Willowbrook facility consists of two buildings, Building 1 and Building 2, with fifteen and four sterilization chambers respectively. Building 1's chambers were built in 1984 and Building 2's chambers were built in 1999 and 2012 (Ex. A, pg. 2).

40.     Each chamber stores various medical devices, pharmaceuticals, and food products contained on 40" x 48" pallets, which are then sprayed with EtO and other chemical compounds, such as gamma, Ebeam, and x-ray sterilization. (Ex. A, pg. 2). Figure 1, below, roughly illustrates an EtO sterilization process:

12

FILED DATE: 10/12/2018 10:42 AM  2018L010183

**Figure 1: Ethylene Oxide Sterilization Process[22]**



41.     From 1984 to present, the back vents on the Willowbrook plant's sterilization chambers were uncontrolled, allowing uninhibited passive release of EtO into the surrounding environment.

42.     This situation persisted in spite of Sterigenics Vice President of Global Environmental, Health & Safety Kathleen Hoffman's 2014 assertion to the EPA that the EtO sterilizing industry "has utilized emission controls to significantly reduce environmental E[t]O emissions during the past several years."[23] Kathleen Hoffman made this statement in order to convince the EPA there was no reason to raise the cancer risk EtO posed to the public, even as her own company had not implemented such emission controls at its Willowbrook facility and was exposing the public to elevated cancer risks.

43.     Only now, after the ATSDR's recent investigation finding hazardous levels of EtO around its plant, has Sterigenics reportedly begun to install pollution controls to limit passive EtO release (Ex. A, pg. 2).

---

[22] https://www.csb.gov/assets/1/20/sterigenics_report.pdf?13828
[23]
https://yosemite.epa.gov/sab/sabproduct.nsf/BC3AE563588248BC85257D8E00785A32/$File/sterigenics+comment s.pdf *accessed 9.25.2018.*

FILED DATE: 10/12/2018 10:42 AM    2018L010183

44.     Therefore, Sterigenics has been passively emitting EtO from its Willowbrook facility into the surrounding community for the past 34 years (Ex. A, pg. 2).

45.     Emissions data from the United States Environmental Protection Agency's Toxic Release Inventory (TRI) show large amounts of EtO emissions in the late-1990s (see Figure 3 and Figure 4, below).

46.     No continuous data exist before 1995 on ambient air releases. However, the ATSDR notes that the available data suggest that "substantially higher ambient releases prior to 1995 were likely." (Ex. A, pg. 2). Indeed, a lone 1988 report on Sterigenics' Willowbrook facility's EtO emissions accessed through the EPA's TRI Explorer Database supports this contention.[24] The 1988 report indicates that the Willowbrook facility emitted 97,518 pounds of EtO into the air.[25] This is over three times greater than the highest amount recorded in the contiguous 1995-2016 data set (32,200 pounds in 1998) and over 20 times greater than emissions levels in 2016 (4,205 pounds).

47.     Figure 2 and Figure 3 illustrate available data on the total EtO air emissions released from the Willowbrook Sterigenics Facility:

---

[24]

https://iaspub.epa.gov/triexplorer/release_trends?tri=60521GRFFT7775Q&p_view=TRYR&trilib=TRIQ1&sort=_V
IEW_&sort_fmt=1&state=All+states&county=All+counties&chemical=000075218&industry=ALL&core_year=&t
ab_rpt=1&FLD=AIRLBY&FLD=E1&FLD=E2&FLD=E3&FLD=E4&FLD=E41&FLD=E42&FLD=E5&FLD=E5
2&FLD=E53&FLD=E53A&FLD=E53B&FLD=E54&FLD=E51&FLD=E51A&FLD=E51B&FLD=TSFDSP&FLD
=m10&FLD=m41&FLD=m62&FLD=potwmetl&FLD=m71&FLD=m81&FLD=m82&FLD=m72&FLD=m63&FL
D=m64&FLD=m65&FLD=m66&FLD=m67&FLD=m73&FLD=m79&FLD=m90&FLD=m94&FLD=m99&FLD=
RELLBY

[25]

https://ofmpub.epa.gov/enviro/tri_formr_partone_v2.get_thisone?rpt_year=1988&den_num=1388025024213&ban
flag=Y

14

**Figure 2: TRI total air emissions (in pounds), by Sterigenics Willowbrook – Ethylene Oxide. 1988, 1995-2016[26]**

| Year | Pounds EtO |
|------|-----------|
| 1988 | 97,518 |
| 1989 | - |
| 1990 | - |
| 1991 | - |
| 1992 | - |
| 1993 | - |
| 1994 | - |
| 1995 | 18,373 |
| 1996 | 22,420 |
| 1997 | 27,020 |
| 1998 | 32,200 |
| **Year** | **Pounds EtO** |
| 1999 | 2,640 |
| 2000 | 7,628 |
| 2001 | 8,113 |
| 2002 | 6,957 |
| 2003 | 6,909 |
| 2004 | 5,312 |
| 2005 | 2,910 |
| 2006 | 4,274 |
| 2007 | 3,966 |
| **Year** | **Pounds EtO** |
| 2008 | 3,858 |
| 2009 | 3,690 |
| 2010 | 7,151 |
| 2011 | 7,160 |
| 2012 | 7,091 |
| 2013 | 6,133 |
| 2014 | 5,241 |
| 2015 | 4,899 |
| 2016 | 4,205 |

---

[26]

https://iaspub.epa.gov/triexplorer/release_trends?tri=60521GRFFT7775Q&p_view=TRYR&trilib=TRIQ1&sort=_V
IEW_&sort_fmt=1&state=All+states&county=All+counties&chemical=000075218&industry=ALL&core_year=&t
ab_rpt=1&FLD=AIRLBY&FLD=E1&FLD=E2&FLD=E3&FLD=E4&FLD=E41&FLD=E42&FLD=E5&FLD=E5
2&FLD=E53&FLD=E53A&FLD=E53B&FLD=E54&FLD=E51&FLD=E51A&FLD=E51B&FLD=TSFDSP&FLD
=m10&FLD=m41&FLD=m62&FLD=potwmetl&FLD=m71&FLD=m81&FLD=m82&FLD=m72&FLD=m63&FL
D=m64&FLD=m65&FLD=m66&FLD=m67&FLD=m73&FLD=m79&FLD=m90&FLD=m94&FLD=m99&FLD=
RELLBY

FILED DATE: 10/12/2018 10:42 AM   2018L010183

**Figure 3: TRI total air emissions reported (in pounds), by Sterigenics Willowbrook –
Ethylene Oxide, 1995-2016.** [27] [28]



48.         Nor was passive venting the only manner in which Sterigenics exposed area

residents, workers, and students to EtO. Sterigenics has also made at least one mass

"uncontrolled release" of EtO. In 2015, Sterigenics signed a consent order with the State of

Illinois in response to an October 7, 2013 release of ethylene glycol (an EtO byproduct) into

the soil and groundwater surrounding the Willowbrook plant and another uncontrolled release

of EtO into the atmosphere (See "Consent Order," attached as Exhibit B). Sterigenics initially

reported that it had released 30 pounds of EtO into the atmosphere in this incident, but

subsequently revised its estimate to 12 pounds. Sterigenics ultimately paid a $50,000 civil

penalty for these uncontrolled releases.

---

[27] Source: Toxic Release Inventory (TRI): https://www.epa.gov/enviro/tri-overview.
[28] Exhibit A, page 2.

16

FILED DATE: 10/12/2018 10:42 AM    2018L010183

49.     Notably, even after this incident, Sterigenics did not install control measures on the vents that freely allowed EtO to disperse into the atmosphere.

50.     Nor did Sterigenics' EtO emissions, once released, disperse far. The half-life of EtO in the atmosphere is roughly 211 days. According the IARC, "[n]either rain nor absorption of aqueous aerosols is capable of removing ethylene oxide from the atmosphere."[29] In addition, EtO is heavier than air, meaning that it can linger and travel along the ground.[30] Consequently, Sterigenics' releases of EtO are likely to have lingered at breathing level in the area around its facility for a considerable time, causing ongoing harm the Plaintiffs.

## C. Sterigenics' Activity in Willowbrook Is Part of a Broader Pattern of Behavior

51.     Sterigenics' behavior in Willowbrook fits into a broader pattern of recklessness related to its EtO facilities.

52.     Between 2004 and 2009, Sterigenics released excessive amounts of EtO into the atmosphere from its sterilizing facility in the Dutch town of Zoetermeer. The excess EtO was reportedly due to Sterigenics failure to replace broken filters.[31] Like the Willowbrook plant, the Zoetermeer facility was set amidst a residential neighborhood, meaning that approximately 2,000 residents were potentially exposed.[32] Sterigenics ultimately shut down and demolished the Zoetermeer plant.[33]

53.     In the U.S., Sterigenics' California facilities have a history of regulatory problems. Sterigenics was investigated and fined $450,000 by the U.S. Department of Justice (DOJ) in

---

[29] https://monographs.iarc.fr/wp-content/uploads/2018/06/mono100F-28.pdf *accessed 9.25.2018.*
[30] http://www.inchem.org/documents/icsc/icsc/eics0155.htm *accessed 9.25.2018.*
[31] https://www.omroepwest.nl/nieuws/3574491/Rechtszaak-tegen-gifuitstoter-Sterigenics-na-jaren-van-start-Hoe-zat-het-ook-alweer *accessed 9.25.2018.*
[32] https://www.omroepwest.nl/nieuws/2648769/Niet-vaker-kanker-rondom-Sterigenics-in-Zoetermeer *accessed 9.25.2018.*
[33] https://www.dutchnews.nl/news/2010/07/zoetermeer_shuts_firm_for_brea/ & https://www.zoetermeer.nl/inwoners/uitstoot-schadelijke-stoffen-bij-sterigenics_46553?pk_campaign=Redirects&pk_kwd=sterigenics *accessed 9.25.2018.*

2015 for failing "to keep and maintain adequate records pertaining to controlled substances." Specifically, the DOJ found that between April 4, 2011 and April 4, 2013, Sterigenics failed compliance with the Controlled Substance Act at least 156 times.[34]

54.     More seriously, Sterigenics failed to properly train employees in the safe use of EtO at its sterilizing plant in Ontario, California, causing a major EtO explosion on August 19, 2004 that injured four employees and forcing the evacuation of the plant and neighboring facilities. The U.S. Chemical Safety and Hazard Investigation Board (CSB) investigation into the incident found that Sterigenics had failed to ensure its maintenance employees understood the hazards associated with EtO-based processes, which led them to manually override safety devices, causing the explosion. The CSB faulted Sterigenics management for not implementing "company-wide engineering control recommendations that could have prevented this explosion" and failing to follow recommendations on EtO concentrations disseminated by NIOSH.[35]

55.     At Sterigenics' Willowbrook, Illinois facility, OSHA records several safety violations for which the company has paid thousands of dollars in fines.[36] Specifically, Sterigenics paid $5,062 in fines in 2006 for several "Serious" violations that left workers exposed to unspecified "highly hazardous chemicals." [37] Given the work undertaken at the Willowbrook facility, these "highly hazardous chemicals" likely included EtO.

56.     Current and former Sterigenics employees have also raised concerns about company safety practices around EtO. For instance, on the company's Glassdoor page, one

---

[34] https://www.justice.gov/usao-ndca/pr/bay-area-company-agrees-pay-450000-settle-claims-failing-maintain-adequate-records *accessed 9.25.2018.*
[35] https://www.csb.gov/assets/1/20/sterigenics_report.pdf?13828 *accessed 9.25.2018.*
[36] E.g. https://www.osha.gov/pls/imis/establishment.inspection_detail?id=308153717 *accessed 9.25.2018.*
[37] https://www.osha.gov/pls/imis/establishment.inspection_detail?id=308153717 &
https://www.osha.gov/pls/imis/establishment.violation_detail?id=308153717&citation_id=01001 *accessed 9.25.2018.*

FILED DATE: 10/12/2018 10:42 AM   2018L010183

former employee noted on June 25, 2013 that "[t]here is a minimum attention to quality & safety which will backfire eventually."[38] Another stated on October 9, 2015 that "you're working with Ethylene Oxide which is extremely dangerous and the company seems to cut corners around safety at times."[39] Perhaps most concerning, an "EtO A Operator" in the Charlotte, North Carolina facility reported on February 24, 2015 that "Safety is an issue sometimes regarding procedures. The maintenance team cuts a lot of corners." This employee advised management to "Lock out the overrides for equipment. Fire any maintenance manager that shows operators how to manually operate equipment without it showing on the computer system."[40] Notably, this comment comes after the 2004 Ontario, California explosion. As discussed above, the CSB identified maintenance cutting corners and manually overriding equipment as factors leading to that incident. This employee review suggests that the safety and management failures that caused the California explosion were not addressed system-wide and continued to be in evidence at other Sterigenics facilities over a decade later.

57.     Taken together, these elements demonstrate a pattern of Sterigenics consistently failing to implement company-wide safety measures across all its facilities, despite research, NIOSH bulletins, regulatory interventions, and problematic incidents demonstrating their need. This willingness to "cut corners" and lack of oversight may explain why Sterigenics failed for decades to install emission mitigation technology to limit passive venting of EtO from its Willowbrook facility.

**D. Willowbrook Air Quality and the Health Implications**

---

[38] https://www.glassdoor.com/Reviews/Employee-Review-Sterigenics-RVW2768416.htm *accessed 9.25.2018.*
[39] https://www.glassdoor.com/Reviews/Employee-Review-Sterigenics-RVW8236300.htm *accessed 9.25.2018.*
[40] https://www.glassdoor.com/Reviews/Employee-Review-Sterigenics-RVW5987616.htm *accessed 9.25.2018.*

FILED DATE: 10/12/2018 10:42 AM   2018L010183

FILED DATE: 10/12/2018 10:42 AM   2018L010183

58.     Scientific analysis demonstrates that Sterigenics failure to install appropriate emissions mitigation technology has exposed residents, workers, and students to hazardous levels of EtO for the last 34 years.

59.     The 2014 EPA NATA database already demonstrated unacceptably high levels of cancer risk in the area surrounding the Willowbrook plant. The database places the cancer risks of the land tracts measured in Willowbrook as the highest in Illinois and among the highest in the country (the tract upon which the Sterigenics facility sits is in the 99.98[th] percentile for cancer risk level in the U.S.).[41] These risk levels are comparable to those of "Cancer Alley," an area along the Mississippi River famous for high incidences of cancer.[42]

60.     The NATA database also makes clear that the elevated cancer risks around Willowbrook are primarily due to EtO emissions, attributing 88.98% of the risk to this source. Sterigenics is the only major emitter of EtO in this area. Notably, this data was collected **before** the EPA revised the way it calculated the carcinogenicity of EtO to accommodate "a 30-fold increase in cancer potency" (Ex. A, pg. 2).

61.     As discussed earlier, the EPA generally considers the maximum "acceptable risk" for air toxics to be roughly a 100 per million (i.e., for every one million people exposed, 100 develop cancer over their lifetimes).[43]  However, a 2014 EPA National Air Toxics Assessment (NATA) found the lifetime cancer risk in the tract of land upon which the Sterigenics plant sits (Tract ID # 17043845902) to be 281.8075 per million, almost three times the maximum acceptable level.

---

[41] https://www.epa.gov/national-air-toxics-assessment *accessed 9.25.2018.*
[42] http://www.chicagotribune.com/news/local/breaking/ct-met-dupage-cancer-pollution-rauner-20180827-story.html *accessed 9.25.2018.*
[43] https://www.epa.gov/national-air-toxics-assessment/nata-frequent-questions *accessed 9.25.2018.*

FILED DATE: 10/12/2018 10:42 AM   2018L010183

62.     Figure 4 below depicts a 2014 NATA map demonstrating above-acceptable levels

(>100 per million) of cancer risk in the tracts surrounding the Willowbrook facility:

**Figure 4: 2014 NATA map depicting levels of lifetime cancer risk surrounding the Willowbrook Sterigenics facility**



63.     More recently, for the August 21, 2018 evaluation of the Willowbrook plant's EtO

emissions, the EPA modeled short and long-term ambient EtO concentrations around the

facility to determine the impact of site emissions. (See Figure 3 on Ex. A, pg. 4).

64.     Figure 5 shows large amounts of EtO emissions surrounding both Sterigenics

buildings and pervading the community up to a one-mile radius.

65.     Figure 5 also depicts a 5-year average to represent chronic exposures and maximum

1- and 8-hour averages to represent acute exposures at 882 community receptor points.

**Figure 5. AERMOD modeling output: 5-year average exposure estimates**



66.    The U.S. EPA collected 39 air samples from 26 discrete locations in the Willowbrook community on May 16 and 17, 2018 using SUMMA canisters. (Ex. A, pg. 5).

67.    SUMMA canisters are "airtight, stainless-steel containers with an inner surface that has been electro-polished and chemically deactivated," ensuring an accurate air sample is collected. (Ex. A, pg. 5).

FILED DATE: 10/12/2018 10:42 AM    2018L010183

FILED DATE: 10/12/2018 10:42 AM   2018L010183

68.     Based on the samples collected, "chronic upper bound residential (2.1 μg/m3) and occupational (9.1 μg/m3) exposures in the community" existed, with higher concentrations during the nighttime. (Ex. A, pg. 7).

**Figure 6. Site-specific ADAF calculations for residential exposure**

| Age Range | ADAF | U.S. EPA unadiusted | EPC ($\mu g/m^3$) | Duration Adjustment | Partial Risk |
|---|---|---|---|---|---|
| 0 to <2 yrs | 10 | $2.99 \times 10^{-3}$ | 2.1 | 2 years/78 years | $1.6 \times 10^{-3}$ |
| 2 to <16 yrs | 3 | $2.99 \times 10^{-3}$ | 2.1 | 14 years/78 years | $3.4 \times 10^{-3}$ |
| 16 to 33 yrs | 3 | $2.99 \times 10^{-3}$ | 2.1 | 17 years/78 years | $1.4 \times 10^{-3}$ |
| | | | | Lifetime Risk | $6.4 \times 10^{-3}$ |

69.     Ultimately, the August 21, 2018 report calculated that Sterigenics' EtO emissions caused "an additional lifetime risk of 6.4 cancers in a population of 1,000 residents who could be exposed to EtO emissions from Sterigenics," equivalent to 6,400 per million (Ex. A., pg. 10). These updated calculations place the area's cancer risk at 64 times the EPA's maximum acceptable risk level.

70.     It should also be noted that, if anything, the EPA samples and models are a massive underestimate for the ambient levels of EtO the area has been exposed to in the last 34 years. As noted earlier, total EtO air releases from the Willowbrook facility were over 20 times higher in 1988 than in 2016 (2016 levels are presumably comparable to present release levels). In addition, release levels in the late 1990s were still up to 7.7 times higher than 2016 levels.

71.     Throughout the period of exposure, the area immediately around the Willowbrook plant has contained numerous homes and businesses, as well as four schools and a daycare facility (See Figure 2 on Ex. A, pg. 3). As a result, thousands of residents, workers, and students have been exposed to elevated levels of EtO. Figure 7 demonstrates the proximity of these facilities to the Willowbrook plant:

Figure 7. Aerial map of the community surrounding Sterigenics Corporation[44]



FILED DATE: 10/12/2018 10:42 AM   2018L010183

72.      One of the schools near the Sterigenics facility is Gower West Elementary School, with recent enrollment of almost 500 students.[45] Another is Hinsdale South High School, with enrollment of over 1,500 students.[46] Hinsdale South High School has been open and active at its present locations since prior to the Sterigenics facility's opening in 1984. Consequently, thousands of minors have been exposed to unsafe levels of EtO over the years both in classrooms and outdoor athletic facilities.

73.      The EPA notes that EtO exposure could have especially deleterious effects on children, as "the immaturity of *detoxifying* enzymes in very young children may increase children's susceptibility because children may clear EtO at a slower rate than adults... In the

---

[44] http://www.chicagotribune.com/news/local/breaking/ct-met-sterigenics-cancer-risks-politics-20180919-story,amp.html *accessed 9.25.2018.*
[45] http://webprod.isbe.net/ereportcard/publicsite/getReport.aspx?year=2017&code=1902206202002_e.pdf *accessed 9.25.2018.*
[46] http://webprod.isbe.net/ereportcard/publicsite/getReport.aspx?year=2017&code=1902208600002_e.pdf *accessed 9.25.2018.*

absence of data on the relative susceptibility associated with EtO exposure in early life, increased early-life susceptibility is assumed."[47] Thus it is likely that students at schools within a one-mile radius of the Willowbrook facility in the 1980s and 1990s were particularly vulnerable to the mutagenic effects of EtO.

74.    Although apprised of the severe dangers associated with EtO, Sterigenics nonetheless willfully and negligently emitted large amounts of this toxic gas from its Willowbrook facility for 34 years. Moreover, Sterigenics failed to warn those near its plant of their exposure to EtO and the risks to their health this exposure entailed. Consequently, Sterigenics exposed Plaintiffs and thousands like them to devastating health consequences.

### COUNT I
(Nuisance – Russ Shenouda, Individually and On Behalf of All Those Similarly Situated)

75.    Plaintiffs reallege and incorporate herein by reference all allegations into this claim as if fully set forth herein, and further allege as follows:

76.    At all times relevant hereto, Defendants knew ethylene oxide to be hazardous and harmful to human beings.

77.    As a direct and proximate result of Defendants' operation, maintenance, and use of its sterilizing facility, ethylene oxide continuously invaded and caused to be contaminated the areas immediately surrounding and on Plaintiffs' properties.

78.    As a direct and proximate result of Defendants' operation, maintenance, and use of its sterilizing facility, Plaintiffs sustained and will continue to sustain severe and permanent physical damage to their properties and damage to their property value due to the decades long emission of ethylene oxide.

---

[47] https://cfpub.epa.gov/ncea/iris/iris_documents/documents/toxreviews/1025tr.pdf at pg. 3-71. *Accessed 9.25.2018.*

FILED DATE: 10/12/2018 10:42 AM   2018L010183

FILED DATE: 10/12/2018 10:42 AM   2018L010183

79.     Plaintiffs bring this action for all monetary damages associated with its ethylene oxide contamination, including damages for reduction of value of their property. Finally, Plaintiffs request that Defendants be required to pay the costs associated with remediating all ethylene oxide contamination that is located on or threatens their property.

Wherefore, Russ Shenouda, Individually and On Behalf of All Those Similarly Situated, demand judgment against Defendants in an amount in excess of $50,000, as shall represent fair and just compensation.

## COUNT II
(Trespass – Russ Shenouda, Individually and On Behalf of All Those Similarly Situated)

80.     Plaintiffs reallege and incorporate herein by reference all allegations into this claim as if fully set forth herein, and further allege as follows:

81.     Defendants have trespassed through unlawful, unauthorized, and wrongful entry and damage to Plaintiffs' land by depositing airborne and waterborne particles of radiation and other hazardous materials on the Plaintiffs' properties without their permission or invitation.

82.     Defendants were aware that trespass was occurring.

83.     This trespass has caused actual and substantial damage to the Plaintiffs' properties, and has interfered with the Plaintiffs exclusive possession of their properties. This trespass is continuing and ongoing.

84.     Defendants have indirectly interfered with Plaintiffs possessory rights due to migration of ethylene oxide emitting from its sterilizing facility. This interference was unreasonable and foreseeable.

85.     As a direct and proximate result of Defendants' trespass, Plaintiffs' properties sustained and will continue to sustain severe and permanent physical damages by ethylene oxide contamination.

26

FILED DATE: 10/12/2018 10:42 AM   2018L010183

86.  Plaintiffs bring this action for all monetary damages associated with its ethylene oxide contamination, including damages for reduction of value of their property. Finally, Plaintiffs request that Defendants be required to pay the costs associated with remediating all ethylene oxide contamination that is located on or threatens their property.

Wherefore, Russ Shenouda, Individually and On Behalf of All Those Similarly Situated, demand judgment against Defendants in an amount in excess of $50,000, as shall represent fair and just compensation.

## COUNT III
(Fraudulent Concealment – All Plaintiffs)

87.  Plaintiffs reallege and incorporate herein by reference all allegations into this claim as if fully set forth herein, and further allege as follows:

88.  Since 1984, Defendants had actual or constructive knowledge of the highly carcinogenetic nature of ethylene oxide and deliberately hid and/or suppressed information pertaining to the highly carcinogenetic nature of ethylene oxide from Willowbrook residents, workers, and visitors.

89.  As a direct and proximate result of Defendants' deliberate hiding and/or suppression of information pertaining to the highly carcinogenetic nature of ethylene oxide, Plaintiffs have suffered harm and damages.

Wherefore Plaintiffs demand judgment against Defendants in an amount in excess of $50,000, as shall represent fair and just compensation.

## COUNT IV
(Negligence – Julie Cannell)

90.  JULIE CANNELL realleges and incorporates herein by reference all allegations into this claim as if fully set forth herein, and further allege as follows:

91.     Defendants owed a duty to JULIE CANNELL to operate, maintain, control, and use its Willowbrook facility, including the emitting of ethylene oxide, in a manner that would not cause harm to JULIE CANNELL.

92.     Defendants breached that duty by emitting ethylene oxide in a dangerous and negligent way so as to cause the formation of cancer in JULIE CANNELL and/or place her at a higher risk of acquiring cancer related to ethylene oxide. Specifically, Defendants breached their duty in that they:

   a.  Failed to notify residents, workers, and visitors of the highly carcinogenetic nature of ethylene oxide; or

   b.  Failed to notify residents, workers, and visitors of the elevated airborne ethylene oxide concentrations; or

   c.  Failed to notify residents, workers, and visitors of the elevated cancer risk that ethylene oxide emissions pose; or

   d.  Failed to adopt or construct modern technology to aid in the prevention of ethylene oxide emissions in the surrounding area; or

   e.  Allowed excess levels of ethylene oxide to emit into the community; or

   f.  Failed to use/seek reasonable alternatives to ethylene oxide when they knew of the dangers associated with it; or

   g.  Failed to control emissions of ethylene oxide from their facility; or

   h.  Were otherwise negligent.

93.     As a direct and proximate result of Defendants' negligence, as set forth above, JULIE CANNELL has suffered severe and permanent health problems and has endured and will in the future endure pain and suffering; has suffered a loss of the enjoyment of a normal

FILED DATE: 10/12/2018 10:42 AM   2018L010183

life; has endured and will in the future endure emotional distress; has incurred and will in the future incur expenses for medical and rehabilitative care; has suffered a loss of earnings; and has been damaged in her capacity to earn a living.

Wherefore Plaintiff JULIE CANNELL demands judgment against Defendants in an amount in excess of $50,000, as shall represent fair and just compensation.

### COUNT V
(Strict Liability – Julie Cannell)

94.     JULIE CANNELL realleges and incorporates herein by reference all allegations into this claim as if fully set forth herein, and further allege as follows:

95.     Defendants engaged in ultra-hazardous or abnormally dangerous activities by continuously emitting ethylene oxide, a known human carcinogen.

96.     As a direct and proximate result of Defendants' ultra-hazardous or abnormally dangerous activities, JULIE CANNELL has suffered severe and permanent health problems and has endured and will in the future endure pain and suffering; has suffered a loss of the enjoyment of a normal life; has endured and will in the future endure emotional distress; has incurred and will in the future incur expenses for medical and rehabilitative care; has suffered a loss of earnings; and has been damaged in her capacity to earn a living.

Wherefore Plaintiff JULIE CANNELL demands judgment against Defendants in an amount in excess of $50,000, as shall represent fair and just compensation.

**JURY DEMAND**

All Plaintiffs demand trial by jury.

Respectfully Submitted,

By: s/ Brian LaCien
One of Their Attorneys

Todd A. Smith
Brian LaCien
POWER, ROGERS & SMITH, LLP
70 West Madison Street, 55th Floor
Chicago, IL 60602-4212
Phone: (312) 236-9381
Fax: (312) 236-0920

John Libra
KOREIN TILLERY, LLC
205 North Michigan Avenue
Suite 1950
Chicago, IL 60601
Office: 312-641-9750

FILED DATE: 10/12/2018 10:42 AM    2018L010183

30

FILED DATE: 10/12/2018 10:42 AM   2018L010183

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

JULIE CANNELL, Individually and On Behalf of All Those
Similarly Situated;
RUSS SHENOUDA, Individually and On Behalf of All
Those Similarly Situated.

                Plaintiffs,

     v.

STERIGENICS U.S., LLC; and
GTCR LLC.

              Defendants.

No: 2018 L 010183

## AFFIDAVIT REGARDING DAMAGES SOUGHT

Plaintiffs JULIE CANNELL, Individually and On Behalf of All Those Similarly Situated and

RUSS SHENOUDA, Individually and On Behalf of All Those Similarly Situated, by their attorney,

Brian LaCien, being first duly sworn under oath, states as follows:

1.    That the affiant is one of the attorneys of record for the Plaintiffs in this matter.

2.    That the total money damages sought in this civil action exceed the amount of

$50,000.00.

Further Affiant Sayeth Not.

                                           BRIAN LACIEN

SUBSCRIBED AND SWORN to before me
this ____ day of _____, 2018.

_____
NOTARY PUBLIC

DONNA L SYMANSKI
Official Seal
Notary Public - State of Illinois
My Commission Expires Jun 19, 2020

POWER ROGERS & SMITH, LLP
70 W. Madison Street, 55th Floor
Chicago, IL  60602-4212
312-236-9381
31444

FILED
10/12/2018 10:42 AM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018L010183

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | |
|---|---|
| JULIE CANNELL, Individually and On Behalf of All Those Similarly Situated; RUSS SHENOUDA, Individually and On Behalf of All Those Similarly Situated; <br><br> Plaintiffs, <br><br> v. <br><br> STERIGENICS INTRNATIONAL LLC; and GTCR LLC, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> No. 2018 L 010183 |

FILED DATE: 10/12/2018 10:42 AM   2018L010183

## NOTICE OF FILING

TO:  No Parties Have Appeared

I hereby certify that on October 12, 2018, at or before the hour of 5:00 PM, I electronically filed this Second Amended Complaint with the Clerk of the Circuit Court of Cook County by using the Odyssey eFile IL system.

s/ Brian LaCien

| | |
|---|---|
| Name: | POWER ROGERS & SMITH, LLP (Brian LaCien) |
| Atty for: | Plaintiff |
| Address: | 70 W. Madison Street, 55th Floor |
| City: | Chicago, Illinois 60601 |
| Telephone: | 236-9381 |
| Atty. No.: | 31444 |

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

JULIE CANNELL, Individually and On Behalf of All Those
Similarly Situated;
RUSS SHENOUDA, Individually and On Behalf of All
Those Similarly Situated.

          Plaintiffs,

    v.

STERIGENICS U.S. LLC; and
GTCR LLC.

          Defendants.

No: 2018 L 10183

### ROUTINE ORDER

    This matter Coming to be heard on Plaintiffs' Motion to Appoint Special Process Server, no parties having appeared and the Court being fully advised in the premises;

    IT IS HEREBY ORDRED:

    LaSalle Process Servers and any other employee of LaSalle Process Servers, License No. 117001432, be appointed special process server for the purpose of serving Second Amended Complaint upon Defendants, STERIGENICS U.S., LLC and GTCR, LLC.

ENTER:

_____
Judge

Judge Brendan A. O'Brien

OCT 12 2018

Circuit Court - 2175

Todd A. Smith
Brian LaCien
POWER ROGERS & SMITH, LLP
70 W. Madison Street, 55th Floor
Chicago, IL 60602-4212
312-236-9381
31444

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

JULIE CANNELL, Individually and On Behalf of All Those
Similarly Situated;
PAMELA MCGONIGAL, Individually and On Behalf of All
Those Similarly Situated.

        Plaintiffs,

    v.

STERIGENICS U.S. LLC; and
GTCR LLC.

        Defendants.

No: 2018 L 10183

## ROUTINE ORDER

    This matter Coming to be heard on Plaintiffs' Motion for Leave to File Their Second
Amended Complaint and Appoint Special Process Server, no parties having appeared and the
Court being fully advised in the premises;

    IT IS HEREBY ORDERED:

1. Plaintiffs are hereby granted leave to amend their complaint and file their Second
   Amended Complaint;

2. Voluntarily dismiss Pamela McGonigal without prejudice and without costs pursuant
   to ILCS 735 ILCS 5/2-1009;

3. Add Russ Shenouda as a plaintiff.

ENTER:

_____
Judge     Judge Brendan A. O'Brien
OCT 12 2018
Circuit Court - 2175

Todd A. Smith
Brian LaCien
POWER ROGERS & SMITH, LLP
70 W. Madison Street, 55th Floor
Chicago, IL 60602-4212
312-236-9381
31444